1                      UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF TEXAS

2                        SAN ANGELO DIVISION

3 UNITED STATES OF AMERICA      )
                             )

4 VS.                        )   CAUSE NO. 6:15-CR-030-C
                             )

5 RAFAEL ANTONIO MARIN-PINA    )

6

7       ------------------------------------------------

8           **TRANSCRIPT OF TRIAL - VOLUME 1 OF 2**
          **BEFORE THE HONORABLE SAM R. CUMMINGS,**

9     **SENIOR UNITED STATES DISTRICT JUDGE, AND A JURY.**

10            **MONDAY, FEBRUARY 1, 2016**
               **LUBBOCK, TEXAS**

11       ------------------------------------------------

12

13            **A P P E A R A N C E S**

14 **FOR THE GOVERNMENT:**
UNITED STATES ATTORNEY'S OFFICE

15 1205 TEXAS AVENUE, SUITE 700
LUBBOCK, TEXAS 79401

16 BY:  SEAN LONG
      JEFFREY R. HAAG

17

18 **FOR THE DEFENSE:**
FEDERAL PUBLIC DEFENDER'S OFFICE

19 1205 TEXAS AVENUE, SUITE 506
LUBBOCK, TEXAS 79401

20 BY:  DAVID SLOAN
      HELEN M. LIGGETT

21

22

23 FEDERAL OFFICIAL COURT REPORTER: MECHELLE DANIEL, 1205 TEXAS
AVENUE, LUBBOCK, TEXAS 79401, (806) 744-7667.

24

25 PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

1
                            **I N D E X**
                **FEBRUARY 1, 2016; VOLUME 1**

2

3   VOIR-DIRE EXAMINATION BY THE GOVERNMENT            19
    VOIR-DIRE EXAMINATION BY THE DEFENSE               37
4   OPENING STATEMENT BY THE GOVERNMENT                55
    OPENING STATEMENT BY THE DEFENSE                   60

5


6           **WITNESSES FOR THE GOVERNMENT:**
    **LONNIE FELPS**
7       DIRECT EXAMINATION BY MR. LONG                 65
        CROSS-EXAMINATION BY MR. SLOAN                 94
8       REDIRECT EXAMINATION BY MR. LONG               98
    **GARLAND TIMMS**
9       DIRECT EXAMINATION BY MR. HAAG                101

10


11          **WITNESSES FOR THE DEFENSE:**
    **BIBIANA CORTEZ-MARIN**
12      DIRECT EXAMINATION BY MR. SLOAN               110
        CROSS-EXAMINATION BY MR. LONG                 126
13      REDIRECT EXAMINATION BY MR. SLOAN             165
    **RAFAEL ANTONIO MARIN-PINA**
14      DIRECT EXAMINATION BY MR. SLOAN               169
        CROSS-EXAMINATION BY MR. LONG                 192
15      REDIRECT EXAMINATION BY MR. SLOAN             225
    **OSCAR BARRIENTOS**
16      DIRECT EXAMINATION BY MR. SLOAN               227
        CROSS-EXAMINATION BY MR. HAAG                 252
17      REDIRECT EXAMINATION BY MR. SLOAN             259

18

19

20

21                       **(CONTINUED)**

22

23

24

25

1                              INDEX (CONTINUED)

2

3   **GOVERNMENT EXHIBITS**
    <u>**NO.**</u>              <u>**DESCRIPTION**</u>                 <u>**OFFERED**</u>    <u>**ADMITTED**</u>
4   2               Voter identification card        71          71
    1               Form I-214                       75          75
5   3, 4, 6         Order of immigration judge,
                    Form I-205, birth certificate    82          82
6   5               Form I-213                       91          91

7

8   **DEFENSE EXHIBITS**
    <u>**NO.**</u>              <u>**DESCRIPTION**</u>                 <u>**OFFERED**</u>    <u>**ADMITTED**</u>
9   None

10

11

12                          *  *  *  *  *
13

14

15

16

17

18

19

20

21

22

23

24

25

26

```
 1                   P R O C E E D I N G S
 2              THE COURT:  Good morning.  Welcome to the United
 3    States District Court.
 4              The first item of business this morning will be to
 5    qualify those who have responded to a jury summons.  So if you
 6    are here in response to a jury summons, if you would please
 7    stand and raise your right hands, we need to give you an oath.
 8              (THE PANEL MEMBERS ARE SWORN)
 9              THE COURT:  Please be seated.
10              Listen carefully as I read the qualifications for
11    those to serve on a jury in the United States District Court.
12    Every person shall be deemed qualified to serve on a trial jury
13    in the United States District Court for the Northern District
14    of Texas if you are a citizen of the United States, at least
15    eighteen years old and have resided for a period of at least
16    one year within this judicial district; if you're able to read,
17    write, and understand the English language with a degree of
18    proficiency sufficient to fill out satisfactorily the jury
19    qualification form; if you're able to speak the English
20    language; if you're capable, both mentally and physically, to
21    render satisfactory jury service; and if you have neither a
22    charge pending against you for the commission of, nor have you
23    been convicted in a state or federal court of record of a crime
24    punishable by imprisonment for more than one year and your
25    civil rights have not been restored by pardon or amnesty.
```

1          Now, is there anyone on the jury panel who believes

2     you are not qualified to serve on a jury based on what I've

3     just read?  If so, please raise your hand.  Anyone?  I take it

4     each one of you believes you are qualified, and I so find.

5          Now, even though you are qualified, there are

6     certain members of the community who are exempt from jury

7     service, so listen carefully.  Members of the following groups

8     are exempt from jury service in the United States District

9     Court for the Northern District of Texas:

10          First, members in active service in the armed

11     forces of the United States;

12          Next, members of the fire or police departments of

13     any state, district, territory, possession, or subdivision

14     thereof;

15          And finally, any public officers in the executive,

16     legislative, or judicial branches of the government of the

17     United States, or any state, district, territory, possession,

18     or subdivision thereof, who are actively engaged in the

19     performance of official duties.

20          Now, is there anyone on the jury panel who believes

21     you are exempt from jury service based on what I've just read?

22     If so, please raise your hand.  Anyone?  I take it none of you

23     believes you are exempt, and I so find.

24          Now, even though you are qualified and are not

25     exempt, there are certain members of the community who may seek

1    to be excused from jury service if you fall within any of the

2    following categories.  It's within my discretion to grant that

3    excuse however.

4              First, persons who are licensed to and who are

5    actively practicing medicine in the State of Texas;

6              Next, persons having active care of a child or

7    children under ten years of age whose service on a jury would

8    require leaving the child or children without adequate

9    supervision;

10             Next, persons essential to the care of aged or

11   infirm persons;

12             Next, persons over seventy years of age;

13             Next, persons who are full-time students of a

14   public or private secondary school or an accredited college or

15   university;

16             Next, persons who are volunteer safety personnel,

17   that is, serving in an official capacity without compensation

18   as firefighters or members of a rescue squad or ambulance crew;

19             And finally, persons who have, within the past two

20   years, served on a federal grand jury or trial jury panel for

21   more than 30 days.

22             Now, is there anyone on the jury panel who would

23   seek to be excused based on what I've just read?  If so, please

24   raise your hand.  Anyone?  Yes, if you would stand and give us

25   your name.

1          UNIDENTIFIED PANEL MEMBER:  My name is Krisann

2     Schulz.  I'm a physician assistant, and I practice medicine.

3          THE COURT:  All right.  We'll make a note of that.

4     Thank you.

5          Anyone else?  Yes, if you would stand and give us

6     your name.

7          UNIDENTIFIED PANEL MEMBER:  Aracely Villarreal.  I

8     have a, you know, child under the age of--well, she is seven,

9     and then a 14-year-old.  I live in Denver City, an hour and a

10    half away.  I'd have to leave my kids either overnight or

11    somebody to pick them up to go--to take them to school.

12         THE COURT:  Where do you live?

13         THE PANEL MEMBER:  Denver City.

14         THE COURT:  Denver City?  All right.  We'll make a

15    note of that and get back to you.

16         Anyone else?  All right.

17         We're going to begin trial this morning in

18    Cause Number 6:15-030.  This case is styled

19    United States of America vs. Rafael Antonio Marin-Pina.  This

20    is a criminal case brought by the government against the

21    defendant.  In a case of this nature, the jury panel must keep

22    certain things in mind.

23         First of all, the government has the burden of

24    proof.  The government must prove their case beyond a

25    reasonable doubt.

1          Next, the defendant is presumed to be innocent.

2          And finally, the defendant is not required to

3    testify or present any evidence.

4          So keep those things in mind as we proceed

5    throughout the trial of this case.

6          The first stage of the proceedings is the voir-dire

7    examination.  The purpose of voir dire is to select that jury

8    which we believe is best situated to try this particular case.

9    I'll be asking you a few questions; then I'll give the

10   attorneys an opportunity to ask supplemental questions.  In

11   asking these questions, we're not trying to pry into your lives

12   unnecessarily.  We're simply trying to get enough information

13   to select the jury in this particular case, or for this

14   particular case.

15         Now, in this case, the United States is represented

16   by Attorney Sean Long.  Mr. Long, if you would introduce

17   yourself and your co-counsel and case agent.

18         MR. LONG:  Good morning.  My name is Sean Long with

19   the United States Attorney's Office.  This is my co-counsel,

20   Jeffrey Haag--

21         MR. HAAG:  Good morning.

22         MR. LONG:  --and this is our case agent, Lonnie

23   Felps.

24         THE COURT:  All right.  Anybody on the jury panel

25   who knows Mr. Long, his co-counsel or the case agent?  If so,

1    please raise your hand.  Anyone?  I take it none of you knows

2    these individuals.

3            The defendant in this case is represented by

4    Attorney David Sloan.  Mr. Sloan, if you would introduce

5    yourself, your co-counsel, and your client.

6            MR. SLOAN:  Good morning.  My name is David Sloan.

7    I work in the Federal Defender's Office.  This is my client,

8    Rafael Marin, and my co-counsel is Helen Liggett.

9            THE COURT:  All right.  Thank you very much.

10           Anybody on the jury panel who knows Mr. Sloan, his

11   co-counsel, or their client?  If so, please raise your hand.

12   Anyone?  I take it none of you knows these individuals.

13           This case is brought into court by what is called

14   an indictment.  An indictment is not evidence of guilt.  It's

15   not evidence of anything at all.  It's simply the means by

16   which the government bring their case into court.

17           In this case, we have a one-count indictment, and I

18   will read it as follows:

19           The government is alleging on or about

20   September 13, 2015, in the San Angelo Division of the Northern

21   District and elsewhere, Rafael Antonio Marin-Pina, defendant,

22   an alien, knowingly entered, attempted to enter, and was found

23   in the United States of America after having been denied

24   admission, excluded, deported and removed therefrom, at or near

25   the port of departure at San Ysidro, California, on or about

1    August 7, 2008, and not having received the express consent of

2    the Attorney General of the United States and the Secretary of

3    Homeland Security to apply for readmission to the United States

4    since the time of his previous denial of admission, exclusion,

5    deportation, and removal therefrom.

6              That's what the government is alleging in the case.

7    To this indictment, the defendant has entered a plea of not

8    guilty.  I've already told you that he is presumed to be

9    innocent, and the burden of proof is upon the government to

10   prove their case.

11             Based on what I've just read, is there anybody on

12   the jury panel who has personal knowledge of any facts that

13   might deal with this case in any way?  If so, please raise your

14   hand.  Anyone?  I take it none of you does.

15             Is there anyone on the jury panel who has read or

16   heard anything in the way of pretrial publicity or news

17   accounts in reference to this case?  If so, please raise your

18   hand.  Anyone?  I take it none of you has.

19             I'd ask the lawyers to pull your witness lists and

20   be prepared to read the names of your witnesses.  Mr. Long?

21             MR. LONG:  Yes, Your Honor.  Potential witnesses

22   are Lonnie Felps and Garland Timms with the Lubbock Police

23   Department.

24             THE COURT:  All right.  Anybody on the jury panel

25   who knows the witnesses that might be called by the government

1    in the case?  If so, please raise your hand.  Anyone?  I take

2    it no one knows these individuals.

3              Mr. Sloan?

4              MR. SLOAN:  Your Honor, potential witnesses in this

5    case include the defendant, Rafael Marin; his wife, Bibiana

6    Marin; and Oscar Barrientos, an investigator in our Del Rio

7    office.

8              THE COURT:  All right.  Anybody on the jury panel

9    who knows any of the additional witnesses that might be called

10   by the defense?  If so, please raise your hand.  Anyone?  I

11   take it none of you knows these individuals.

12             Is there anyone on the jury panel who has served as

13   a juror in another case, either in state or federal court?  You

14   have served as a member of a trial jury, either in state or

15   federal court.  If so, please raise your hand.  Anyone?

16             All right.  We've got a number of persons.  Just

17   lower your hands.  Let me ask you an additional question.

18   Those of you who have served on a jury, how many have served on

19   a criminal jury?  You dealt with a criminal matter, either in

20   state or federal court.  If so, please raise your hand.

21   Anyone?  All right.  Here on the first row, if you would stand

22   and give us your name, please.

23             UNIDENTIFIED PANEL MEMBER:  Nathan Edmunds.  I

24   served on a DWI case.

25             THE COURT:  All right.  Where was that?

1      THE PANEL MEMBER:  That was here in Lubbock.  I
2  don't know if it was a state or county issue.
3      THE COURT:  How long ago?
4      THE PANEL MEMBER:  Two years ago.
5      THE COURT:  All right.  The fact that you sat as a
6  juror in that case, would that have any bearing upon you being
7  a fair and impartial juror in this case?
8      THE PANEL MEMBER:  Shouldn't have any--anything to
9  do with it, no, sir.
10     THE COURT:  All right.  Thank you very much.
11  Someone else over here?  Anyone?  Yes, sir.
12     UNIDENTIFIED PANEL MEMBER:  William Scott.  I
13  served on a jury about, oh, five or six years ago in Yoakum
14  County, Texas, and it was a drug--drug arrest.
15     THE COURT:  All right, sir.  The fact that you
16  served as a juror in that case, would that have any bearing
17  upon you being a fair and impartial juror in this case?
18     THE PANEL MEMBER:  No.
19     THE COURT:  All right.  Thank you very much.
20     Anyone else over here?  Yes.
21     UNIDENTIFIED PANEL MEMBER:  My name is Chad Morse.
22  I served on a jury probably seven years ago regarding a
23  criminal case.
24     THE COURT:  Where was that?
25     THE PANEL MEMBER:  Here in Lubbock, Texas.

1          THE COURT:  Here in Lubbock?  The fact that you sat

2    on that jury, would that have any bearing upon you being a fair

3    and impartial juror in this case?

4          THE PANEL MEMBER:  No.

5          THE COURT:  Thank you very much.

6          Anyone else over here?  Yes, sir.

7          UNIDENTIFIED PANEL MEMBER:  My name is David

8    Hagood.  I served on a criminal jury in Lubbock County about

9    ten years ago.  It was drug-related.

10          THE COURT:  All right, sir.  The fact that you sat

11    on that jury, would that have any bearing upon you being a fair

12    and impartial juror in this case?

13          THE PANEL MEMBER:  No, sir.

14          THE COURT:  All right.  Thank you very much.

15          Yes, ma'am?

16          UNIDENTIFIED PANEL MEMBER:  Bronwyn Shaw.  I served

17    on a jury duty in Lubbock about five years ago, and it was also

18    drug-related.

19          THE COURT:  All right.  The fact that you sat as a

20    juror in that case, would that have any bearing upon you being

21    a fair and impartial juror in this case?

22          THE PANEL MEMBER:  No, I don't believe so.

23          THE COURT:  All right.  Thank you very much.

24          Yes?

25          UNIDENTIFIED PANEL MEMBER:  Yes, sir, Thomas

1    Gonzales.  I served on a jury here in Lubbock, federal jury.

2    It's been about ten year ago.  It was a civil.

3              THE COURT:  All right, sir.  The fact that you sat

4    on that jury, would that have any bearing upon you being a fair

5    and impartial juror in this case?

6              THE PANEL MEMBER:  No, sir.

7              THE COURT:  All right.  Thank you very much.

8              All right.  Anyone over here sat on a criminal jury

9    before?  Yes.  Your name?

10             UNIDENTIFIED PANEL MEMBER:  Guadalupe Ruiz.  I sat

11   on a jury to determine competency for an individual to stand

12   trial for the death of a child.

13             THE COURT:  All right, sir.  The fact that you sat

14   on that jury, would that have any bearing upon you being a fair

15   and impartial juror in this case?

16             THE PANEL MEMBER:  No, sir.

17             THE COURT:  All right.  Thank you very much.

18             Have we missed anyone?  All right.

19             Anyone on the jury panel who has ever served as a

20   member of a grand jury, as a member of a grand jury, either in

21   state or federal court?  If so, please raise your hand.

22   Anyone?  I take it none of you has.

23             Is there anyone on the jury panel or anyone in your

24   immediate family--by that, I mean your spouse, your parents, or

25   your children--who has ever been employed by or who is

1    presently employed by a law enforcement agency?  Anyone in your

2    family--your immediate family who has ever been employed by a

3    law enforcement agency?  All right.  Let's come over here.

4    Give us your name, please.

5                UNIDENTIFIED PANEL MEMBER:  Korey Anthony.  My

6    stepmother, Lisa Anthony, works for the detectives here in

7    town.

8                THE COURT:  All right.  Would that have any bearing

9    upon you being a fair and impartial juror in this case?

10               THE PANEL MEMBER:  No, sir.

11               THE COURT:  All right.  Thank you very much.

12               Anyone else?  Coming on down--  Let's see.  Yes,

13   sir.  Your name?

14               UNIDENTIFIED PANEL MEMBER:  Larry Bartholomew.  My

15   son worked for the Lubbock County Sheriff's Department.

16               THE COURT:  All right.

17               THE PANEL MEMBER:  And he's no longer employed with

18   them now.

19               THE COURT:  All right.  The fact that he was

20   employed in that capacity, would that have any bearing upon you

21   being a fair and impartial juror in this case?

22               THE PANEL MEMBER:  No, sir.

23               THE COURT:  Thank you very much.

24               Yes, sir, back in the back.

25               UNIDENTIFIED PANEL MEMBER:  Allen Weathers.  My

1    father, Carl Weathers, was a Texas Ranger, now retired.

2              THE COURT:  All right, sir.  The fact that he was

3    employed in that capacity, would that have any bearing upon you

4    being a fair and impartial juror in this case?

5              THE PANEL MEMBER:  No, sir.  No, sir.

6              THE COURT:  Thank you very much.

7              Yes, ma'am?

8              UNIDENTIFIED PANEL MEMBER:  Kathlene Basinger.  My

9    mom is a district court clerk in New Mexico.

10             THE COURT:  All right.  I guess, technically, that

11   wouldn't be a law enforcement agency, but the fact that she's

12   employed in that capacity, would that have any bearing upon you

13   being a fair and impartial juror?

14             THE PANEL MEMBER:  No, sir.

15             THE COURT:  All right.  Yes, sir?

16             UNIDENTIFIED PANEL MEMBER:  My son is a--he's a

17   police officer in Denver City, Texas.

18             THE COURT:  All right.  The fact that he's a police

19   officer, would that have any bearing upon you being a fair and

20   impartial juror in this case?

21             THE PANEL MEMBER:  No, sir.

22             THE COURT:  All right.  Now--  Yes?

23             UNIDENTIFIED PANEL MEMBER:  Stephanie Hadaway.  My

24   ex-husband was a sheriff deputy for St. Charles Parish in

25   Louisiana.

```
 1                    THE COURT:  In Louisiana?  Would that have any
 2       bearing upon you being a fair and impartial juror in this case?
 3                    THE PANEL MEMBER:  No, it won't.
 4                    THE COURT:  All right.  Anyone else over here,
 5       family member--immediate family member employed by law
 6       enforcement?  All right.  Coming over here.  Anyone?  Let's
 7       start right--  Yes, sir?
 8                    UNIDENTIFIED PANEL MEMBER:  Aaron Rodriguez.  I've
 9       got an older brother that's a police officer in Plainview.
10                    THE COURT:  All right.  The fact that he's employed
11       in that capacity, would that have any bearing upon you being a
12       fair and impartial juror in this case?
13                    THE PANEL MEMBER:  No, sir.
14                    THE COURT:  Thank you very much.
15                    Someone else?  Yes, ma'am.
16                    UNIDENTIFIED PANEL MEMBER:  Laura Quintana.  My
17       mother-in-law works for the U.S. government district attorney.
18                    THE COURT:  Now, I didn't--  Would you speak up
19       just a little?  What--
20                    THE PANEL MEMBER:  Laura Quintana.  My
21       mother-in-law works for the U.S. government district attorney.
22                    THE COURT:  Oh, okay.  And what is her name?
23                    THE PANEL MEMBER:  Zelma Medrano.
24                    THE COURT:  So she works here in this building?
25                    THE PANEL MEMBER:  Yes, sir.
```

```
 1                     THE COURT:  All right.  The fact that she's

 2     employed in that capacity, would that have any bearing upon you

 3     being a fair and impartial juror in this case?

 4                     THE PANEL MEMBER:  No.

 5                     THE COURT:  All right.  Someone else over here?

 6     Yes, sir.

 7                     UNIDENTIFIED PANEL MEMBER:  Officer Jeremy

 8     Thompson, Your Honor.  Myself and my step-brother are both

 9     employed by the Texas Department of Criminal Justice as

10     correctional officers.  He has now--he has now resigned.

11                     THE COURT:  What facility are we talking about?

12                     THE PANEL MEMBER:  I work for the (inaudible) Unit,

13     sir.  He worked for the Montfort Unit here in Lubbock.

14                     THE COURT:  Are you still employed in that

15     capacity?

16                     THE PANEL MEMBER:  I am, sir.

17                     THE COURT:  All right.  The fact that you're

18     employed in that capacity, would that have any bearing upon you

19     being a fair and impartial juror in this case?

20                     THE PANEL MEMBER:  No, Your Honor.

21                     THE COURT:  Thank you very much.

22                     THE PANEL MEMBER:  Yes, Your Honor.

23                     THE COURT:  Have we missed anyone?  All right.

24                     At this point, I'm going to give the attorneys an

25     opportunity to ask supplemental questions.  In asking these
```

1    questions, again, we're not trying to pry into your lives

2    unnecessarily; we're simply trying to get enough information to

3    select a jury for this case.

4              All right, Mr. Long.

5              MR. LONG:  May it please the Court.

6              THE COURT:  Yes, sir.

7              MR. LONG:  Good morning.

8              PANEL MEMBERS:  Good morning.

9              MR. LONG:  That's pretty good.  Not too bad for a

10   Monday morning.

11             As the Judge mentioned, this is voir dire, and it's

12   an opportunity for the Judge and the attorneys in the case to

13   ask you some questions.  These questions may seem personal to

14   you, but please don't take them personally.  We're trying to

15   figure out what your opinions are based on the subject matter

16   of this case to make sure you would be an appropriate juror for

17   the case.

18             So I won't get to call on every one of you, so what

19   that means is, if I ask a question and you have a strong

20   opinion, please don't be afraid to raise your hand and answer

21   that question to let us know what you're thinking.  That could

22   be important to myself or Mr. Sloan.

23             But first, I have a preliminary question.  It's tax

24   season.  Let's do an exercise here.  Who gets excited when they

25   get to file their taxes?  Okay.  So not very many of you.  I'm

1   with those of you who didn't raise your hand.  I don't get

2   excited to file taxes and I work for the government, so go

3   figure.

4          But I'm going to ask you a question, and it's

5   important that you think about this.  Other than things like

6   having to pay your taxes, sometimes you may have had

7   interactions with the federal government that maybe caused you

8   some concern.  And so what I mean by that is, have any of you

9   here ever been in a position where you had a claim from the

10  federal government placed against you?  Maybe it was by the

11  IRS, maybe it was another government agency.  We may have some

12  folks who work in farming and ranching, maybe work for federal

13  agencies that way.  Is there anyone here who has had a negative

14  experience with a federal agency either making a claim against

15  them, or you had to make a claim against a federal agency?  Is

16  there anybody here who falls in that category?

17         Okay.  I don't see any hands, but if that comes to

18  mind or something comes to mind, please raise your hand and let

19  me know.

20         And another sort of general question, is there

21  anyone here who, for religious or moral reasons, would not be

22  able to sit in judgment of another person?  In a criminal case,

23  if you're selected to be on this jury, ultimately the question

24  you're going to be asked is whether the government provided

25  enough evidence for you to find someone guilty of a crime,

1    which means you will be having to judge whether someone is

2    guilty of a crime.  Again, anyone who, for moral or religious

3    reasons, would not be able to do that?

4              Okay.  I don't see any hands.

5              The Judge already mentioned to you that this case

6    involves a charge, and what he read is called illegal re-entry

7    after deportation.  So what that means is, this case is going

8    to involve you hearing some about the immigration laws of the

9    United States.  Now, I watch the news.  I know that's a pretty

10   hot-button topic right now.  And so all of us, if you didn't

11   have an opinion about immigration before, you may have one now.

12   So what I want to point out to you first is a couple of things.

13             One, this is a criminal case.  This is an

14   allegation of somebody violating the immigration laws in such a

15   way that they could be held criminally responsible.  So what

16   that means is, if you're going to be selected as a juror in

17   this case, at no point are you going to be asked whether an

18   individual should be removed from the country or whether they

19   should be allowed to stay in the country.  That would not be

20   the subject of a criminal case; that would be the subject of an

21   immigration proceeding, which is a totally separate proceeding,

22   a totally separate proceeding.

23             So I want to make that clarification, because I do

24   want to ask about your opinions with regard to the immigration

25   law, and we'll get there in just a moment.  But I want to make

 1   it clear to you that at no point, if you're selected to be a

 2   juror in this case, are you going to have to make a decision

 3   that says this person does or does not need to be removed from

 4   the country.  Does anybody have any questions about that?

 5        Okay.  I'll give you some more information, and if

 6   you do have questions about that, please let me know.

 7        So it's illegal re-entry after deportation, and the

 8   Judge already read the charge to you.  The basic elements are

 9   that somebody was found in the United States and that they had

10   been previously found in the United States and ordered removed

11   by an immigration official or an immigration judge.  So someone

12   had been here in the country before illegally; they had gone

13   before an immigration judge or an immigration officer, and a

14   decision was made to remove them from the United States.

15        Now, why somebody is removed from the

16   United States, which is the subject of a lot of debate, that,

17   you may not likely hear about in this case.  Why somebody is

18   actually removed is not an element that the government has to

19   prove.  What the government has to prove is, someone was here

20   previously illegally; a decision was made that they needed to

21   be removed from the country; and then they were later found to

22   have re-entered the country.  It's illegal re-entry after

23   you've been deported.

24        Now, there's another element the Judge talked

25   about, which is that you didn't get permission to come back in.

```
1   So if you're removed from the country, there are steps and

2   procedures you can follow to get permission to apply to come

3   back in.  So that's what that element is about.  If someone is

4   found after coming back into the country after having been

5   removed, that's a crime.  Okay?

6           So I'm going to kind of skip around a little bit,

7   if you'll bear with me.  And, ma'am, I may say your last name

8   incorrectly.  Is it Dipaolo?

9           PANEL MEMBER:  Dipaolo.

10          MR. LONG:  Dipaolo.

11          THE PANEL MEMBER:  You were close.

12          MR. LONG:  And please correct me if I say your last

13  name incorrectly.  I probably will.

14          All right.  So, Ms. Dipaolo, do you think illegal

15  re-entry after deportation--why do you think that's a crime?

16          THE PANEL MEMBER:  Umm--

17          MR. LONG:  Judge, do they need to stand up when

18  they respond, or do--

19          THE COURT:  Yes.

20          THE PANEL MEMBER:  Yeah, she had told us to.

21          MR. LONG:  Yes, ma'am.

22          THE PANEL MEMBER:  Because they didn't go through

23  the proper channels to get back in the country.  They're

24  illegal.

25          MR. LONG:  Okay.  Ms. Alvarado, do you have any
```

1    thoughts about why illegal re-entry is a crime?  What do you

2    think?

3                   PANEL MEMBER:  I think so because, like she said,

4    it's--there's steps to follow to--

5                   THE COURT:  You need to speak up now so we can hear

6    you.

7                   THE PANEL MEMBER:  There are steps that should be

8    followed to be allowed back in, so I think it is.

9                   MR. LONG:  Okay.  And if you couldn't hear

10   Ms. Alvarado, she said--  And you can be seated, ma'am.

11                  She said there's steps that you can follow to come

12   back in.  So what do you think it does--  Let me see.

13   Mr. Anthony, what do you think it does to criminalize that

14   behavior if you don't follow the steps?  Why do you think we

15   criminalize that?  Why do we punish somebody for doing that?

16                  PANEL MEMBER:  Same reason why if I break--or walk

17   into somebody else's house uninvited, it's the same thing to

18   me.  I mean, you need to be asked to come back into this

19   country or, like she said, follow the proper channels and do it

20   correctly.

21                  MR. LONG:  Yeah.  Absolutely, absolutely.  Thank

22   you, sir.

23                  Is it Mr. Hill?

24                  PANEL MEMBER:  Yes, sir.

25                  MR. LONG:  Do you think that's a good law?  Bad

1    law?  Silly law?  What are your thoughts?

2         THE PANEL MEMBER:  I think it is a good law.  I

3    know that illegal immigration is strong right now, and I know

4    that, you know, people aren't paying taxes that are here

5    illegally while everybody else is--they're keeping all of their

6    money, as to where we have to pay back our taxes.

7         MR. LONG:  Sure.  And if I can expound--  You can

8    sit down, sir.

9         If I can expound on that, one of the things that

10   getting permission to come into the country do--to do which

11   would allow you to be documented might be potentially to pay

12   taxes.  I think that's, again, the subject of a lot of debate,

13   whether people should be let in the country if they're not

14   being documented, things like that.

15        Let me ask a more generalized question.  Is there

16   anyone here who thinks that we shouldn't have any type of

17   restriction on being allowed to come into the country from

18   another country?  So is there anybody here who thinks we

19   shouldn't have any type of immigration laws?  And again, I'm

20   not here to change your opinion if that's how you feel.  So if

21   you're watching the news and you see the different positions,

22   people, of course, have different positions on this.  I don't

23   want to try to change your position.  But I don't want to put

24   you in a position where you're a juror in this case being asked

25   to enforce immigration laws that maybe you don't agree with.

```
 1                    Is there anyone here who thinks that we should have

 2      open borders and absolutely no immigration restrictions?

 3                    I'll jump over here for just a moment.  I

 4      apologize, I'll get these a little bit out of order.  Is it

 5      Mr. Garcia?

 6                    PANEL MEMBER:  Rodriguez.

 7                    MR. LONG:  Mr. Rodriguez.  I apologize, I got the

 8      wrong row here.  Is it Aaron Rodriguez?

 9                    THE PANEL MEMBER:  Yes, sir.

10                    MR. LONG:  What do you think about the idea of

11      having just open borders, no immigration laws?

12                    THE PANEL MEMBER:  I don't like it only for the

13      fact that--you know, I don't mind the Hispanic race, you know.

14      I'm Latin American as well.  I do have family on that side of

15      the border.  You know, as long as they come in--follow the

16      proper steps to come in, you know, they're more than welcome.

17      But as far as that side of the family, I'm sorry, you know--and

18      it's not so much the Hispanic race; it's everybody else.  You

19      know, you got the refugees and stuff coming in and that--I--you

20      know, me, I'm going to take--I feel unsafe, you know, somebody

21      else, if that's gone.  That's--

22                    MR. LONG:  Yes, sir.  No, thank you.  That's--

23      that's plenty.

24                    Is there anyone here who feels--so let's ask the

25      opposite end of the spectrum, if anyone thinks there should be
```

1    open borders, no immigration laws.  Is there anyone here who

2    thinks that the current immigration laws are too strict?  Maybe

3    you're somebody that does have family in Mexico or Canada or

4    some other country and you hear stories about how difficult it

5    may be to get to the United States.  Is there anyone here who

6    thinks the current state of the immigration laws are too

7    strict?  And again, not trying to change your opinion; we'd

8    just like to know about that.  Anyone, show of hands, think the

9    current set of immigration laws are too strict?  Okay.

10           Back to my previous question about why illegal

11   re-entry is a crime.  Let me just ask--  I apologize, I put my

12   list down.  Come back over here a little bit.  Is it

13   Ms. Banister?

14           PANEL MEMBER:  Yes.

15           MR. LONG:  Who do you think is responsible for

16   prosecuting immigration crimes?  There's lots of prosecuting

17   authorities in the United States.  You've got cities, you've

18   got counties, you've got potentially states, and you've got the

19   federal government.  Of those choices, who do you think is

20   responsible for enforcing immigration crimes?

21           THE PANEL MEMBER:  I think they all should.

22           MR. LONG:  Okay.

23           THE PANEL MEMBER:  I think everybody is--  It's

24   something that we really need to think about in this country,

25   you know, the safety of Americans.  And that's basically my

1   opinion.  You know, I just think we've all got to get together

2   and handle this issue.

3              MR. LONG:  Yes, ma'am.  You think there should be

4   some cooperation between all those agencies?

5              THE PANEL MEMBER:  Yes.  Every government, yes.

6              MR. LONG:  Okay.  Thank you, ma'am.

7              Well, I'm going to let you guys in--it's not really

8   a secret; it's just a fact.  The immigration laws of the

9   United States are put in place by Congress.  Okay?  They are

10  the laws that are passed by your senators and legislators that

11  you elect.

12             Since they're federal laws, they have to be

13  enforced by federal agencies.  And so what I mean by that, if

14  it's a crime to re-enter the country illegally after you have

15  been removed, that has to be enforced by federal agencies,

16  because that's a federal law.  Is that confusing to anybody?

17  I'm trying to--I may be oversimplifying it, but what I mean is

18  this.  If someone is going to be tried for the crime of illegal

19  re-entry after deportation, it has to be done by a federal

20  agency.  Does anybody have questions about that?

21             The reason I mention that is this.  Who has ever

22  heard the phrase, "Don't make a federal case out of it."

23  Right?  Maybe in a conversation with a loved one or a child, a

24  co-worker, don't make a federal case out of it.  And what do we

25  normally mean by that?  Let me ask--is it Mr. Bronwyn--I'm

1    sorry, Ms. Bronwyn.  Excuse me.

2              PANEL MEMBER:  Ms. Shaw.

3              MR. LONG:  Ms. Shaw.  Man, I'm just getting that

4    all kinds of wrong.  Ms. Shaw, what do we normally mean when we

5    say, don't make a federal case out of it?

6              THE PANEL MEMBER:  Very extended conversations or

7    work or money.  Every bit of our energy used extensively to do

8    something simple.

9              MR. LONG:  Right.  If you're pouring a lot of

10   resources--maybe using a sledgehammer to kill a gnat, probably

11   would be the easiest way I'd explain it.

12             THE PANEL MEMBER:  Exactly, yes.

13             MR. LONG:  Okay.  Thank you, ma'am.

14             Anybody else disagree with, sort of, that idea?

15   Okay.  Well, would it surprise you that, in an illegal re-entry

16   case, if it has to be tried by the federal government, one,

17   it's going to be a federal case.  Just by definition, it's

18   going to be a federal case.

19             But would it surprise you if I told you it wouldn't

20   be uncommon to prove up that type of crime, that type of

21   violation with just a couple of witnesses and a handful of

22   documents?  I can tell you that immigration, the way it's

23   tracked is normally document-intensive, meaning that documents

24   are generated, things are documented.  That's why we call

25   people undocumented if they're in the United States.  There's a

1    lot of documents that follow someone around if they're being

2    handled in the immigration system.  So to figure out where

3    they've gone or where they have been sent, found, things of

4    that nature, lots of documents are involved.  That's how that

5    would be proven.

6         Is there anyone here who thinks--using that

7    definition of what we all kind of hear about being a federal

8    case, is there anyone here who thinks we have to make a federal

9    case--I'll use the quotes--out of an illegal re-entry charge?

10   Meaning, if the government is going to prove that, they're

11   going to have to call three dozen witnesses and give me a

12   thousand-plus documents?  Is there anyone here who feels that

13   way?

14        Some of you may be a little bit excited that I'm

15   telling you that this trial is not going to take three weeks.

16   In fact, you know, depending on how cases go, it may just take

17   a day or two.  Is there anyone here who would say, if I don't

18   get to sit here for three weeks and hear evidence, no way I'm

19   going to find somebody guilty of a crime?  Is there anyone here

20   who feels that way?  It's okay if you do.

21        Okay.  I don't see any hands.

22        The federal law enforcement agency that Mr. Felps,

23   who I have introduced to you--he works for--and I'm going to

24   read it and make sure I get it correctly--is Immigration

25   Enforcement and Removal Operations.  Is there anyone here who

1    has ever had a negative experience with an immigration officer

2    or an immigration official, either yourself or a loved one?

3    Anyone here who has ever had a negative experience in that

4    regard?  And again, okay if you have; just something we'd like

5    to know about.

6              Okay.  I don't see any hands.

7              The last subject I want to talk to you just briefly

8    about is this idea of justification or duress.  Sometimes in a

9    criminal case, the Court may allow a defendant to raise a

10   defense of justification or duress.  What that means is, a

11   defendant is allowed to say, "I may have committed that crime

12   that you're accusing me of, but if I did, Jury, if you're going

13   to find me guilty of committing this crime, the reason I did it

14   is because, essentially, I was forced to.  I was placed under

15   duress.  I didn't have any other options."  Okay?  And so I

16   want to ask--I'm going to put maybe one of you on the spot

17   here.  Mr. Patterson?

18             PANEL MEMBER:  Yes.

19             MR. LONG:  Can you think of a scenario--and it

20   doesn't have to be a federal crime; it can be shoplifting, bank

21   robbery, whatever.  Can you think of a scenario where somebody

22   might say, "I committed that crime, but I was forced to.  I was

23   placed under duress."  Can you think of an example?

24             THE PANEL MEMBER:  Maybe had to do it for their

25   family, I guess, I don't know, something like that.

1          MR. LONG:  Okay.  What do you mean by that, they

2     had to do it for their family?

3          THE PANEL MEMBER:  Had to do something for their

4     family, maybe to feed them or get them out of danger, something

5     like that.

6          MR. LONG:  Okay.  Get them out of danger.  Do you

7     think there should be circumstances where somebody has

8     committed a crime and they should be allowed to essentially go

9     free or not be held accountable because they were forced to do

10    it?  Do you think that those circumstances exist?

11         THE PANEL MEMBER:  They could.

12         MR. LONG:  They could?

13         THE PANEL MEMBER:  Yeah.

14         MR. LONG:  Okay.  And I kind of put you on the spot

15    there.  Thank you, sir.

16         I like to use the example of a bank robbery.  Okay?

17    A bank robbery where somebody comes to you or your loved one

18    and puts a gun to your head and says, "You got to go rob this

19    bank.  You got to go rob this bank right now or I'm going to

20    kill you."  So there's a situation where somebody is being

21    forced to break the law.  Okay?  What sorts of things--is it

22    Ms. Blackwell?  Ms. Blackwell?

23         PANEL MEMBER:  Yes, sir.

24         MR. LONG:  What sorts of things would you want to

25    know about whether somebody who robs a bank under duress or

1    justification--what sorts of things would you want to know

2    about that threat or what was going on as to whether they

3    should be able to get away with a bank robbery because they

4    were under duress?  What sort of things would you want to know?

5              THE PANEL MEMBER:  I mean, I think they would have

6    to have a gun to their head in order to have an excuse.  We all

7    have a brain and a mind, and if you made the decision yourself,

8    then--I mean, if it was not life-threatening, I think it's your

9    fault.

10             MR. LONG:  Sure.  And let me follow up with this

11   question.  Do you think someone should be allowed to rob a

12   bank, run away, essentially get away with it, and then after

13   detectives finally catch up with them through whatever evidence

14   they find, the guy goes--or girl--says, "I know I robbed a

15   bank, but I only did it because somebody forced me to."

16             THE PANEL MEMBER:  No.

17             MR. LONG:  Do you think that would be common if

18   people could just say that and get away with it?

19             THE PANEL MEMBER:  No, they shouldn't be able to.

20             MR. LONG:  Okay.  You can have a seat.  Thank you,

21   ma'am.

22             And I won't belabor it too much.  You're all

23   correct, and you're correct especially, when you mention that

24   they should have to show something.  It should be an immediate

25   threat.

1          If the Court allows such defense to be put in front

2     of the jury, then there are four things--the government

3     normally has to prove the case, but there are four things a

4     defendant has to prove in order for a duress claim to be

5     substantiated, in order for a jury to consider that.  Okay?  So

6     you can't just get caught and say, "Oh, you know, I'm sorry I

7     got caught, but somebody else made me do it."  Right?  If that

8     was a get-out-of-jail-free card, we'd probably hear it quite a

9     bit, would be my guess.

10         But there are four things that a defendant would

11    have to prove to claim duress.  The first is, the defendant was

12    under an unlawful present, imminent, and impending threat of

13    such a nature as to induce a well-grounded fear of death or

14    serious bodily injury to himself or a family member.

15         Now, that's a mouthful, but I anticipate, if you

16    are instructed on that, that will be what the element would

17    sound like.  So that first element is immediate serious threat.

18    Okay?  And that's what you were just talking about.  There has

19    to be an immediate serious threat.

20         So in that bank robbery example, if someone calls

21    me on the phone and says, "If you don't go rob this bank, I'm

22    going to shoot you."  Let me ask you, Ms. Harrison.  Where is

23    Ms. Harrison at?  I'm sorry.  Ms. Harrison, would that be an

24    immediate threat, a present, impending threat if someone just

25    calls you on the phone to say, go rob a bank?

```
 1                PANEL MEMBER:  No.

 2                MR. LONG:  No?  Why not?

 3                THE PANEL MEMBER:  Because you don't have a threat.

 4                MR. LONG:  Yeah, there's no one there telling you

 5      to do it.

 6                THE PANEL MEMBER:  It's just words.

 7                MR. LONG:  Just words.  Could be a stranger, who

 8      knows.  Right?

 9                THE PANEL MEMBER:  Uh-huh.

10                MR. LONG:  All right.  Thank you, ma'am.

11                The second element quickly is that the defendant

12      had not recklessly or negligently placed himself in a situation

13      in which it was probable that he would be forced to choose the

14      criminal conduct.  Okay?  So you can't put yourself in the

15      situation where that's likely going to happen.

16                So I would use the bank robbery example.  Let's say

17      me and my friends go rob a bunch of banks and I decide I don't

18      want to rob the next bank.  And then my friend says, "Well,

19      you'd better rob the bank, you're the driver," and he holds a

20      gun to me.  In that circumstance, I have put myself in that

21      situation by, well, one, associating myself with bank robbers.

22      So you can't--you can't create the duress, is basically what

23      that says.  Does that make sense to everybody?  All right.  So

24      it has to be an immediate, present, serious threat.  You can't

25      have put yourself in that situation.  Okay?
```

```
 1              Third, the defendant had no reasonable legal

 2     alternative to violating the law.  That is, he had no

 3     reasonable opportunity to avoid the threatened harm.  All

 4     right.  So let me ask--I'm trying to jump around as best I can,

 5     give everyone an opportunity.  I know you all want to be called

 6     on.  Ms. Cox here on the third row?  Ms. Cox?  Yes, ma'am.

 7     Would it make a difference if somebody held a gun to my head

 8     and said, "You'd better go rob the bank," but as I'm walking to

 9     the bank, I have to pass, let's say, three or four police

10     stations before I get to the bank.  Would that make a

11     difference?

12              PANEL MEMBER:  Yes.

13              MR. LONG:  Why?

14              THE PANEL MEMBER:  Because I could stop there and

15     maybe stop it.

16              MR. LONG:  Yeah, absolutely.  You would, in that

17     circumstance, have a reasonable alternative, because you can go

18     to the police station and avoid the harm.  Would that be a fair

19     statement?

20              THE PANEL MEMBER:  Yes.

21              MR. LONG:  Now, we can tweak those facts a little

22     bit in different ways, but if I'm the one being threatened and

23     I have an opportunity to avoid the threat without breaking the

24     law, that would be what this third element calls an available

25     reasonable legal alternative to violating the law.
```

1          THE PANEL MEMBER:  Yes, sir.

2          MR. LONG:  Thank you, ma'am.

3          So again, impending threat, serious threat; can't

4     have put yourself in harm's way; and you can't have had any

5     other legal alternatives.  Because if you have another legal

6     alternative, then you don't have to break the law.  Okay?

7          And then the last one is that a reasonable person

8     would believe that, by committing the criminal action, they

9     would directly avoid the harm.  It kind of goes with the last

10    one.  You have to--a reasonable person has to believe that the

11    only way for me to avoid this harm is to break the law.

12         Does anyone have questions about duress?

13         Does anyone have any questions about immigration

14    law or any of the immigration topics that we have discussed so

15    far?

16         Any general questions of me?

17         Okay.  I appreciate your time.  Thank you.

18         THE COURT:  All right, Mr. Sloan.

19         MR. SLOAN:  Thank you, Your Honor.

20         I'd like to follow up on some of the questions

21    Mr. Long was just asking.  First of all, I do want to let you

22    know, in this case, we will most definitely be talking about

23    the legal principle of duress justification.  And it's the idea

24    that you commit a crime because you're forced to commit a

25    crime, because you don't have another legal alternative.

1          And I agree with Mr. Long's definition.  Duress is

2     a little different, though, than the elements of a crime.  The

3     elements of a crime, those are the things the government has to

4     prove.  And when they prove it, they have to prove it by a

5     burden of proof called beyond a reasonable doubt, and beyond a

6     reasonable doubt is the highest burden of proof in the law.

7     And the reason for that is, you know, when they set up the

8     legal system in this country, the people who set that up wanted

9     to make sure that everybody charged with a crime had the utmost

10    protection against the government in a criminal case.

11         On the other hand, a defensive issue like duress,

12    the burden of proof is not beyond a reasonable doubt.  There's

13    four elements to duress, and Mr. Long sort of spelled them out,

14    and I'll go into those in a little more detail.  But first of

15    all, to start with, those elements are things that the

16    defendant need only prove by what's called a preponderance of

17    the evidence, more likely than not that those elements are met.

18    Okay?

19         So let me ask you, Ms. Alvarado--and if you can

20    speak up.  I know you've got kind of a quiet voice.  Just yell

21    at me like I'm a 3-year old if you don't mind.  No, you

22    shouldn't yell at a 3-year old.

23         If the Judge instructs you that if the elements of

24    duress are met and they are more than likely true in this case,

25    and the Judge instructs you to find that if they are met, that

1    you need to find the defendant not guilty, could you do that,

2    even knowing that he crossed the border illegally?

3                    PANEL MEMBER:  I believe so.

4                    MR. SLOAN:  Okay.  Do you understand that the

5    defense of duress is just as much a part of the law as the law

6    that says you can't cross the border illegally?

7                    THE PANEL MEMBER:  Yes.

8                    MR. SLOAN:  Does everybody agree with that--  You

9    can have a seat.  Thank you.

10                   Does everybody agree with that?  Does anybody think

11   that shouldn't be the law?

12                   Does anyone think that--you know, because duress

13   sounds like you're making an excuse.  Right?  Does anybody feel

14   like, well, you shouldn't be able to make an excuse for

15   anything.  Does anybody feel like that?  All right.

16                   Let's see.  Where's Mr. Hill?  Mr. Hill, you talked

17   a little bit about immigration law.  Have you ever lived in

18   another country?

19                   PANEL MEMBER:  No, sir.

20                   MR. SLOAN:  All right.  Can you imagine that there

21   are places in the world where the rule of law is not respected?

22                   THE PANEL MEMBER:  I can.

23                   MR. SLOAN:  Okay.  Can you imagine there's places

24   in the world where maybe going to local police isn't really an

25   option?

```
 1                  THE PANEL MEMBER:  I can.

 2                  MR. SLOAN:  Okay.  Is anybody keeping up--  Thank

 3      you very much.

 4                  Is anybody keeping up with, like, what's going on

 5      in the Middle East, places that are grabbed by outfits like

 6      ISIS and stuff like that?  Let's see.  Ms. Pyle?

 7                  PANEL MEMBER:  Yes.

 8                  MR. SLOAN:  Could you please stand up?  Ms. Pyle,

 9      if you lived in a place in the world that was controlled by an

10      outfit like ISIS, do you think that going to ISIS for

11      protection would be a good idea?

12                  THE PANEL MEMBER:  No.

13                  MR. SLOAN:  Okay.  Do you think your safety might

14      be a little different than it is here in the United States?

15                  THE PANEL MEMBER:  If I went to ISIS, no, I

16      wouldn't have no protection.

17                  MR. SLOAN:  What I mean is, if you lived in a place

18      where ISIS was in charge--

19                  THE PANEL MEMBER:  Uh-huh.

20                  MR. SLOAN:  --do you think that your safety might

21      be a little different than it is here in the U.S.?

22                  THE PANEL MEMBER:  Yes.

23                  MR. SLOAN:  Okay.  Thank you.

24                  Justification is a principle in the law that goes

25      back from the very beginning.  It's not some newfangled deal.
```

1    It's not some sort of a trick.  Let's see.  Is it Mr. Diggs?

2                PANEL MEMBER:  Yes, sir.

3                MR. SLOAN:  What do you feel about making an excuse

4    if you had to do something because your life is in peril?  Do

5    you think you ought to be able to, you know, come in front of

6    your friends and a jury of your peers and say, you know what,

7    this is what happened, my life was in peril.  Do you think you

8    ought to be able to do that?

9                THE PANEL MEMBER:  Sure.

10               MR. SLOAN:  Do you think that you ought to ask them

11   to listen?

12               THE PANEL MEMBER:  Sure.

13               MR. SLOAN:  Do you think that's fair?

14               THE PANEL MEMBER:  Yes, sir.

15               MR. SLOAN:  Let me give you an example.  Let's say

16   you're crossing a bridge and you're going 75 miles an hour.

17   And up ahead of you, you know, some trucker veers into the

18   guardrail and he jackknives, and he just instantly stopped and

19   he's on fire.  You know it's illegal to go into the other lane

20   of traffic.  Right?

21               THE PANEL MEMBER:  Yes, sir.

22               MR. SLOAN:  You think it would be all right for you

23   to do that to keep from running into his back end and catching

24   on fire yourself?

25               THE PANEL MEMBER:  Yes, sir.

1          MR. SLOAN:  Okay.  Do you think that you should

2    have an excuse in the law for that?

3          THE PANEL MEMBER:  Yes, sir.

4          MR. SLOAN:  All right.  Thank you.

5          Now, the four elements of duress, which I'm hoping

6    that the Judge will instruct you, are that the defendant was

7    under an unlawful present, imminent, and impending threat of

8    such a nature as to induce a well-grounded fear of death or

9    serious bodily injury to himself or to a family member.

10          Let me ask the panel generally, does everybody

11   agree that being under an impending threat of death, either

12   yourself or a family member, should sort of change the way you

13   look at your conduct?  Does anybody think that that's not fair,

14   that, you know, it doesn't matter; you should obey the law no

15   matter what?  Okay.

16          The second element of duress is that you hadn't

17   placed yourself recklessly or negligently in a situation in

18   which it was probable that you would be forced to choose the

19   criminal conduct.  All right.  And so what they're talking

20   about is that you may have placed yourself in a situation--you

21   know, you happened to be there where duress could happen to

22   you, but it wasn't something you did recklessly or negligently.

23          Let me see if I can sort of figure that out, and

24   I'm going to--I'm going to go back to you, Mr. Diggs.  Driving

25   down that highway, you're driving the speed limit.  You placed

1    yourself in that car, didn't you?

2             THE PANEL MEMBER:  Yes, sir.

3             MR. SLOAN:  All right.  You placed yourself on that

4    highway, didn't you?

5             THE PANEL MEMBER:  Yes, sir.

6             MR. SLOAN:  All right.  And you were driving to a

7    place; you decided to go there.  Right?

8             THE PANEL MEMBER:  Yes, sir.

9             MR. SLOAN:  Okay.  Do you think you should still

10   have an excuse for avoiding that wreck, even though you placed

11   yourself there?

12            THE PANEL MEMBER:  Yes, sir.

13            MR. SLOAN:  Okay.  Because it wasn't anything

14   reckless or negligent about you being there.  You were there,

15   just there.  Right?

16            THE PANEL MEMBER:  Yes, sir.

17            MR. SLOAN:  Okay.  Does that make sense to

18   everybody?  Okay.  All right.  Thank you, Mr. Diggs, and I'm

19   going to quit picking on you if that's all right.

20            The third element is that the defendant had no

21   reasonable legal alternative to violating the law, that is, he

22   had no reasonable opportunity to avoid the threatened harm.

23   And, let's see, it's Stacie Poe?  Stacie--or, I'm sorry,

24   Ms. Poe, the question about having no reasonable legal

25   alternative, okay, let's suppose you're in that situation that

1    Mr. Long talked about where the bank robber is pointing a gun

2    to your head and saying you've got to go rob that bank.  Right?

3    He's in the back of your car, and you're on your way to the

4    bank and you decide, I'm not going to rob that bank.  And all

5    the other legal--there's no police stations on the way.

6    There's not a telephone threat.  I mean, it's a real threat

7    pointed at your head, and you say, I'm not going to rob that

8    bank; instead, I'm going to run my car into this group of

9    preschoolers over here, because then I know the cops will come

10   and they'll get me out of this situation.

11            Do you understand that's not a legal alternative?

12            PANEL MEMBER:  (Nods head up and down.)

13            MR. SLOAN:  Okay.  So you could be threatened to do

14   something, and choosing to do it is responding to that threat.

15   Does that make sense?

16            THE PANEL MEMBER:  Yes.

17            MR. SLOAN:  Okay.  Thank you.

18            And the last element is that a reasonable person

19   would believe that, by committing the criminal action, he would

20   directly avoid the threatened harm.  Let's see.  Ms. Gray?

21            PANEL MEMBER:  Yes.

22            MR. SLOAN:  Let's suppose it's you in the car and

23   not Mr. Diggs this time.  And you look over into that oncoming

24   lane of traffic where it's illegal for you to go, and it's

25   clear for miles.  Would it make sense that going into that

1    traffic is a reasonable alternative that's going to avoid the

2    wreck?

3                    THE PANEL MEMBER:  Yes.

4                    MR. SLOAN:  Okay.  Would it make more sense to go

5    into that lane of traffic than, say, plowing into the

6    guardrail?

7                    THE PANEL MEMBER:  Yes.

8                    MR. SLOAN:  Or driving off into the bar ditch or

9    going out in the median?  Would it make more sense just to go

10   into that oncoming lane of traffic--

11                   THE PANEL MEMBER:  Any way that you could be clear

12   of adding to the accident, I would say, would be permissible.

13                   MR. SLOAN:  Okay.  All right.  Thank you.

14                   Folks, it's my job to make sure that my

15   client, Rafael Marin, gets a fair trial, and I need to ask some

16   questions, and I want you to understand, I can't read minds.

17   I've only met you this morning.  And even if I had known you

18   for a while, I probably still couldn't read your minds.

19                   My client is a Mexican citizen, but he was raised

20   in the United States.  The fact that my client does not--is not

21   a U.S. citizen, is there anyone who feels like he shouldn't be

22   entitled to the same kind of fair trial that a U.S. citizen

23   would be entitled to?  Does anybody feel that way?  Okay.  I

24   take it by no hands that nobody feels that way.

25                   Now, my client is Hispanic, and there's something I

1    have to deal with, which is racism.  It still exists.  And I

2    don't have a judgment about that.  But what I will say is this:

3    If--Mr. Diggs, if you're--I told you I wouldn't pick on you

4    again.  I'm not going to call on you.  I'm going to call on,

5    let's see, Gloria Pyle.

6                    PANEL MEMBER:  Yes.

7                    MR. SLOAN:  I'm going to call on you again.  If you

8    are selected on the jury and you're in the room with those

9    other folks, would you do your best to try to keep racism out

10   of the deliberations?

11                   THE PANEL MEMBER:  Yes.

12                   MR. SLOAN:  Okay.  Would everybody agree to that?

13   Is there anybody who wouldn't agree to that, that racism

14   shouldn't have any place in your deliberations?  Thank you.

15                   THE PANEL MEMBER:  Uh-huh.

16                   MR. SLOAN:  Anybody here served in the military,

17   U.S. military?  All right.  I'll pick someone besides you.

18   Let's see.  Is it Stephanie Hadaway?

19                   PANEL MEMBER:  Yes.

20                   MR. SLOAN:  You served in the U.S. military?

21                   THE PANEL MEMBER:  Yes, sir.

22                   MR. SLOAN:  What branch?

23                   THE PANEL MEMBER:  Army.

24                   MR. SLOAN:  Okay.  You were in the Army?  All

25   right.  My client served in the United States Marine Corps.  Do

1    you have bad feelings about the Marines because you're in the

2    Army?

3              THE PANEL MEMBER:  No, sir.

4              MR. SLOAN:  Okay.

5              THE PANEL MEMBER:  I'm sorry, I'm laughing because

6    all my family is all branch of the military.

7              MR. SLOAN:  Okay.  So you have family that are in

8    the Marines?

9              THE PANEL MEMBER:  Yes, sir.

10              MR. SLOAN:  Okay.  So you could be fair towards the

11    Marines?

12              THE PANEL MEMBER:  Yes, sir.

13              MR. SLOAN:  Is there anybody here who couldn't,

14    because they're either in another branch of service or just

15    don't like military personnel?  Anybody that has a problem with

16    that?  Okay.  Thank you.

17              Is it William Scott?

18              PANEL MEMBER:  Yes.

19              MR. SLOAN:  William, I'm going to be bringing in an

20    investigator who works down in Del Rio to talk about the

21    situation in Mexico and the way things are in Mexico.  Do you

22    have any personal knowledge about anything that's going on down

23    there?

24              THE PANEL MEMBER:  No.

25              MR. SLOAN:  All right.  Would you be open to hear

```
 1    about the situation down there if it was part of this case?

 2              THE PANEL MEMBER:  Absolutely.

 3              MR. SLOAN:  All right.  Thank you.

 4              Is there anybody on the panel who has personal

 5    knowledge of either the political or the violence or anything

 6    like that in the Country of Mexico?

 7              UNIDENTIFIED PANEL MEMBER:  I've got--I know a

 8    little bit.

 9              MR. SLOAN:  All right.   And--

10              THE PANEL MEMBER:  Would you like me to stand?

11              MR. SLOAN:  Yes.  Is it Mr. Ruiz?

12              THE PANEL MEMBER:  Rodriguez.

13              MR. SLOAN:  Oh, Mr. Rodriguez.  Okay.  All right.

14    You're the next one--next one in line with Mr.--  You say you

15    have personal knowledge?  Have you been to Mexico recently?

16              THE PANEL MEMBER:  Yes.

17              MR. SLOAN:  Okay.  And you have personal knowledge

18    of what?  The political situation or--

19              THE PANEL MEMBER:  Just the violence.

20              MR. SLOAN:  The violence?  Okay.  Would you say

21    there's a lot of violence down there?

22              THE PANEL MEMBER:  Depends on what part of Mexico

23    you go to.

24              MR. SLOAN:  Okay.  Are there places in Mexico that

25    are violent?
```

```
 1                THE PANEL MEMBER:  Yes.

 2                MR. SLOAN:  What about, like, the border?  Do you

 3     know about that?

 4                THE PANEL MEMBER:  The border?

 5                MR. SLOAN:  The border, the Texas/Mexican border.

 6                THE PANEL MEMBER:  Yeah, the violence there is

 7     really kind of--is kept down.

 8                MR. SLOAN:  Okay.  All right.  Thank you.

 9                Is there anyone else?  All right.  And you're--

10                UNIDENTIFIED PANEL MEMBER:  I'm Mr. Ruiz.

11                MR. SLOAN:  Okay.  You're Mr. Ruiz, the next

12     gentleman.

13                THE PANEL MEMBER:  I had--my uncles live in

14     Coahuila, which is across the border from Eagle Pass, and we

15     stay in constant contact with them.  And their statements are

16     that the law is crooked, the politicians are crooked, and the

17     drug cartel kind of rules the roost, and they kind of do--

18                MR. SLOAN:  Well, is it--the drug cartels rule the

19     roost is what your uncles are telling you?

20                THE PANEL MEMBER:  Yeah.

21                MR. SLOAN:  If you're selected on the jury, would

22     you agree that your personal--I mean, when you're in a jury

23     trial, the evidence you hear from the witnesses, that's what

24     you're supposed to base your verdict on.

25                THE PANEL MEMBER:  Right.
```

```
 1              MR. SLOAN:  All right.  And would you agree that
 2     your personal stories or your personal history--if you're
 3     selected on the jury panel, that what you know is not really
 4     evidence for you to bring in.  Is that--
 5              THE PANEL MEMBER:  That's right.
 6              MR. SLOAN:  Okay.  And I would ask, if anyone with
 7     personal knowledge of the situation in Mexico--is--can
 8     everybody agree to that--  Thank you.  Can everybody agree to
 9     that, that they would listen and decide their verdict on the
10     evidence that they hear?
11              All right.  Thank you.  I appreciate your time this
12     morning.
13              THE COURT:  All right, Counsel.  Approach the bench
14     and bring your lists.
15     ----------------------------------------
16     (AT THE BENCH)
17              THE COURT:  Okay.  So we're operating with the same
18     list, Number 23 is absent.
19              I propose to excuse Number 9.  Any objection?
20              MR. LONG:  No objection.
21              MR. SLOAN:  No objection.
22              THE COURT:  All right.  She's excused.
23              Okay.  Any challenges for cause?
24              MR. LONG:  Not from the government, Your Honor.
25              MR. SLOAN:  None from the defense.
```

1              THE COURT:  All right.  That will put us down

2     through Number 30.  The government will get six preemptories;

3     defense gets ten.  I'll give you 15 minutes.

4              MR. SLOAN:  Thank you.

5     ----------------------------------------

6         (IN OPEN COURT)

7              THE COURT:  Members of the jury, we're going to

8     take a 15-minute recess.  During that period of time, you may

9     leave the courtroom, if you wish, but don't talk about this

10    case among yourselves or with anyone else.  At five minutes

11    after 10:00, please be back in the courtroom and be seated

12    where you're presently situated.

13              Court will stand in recess.

14        (RECESS TAKEN)

15              THE COURT:  All right.  Listen carefully.  If your

16    name is called, please come forward and have a seat in the jury

17    box.

18              COURTROOM DEPUTY:  Donald Wade Johnson, Peggy Lynn

19    Jones, Sherika Cantrice Washington, Monica Marie Alvarado,

20    Gloria Pyle, Jean Rollins Gray, Glenda Sue Cox, Amy Don Bell,

21    Kerry Todd Siders, Billy Joe Mojica, Stacie Valdez Poe, Norman

22    Keith Patterson.

23        (THE JURORS ARE SEATED IN THE JURY BOX)

24              THE COURT:  All right.  If your name was not

25    called, then obviously you were not selected to serve on this

1    particular jury, but it was very important that each one of you

2    be here this morning for voir-dire examination.

3         If you're not serving on this jury, the rest of you

4    are now excused.  Thank you very much.

5    (THE PANEL MEMBERS EXIT THE COURTROOM)

6         THE COURT:  All right.  Be seated, please.

7         All right.  Those of you who have been selected on

8    this jury, if you would please stand and raise your right

9    hands, we need to give you an additional oath.

10   (THE JURORS ARE SWORN)

11        THE COURT:  Please be seated.

12        Members of the jury, now that you have been sworn,

13   I want to give you some preliminary instructions to guide you

14   in your participation in this trial.

15        It will be your duty to find from the evidence what

16   the facts are.  You and you alone are the judges of the facts.

17   You will then have to apply to the facts the law that I will

18   give to you at a later point in the case.  You must follow that

19   law whether you agree with it or not.

20        Now, nothing that I may say or do during the course

21   of this trial is intended to indicate to you what your verdict

22   should be.  The evidence from which you will find the facts

23   will consist of the testimony of witnesses, documents and other

24   things received into the record as exhibits, and any facts that

25   the lawyers agree or stipulate to or that the Court may

 1   instruct you to find.

 2           Now, certain things are not evidence and must not

 3   be considered by you.  These include the following:

 4           Number one, statements, arguments, and questions by

 5   lawyers are not evidence.

 6           Number two, objections to questions are not

 7   evidence.  Lawyers have an obligation to their clients to make

 8   an objection when they believe the evidence being offered is

 9   improper under the rules of evidence.  You should not be

10   influenced by the objection or by the Court's ruling on it.  If

11   the objection is sustained, ignore the question.  If it is

12   overruled, then treat the answer like any other.  If you are

13   instructed that some item of evidence is received for a limited

14   purpose only, you must follow that instruction.

15           Next, testimony that the Court has excluded or told

16   you to disregard is not evidence and must not be considered.

17           Next, anything you may have seen or heard outside

18   the courtroom is not evidence and must be disregarded.  You are

19   here to decide this case solely on the evidence presented here

20   in this courtroom.

21           Now, there are two kinds of evidence: direct and

22   circumstantial.  Direct evidence is direct proof of a fact,

23   such as testimony of an eyewitness.  Circumstantial evidence is

24   proof of facts from which you may infer or conclude that other

25   facts exist.  I will give you further instructions on these, as

1    well as other matters, at the end of the case, but have in mind

2    that you may consider both kinds of evidence.

3           Now, it will be up to you to decide which witnesses

4    to believe, which witnesses not to believe, and how much of any

5    witness's testimony to accept or reject.  I will give you some

6    guidelines for determining the credibility of witnesses at the

7    end of the case.

8           As you know, this is a criminal case.  Again, there

9    are three basic rules about a criminal case that you must keep

10   in mind.

11          First, the defendant is presumed innocent until

12   proven guilty.  The indictment against the defendant brought by

13   the government is only an accusation, nothing more.  It is not

14   proof of guilt or anything else.  The defendant, therefore,

15   starts out with a clean slate.

16          Second, the burden of proof is on the government

17   until the very end of the case.  The defendant has no burden to

18   prove his innocence or to present any evidence or to testify.

19   Since the defendant has the right to remain silent, the law

20   prohibits you, in arriving at your verdict, from considering

21   that the defendant may not have testified.

22          Third, the government must prove the defendant's

23   guilt beyond a reasonable doubt.

24          Now a few words about your conduct as jurors.

25          First, I instruct you that, during the trial, you are

1    not to discuss this case with anyone.  Until you retire to the

2    jury room at the end of the case to deliberate on your verdict,

3    you're simply not to talk about this case.  Furthermore, do not

4    talk to any of the lawyers, the witnesses, or parties involved

5    in the case.  I know that most of you use cell phones, iPhones,

6    Blackberrys, Internet, and other tools of technology.  You must

7    not use these tools to communicate with anyone about this case.

8         Second, do not read or listen to anything touching on

9    this case in the way of news accounts or other publicity.

10        Third, do not try to do any research or make any

11   investigation about the case on your own.

12        Fourth, do not form any opinion until all of the

13   evidence is in.  Keep an open mind until you start your

14   deliberations at the end of the case.

15        Finally, do not try to take any notes.  Just listen

16   carefully to the evidence as it comes into the case.

17        I will now give the lawyers an opportunity to make

18   their opening statements.  The purpose of opening statements is

19   to outline for you what they believe the evidence will show.

20   Mr. Haag?

21        MR. HAAG:  Thank you very much, Your Honor.

22        Good morning, Ladies and Gentlemen of the Jury.  I

23   know you're excited to be the lucky twelve.  Welcome to federal

24   jury service.  I believe that this will be a short trial.

25   There's no such thing as an easy criminal case.  There's not.

1    Anytime someone's liberty is at stake, it's a matter that

2    requires your careful evaluation and your careful deliberation.

3    But there are cases that are clear, straightforward, and

4    direct, and this is going to be one of those cases.

5            This is an illegal re-entry case.  You'll be

6    looking for four things here today:

7            Number one, is the defendant an alien; in other

8    words, is he a citizen and national of a country other than the

9    United States of America.

10           Number two, was the defendant removed or deported

11   from the United States of America.

12           Number three, after that deportation or removal,

13   was the defendant found in the United States of America.

14           And, four, at the time the defendant was found in

15   the United States of America, had he not received the express

16   consent of the Attorney General to apply for readmission to the

17   United States.  That mouthful of language, what that basically

18   means is, did immigration authorities tell the defendant, "You

19   can come back into the United States.  We are allowing you back

20   into the United States."  That's all it means.

21           We believe the evidence in this case is going to

22   show the following:  Agent Lonnie Felps with Immigration

23   Enforcement and Removal Operations had identified the defendant

24   as a person who was illegally in the United States on September

25   the 13th of 2015.

1          On October the 16th of 2015, Agent Felps took the

2     defendant, Rafael Marin-Pina, to his office at the Eden

3     substation for processing.  At the Eden station, he placed him

4     on what's called AFIS or IAFIS, and what that is, is he places

5     the defendant's fingerprint on a computer scanner; the scanner

6     reads that individual's fingerprint and identifies the person

7     to the agent.  The fingerprint positively identified him as the

8     defendant, Rafael Marin-Pina.  With the fingerprint, Agent

9     Felps was able to pull up all the information about the

10    defendant's encounters with immigration authorities.

11         Agent Felps informed the defendant of his

12    constitutional rights.  The defendant agreed to waive his

13    rights and speak with Agent Felps.  He admitted to Agent Felps,

14    "I am a Mexican citizen, born in Mexico City, Mexico."  He

15    admitted to Agent Felps he had previously been deported from

16    the United States of America.

17         Agent Felps already knew that he was in the

18    United States of America because he took custody of him, but

19    the defendant admitted, "I illegally re-entered the

20    United States.  I can't tell you when or how, but I did

21    illegally enter the United States."

22         And finally, he admitted to Agent Felps, "At the

23    time that I entered and all the time subsequent to that, I did

24    not have permission of immigration authorities to come back

25    into the United States of America."

1           Agent Felps, with this information, turned to the

2    defendant's A-file.  Now, an A-file is an alien registration

3    file, and all that is, is a file folder somewhat similar to

4    this one, and in it are all contacts between an alien--in other

5    words, a citizen or national of a country other than the

6    United States--and either immigration or law enforcement

7    authorities.  And every time they come in contact, that

8    paperwork is placed in this file.

9           Agent Felps obtained the file, and looking through

10   the file, he confirmed everything that the defendant had

11   already told him.  He was able to find the defendant's birth

12   certificate, which, in fact, showed he was born in Mexico City,

13   Mexico.  He was able to find the I-205, warrant of deportation.

14   And what that form is, is, anytime someone is removed or

15   deported from the United States, it is done with what's called

16   a warrant of removal or warrant of deportation, and it's an

17   order of the immigration judge to immigration authorities

18   saying, "You are to take this person and you are to remove them

19   from the United States."  And on the I-205, the immigration

20   authority will sign his name and he'll roll the fingerprints of

21   the person that he deported from the United States.

22           You are going to hear testimony from Detective

23   Garland Timms of the Lubbock Police Department, who is going to

24   tell you, "I looked at the I-205, the prior deportation of the

25   defendant.  I looked at the fingerprints taken from the

1    defendant by Agent Felps, and they are a match.  He is, beyond

2    any doubt, the person removed from the United States on August

3    the 7th, 2008."

4              Finally, Agent Felps looks through the entire file,

5    he looks through two different databases, and he determined, no

6    immigration authority anywhere had given the defendant

7    permission to re-enter the United States since he was deported

8    on August the 7th, 2008.

9              I think, in response to this overwhelming evidence,

10   the defendant is going to try and make a claim of what's called

11   duress and coercion.  And we've talked a little bit about that

12   already.  I urge you to carefully evaluate the evidence that

13   comes before you.  As you do so, I ask you to keep two things

14   in mind.

15             Number one, duress is a very, very, very strict

16   defense, and rightfully so.  It requires, first, a present,

17   imminent, and impending threat of death or serious bodily

18   injury.  It also requires no reasonable legal alternative.  In

19   other words, in that moment, at that crucial, critical time, I

20   had no choice but to break the law.

21             And I ask you, as this evidence comes on, to look

22   for that and ask yourself, has the defendant shown that by a

23   preponderance of the evidence.

24             After bringing you the overwhelming evidence of the

25   defendant's guilt of the crime charged and showing to you

1  clearly that he cannot possibly establish a duress or coercion

2  defense, I'm going to ask you for the only possible verdict in

3  this case.  I'm going to ask you to find the defendant guilty.

4  Thank you.

5           THE COURT:  Mr. Sloan?

6           MR. SLOAN:  Thank you, Your Honor.

7           This is a case of mistaken identity.  I've always

8  wanted to say that.  And it is.  Let me tell you how we get

9  there.

10          The evidence is going to show that Rafael came into

11  the country at age three--came into the United States at age

12  three, went to United States schools, enlisted in the Marines

13  as a lawful permanent resident.  He was not a U.S. citizen.

14  English is his first language.  He was here legally.

15          In 1997, he got in trouble with the law, and in

16  1999, he was deported from the United States for a conviction

17  for something called an aggravated felony.  And because of that

18  conviction, he lost his right to be in this country.

19          Between 1999 and 2008, he tried to come back, got

20  married, had kids.  He wound up getting re-deported in 2008,

21  and that's the one that Mr. Haag was talking about.  And every

22  time he came here, he got caught and sent back.

23          In 2007, he gave up on that idea--or in 2008, he

24  gave up on that idea and decided to make a life for himself in

25  Mexico.  He and his family wound up in Acuna, and Acuna is a

1    border town across from the City of Del Rio on the South Texas

2    border.  And his U.S. citizen kids were crossing the border

3    every day to go to U.S. schools in Del Rio.  Because his wife

4    is a U.S. citizen, his children were born in the United States,

5    they're all U.S. citizens, and he didn't want them in Mexican

6    schools.

7          It was a problem.  The problem is, his Spanish is

8    American Spanish.  He has an accent just like you would know

9    somebody's accent from New York.  In Mexico, they knew he was

10   from the United States.  He looks like a military guy.  He

11   walks like a military guy.  He looks like a policeman.  He had

12   a German Shepherd, which is a police dog.  His wife and kids

13   were obviously American.  He didn't seem to have a steady job,

14   like at an American factory or anything like that.

15         And rumors started that he was an undercover

16   United States narcotics agent, somebody in the DEA or border

17   customs or somebody like that.  And that rumor followed him

18   from the first house he lived in in Acuna to the second house

19   in Acuna, and the Marins began to hear about people asking

20   around about them, and they were asking questions.  Their house

21   got searched when they weren't home, but nothing was taken.

22         One day, some men took Rafael at gunpoint to a

23   house that belonged to the Zeta criminal drug cartel, a Mexican

24   drug cartel.  They accused him of being a DEA agent.  He denied

25   it.  They made him strip off his shirt to check him for a wire,

1    and they found on his back a United States Marines Corps

2    tattoo.  And in their minds, that confirmed their suspicion and

3    rumors they had been hearing, that he was a U.S. federal drug

4    enforcement agent in Mexico undercover.  And we do have federal

5    agents undercover in Mexico.

6         They gave him a choice: plata or plomo.  Plata

7    means silver, plomo means lead.  They said, you can prove

8    you're not a DEA agent.  They knew his wife crossed the border

9    every day with the kids.  They said, you're going to run a load

10   of drugs for us with your wife across the--across the border.

11   We're going to put some--going to put some dope in her car,

12   she's going to run it across the border, and that way, we'll

13   know you're not with the DEA.

14        Now, they didn't run the dope.  The Marins knew

15   that--  First of all, it's against their religion.  It's

16   against the law.  But they knew if they ran one load, it

17   wouldn't be the last one and that there was no good way for

18   that to end.  So they sort of just kept along with their life,

19   and the cartel people became impatient with them.  They

20   accosted his wife when she was driving, banged on her door,

21   tried to get her to open the window.  They threatened him when

22   he was out walking.  On another occasion, they blocked in her

23   car, forcing her to flee the car and hide in the house and lock

24   herself in, and after she had locked herself in the house,

25   basically a gun battle erupted in the street outside.  Still,

1     they didn't run that load.

2            Finally, the Zetas lost patience with the Marins

3     and they tried to kill him.  They did a drive-by shooting.  Men

4     in cars chase after him, firing guns at him, and he, by pure

5     luck, happened to be on a one-way street that was jammed up

6     with traffic.  There was a place where he could run and not get

7     shot.  And that was it.  They said, we can't stay.

8            And you will hear from Oscar Barrientos, who is an

9     investigator who investigates down on the border, and he will

10    talk about--he's a former Border Patrol agent.  He'll talk

11    about what's happening in Mexico, and he will explain to you

12    that what they're describing is not unusual, that this is

13    business as usual for the Zeta drug cartel and for the other

14    drug cartels in Mexico.  And that once Mr. Marin had been

15    marked as a DEA agent, there was no cartel in Mexico that

16    wouldn't kill him, because, as a DEA agent, he was a common

17    threat to all the cartels.  Every one of them would kill him.

18    There's no place in Mexico where they couldn't find him.

19           And Mr. Barrientos will talk about the control that

20    the drug cartels have in the Country of Mexico, how they're

21    connected with the police, the corruption, that DEA is a common

22    enemy.  And they kill first.  There's no trials, none of this.

23    Their killing him would have included not only Rafael, but his

24    family, his kids, and pretty much any friends he had down there

25    that they knew about, because that's the way they operate.

1    They don't just kill one person; they want to send a message.

2    And Mr. Barrientos will talk about the mass graves in Mexico.

3              Going to the police here sounds like a good idea.

4    There, it would have been suicide, because the police and the

5    cartels operate hand in glove.  Seeking asylum in the U.S.

6    through legal means wasn't available for Mr. Marin.  Because of

7    his aggravated felony, according to the law, he's completely

8    ineligible for asylum in the United States.  In the end, there

9    was really no choice but to run or die, so they--so they ran.

10             The mistaken identity that I talked about in this

11   case is his identity, because they mistook him for a DEA agent,

12   and he's not.  So he doesn't even have the protection that a

13   DEA agent would have to, you know, get extricated and join his

14   buddies or whatever.

15             Even in the United States, this fear of cartel

16   retaliation follows his family.  They don't keep their house in

17   their name.  They home-school their kids.  They flee from

18   anyone who comes from the Del Rio or the Acuna area.  And I

19   think the evidence is going to show that their fear is

20   reasonable, that the cartels can reach across the border and

21   they have reached across the border to kill people in this

22   country, including law enforcement officials, Border Patrol

23   agents.

24             The threat from this mistaken identity was and

25   remains present, imminent, and impending.  It is real.  It

1   involves death for both Rafael and for his family.  He did

2   nothing recklessly to create this threat except for being

3   himself in Mexico.  And fleeing Mexico, which is the crime he

4   committed, was the only way to avoid this threat, this peril to

5   his life and to his family.

6          These are the elements of duress, and I think that,

7   at the close of this case, the Judge will instruct you that if

8   you find that these things are true, or more likely true than

9   not true, that it's your duty under the law to find him not

10  guilty, and that's what I'm going to ask you to do.  Thank you.

11         THE COURT:  All right, Government.  Call your first

12  witness.

13         MR. LONG:  The United States calls Lonnie Felps.

14         THE COURT:  Raise your right hand, please.

15      (THE OATH IS ADMINISTERED BY THE COURT)

16         THE COURT:  Please be seated.

17                    LONNIE FELPS,

18  GOVERNMENT'S WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

19                 DIRECT EXAMINATION

20  BY MR. LONG:

21  **Q.**   Agent, could you please state your name?

22  **A.**   Lonnie Felps.

23  **Q.**   And could you spell that for the record, please?

24  **A.**   L-o-n-n-i-e, F-e-l-p-s.

25  **Q.**   Agent, how are you currently employed?

1    **A.**    I am a deportation officer with Enforcement and Removal

2    Operations.

3    **Q.**    Is that sometimes called ERO?

4    **A.**    ERO.

5    **Q.**    How long have you been with ERO?

6    **A.**    I've been with ERO since 2012.  Prior to that, I was

7    employed with the Border Patrol, from 2008 to 2012.

8    **Q.**    From 2008 to 2012, you were with Border Patrol?

9    **A.**    Yes.

10   **Q.**    Where was your assignment?

11   **A.**    El Paso.

12   **Q.**    What is the immediate border town adjacent to El Paso in

13   Mexico?

14   **A.**    Juarez.

15   **Q.**    That's Juarez, Mexico, is the adjacent border town to

16   El Paso?

17   **A.**    Yes.

18   **Q.**    So do you have some amount of experience with the

19   interactions in U.S./Mexico border towns?

20   **A.**    Yes.

21   **Q.**    You said you did that until 2012; is that correct?

22   **A.**    Yes.

23   **Q.**    And then where did you go after that?

24   **A.**    From there, I went to ERO in Eden, Texas, southeast of

25   San Angelo.

1   Q.   All right.  So for those who aren't necessarily familiar

2   with the federal jurisdiction, are we in the Northern District

3   of Texas?

4   A.   Yes.

5   Q.   Is San Angelo south of Lubbock approximately 200 miles?

6   A.   Yes, it still is within this district.

7   Q.   And is Eden southeast of San Angelo another forty

8   some-odd miles?

9   A.   Yes.

10  Q.   Are all of those locations still within the Northern

11  District of Texas?

12  A.   Yes.

13  Q.   How long have you been--  Well, let me first back up.

14          Are these agencies you're describing with Border

15  Patrol and then a removal officer with ERO--are those all

16  within the umbrella of the Department of Homeland Security?

17  A.   Yes.

18  Q.   And that may be the acronym most jurors are more familiar

19  with.  Is that a large blanket immigration--excuse me, agency

20  responsible for the enforcement of immigration laws?

21  A.   Yes.

22  Q.   Did you have an opportunity to investigate an individual

23  by the name of Rafael Antonio Marin-Pina?

24  A.   Yes.

25  Q.   And I believe he's been referred to as Rafael Marin.  Do

1   you see him in the courtroom here today?

2   **A.**   Yes, I do.

3   **Q.**   And could you point him out by an article of clothing

4   that he's wearing?

5   **A.**   He's got a blue shirt on.

6   **Q.**   And I see you looking at the defendant in the cause

7   before the Court.

8           MR. LONG:  Would the record please reflect he has

9   identified the defendant?

10          THE COURT:  Yes.

11  **Q.**   (BY MR. LONG)  When someone is potentially arrested on a

12  state accusation or booked into some type of holding facility

13  anywhere in the country, is there a system that notifies

14  immigration officers that there may be a potential alien being

15  housed somewhere in the United States?

16  **A.**   Yes, there is.

17  **Q.**   Can you describe that process to the jury, please?

18  **A.**   When someone is booked into a county jail or a county

19  facility, "booked in" meaning via fingerprints, those

20  fingerprints are submitted to the national database, and that,

21  in turn, if they have any sort of immigration history, is

22  relayed to officials with DHS.

23  **Q.**   And DHS meaning Department of Homeland Security?

24  **A.**   Yes.

25  **Q.**   So it's sort of an automated system.  If someone is

1   booked into, let's say, the Tom Green County Jail--is that

2   where San Angelo is, is in Tom Green County?

3   A.   Yes.

4   Q.   If someone were booked into that jail, would they be

5   fingerprinted and then their fingerprint run through an

6   automated system that would potentially flag them for

7   immigration officials if they're potentially in the country

8   illegally?

9   A.   Correct.

10   Q.   Is that what happened in the case of Mr. Marin?

11   A.   Yes.

12   Q.   Do you recall on what date immigration officials became

13   aware that he was present in San Angelo?

14   A.   I believe it was September 13th, 2015.

15   Q.   And when do you--when did you actually become involved as

16   far as your part of the investigation of Mr. Marin-Pina?

17   A.   October 16th, 2015.

18   Q.   So how does--how did it work that--how was he--how was

19   he--how was it noticed that he was being held in Tom Green

20   County and then how did you become aware of it?

21   A.   Whenever immigration officials in Department of Homeland

22   Security became aware of his presence in Tom Green County Jail,

23   they issued a detainer just simply stating, let us know when

24   this person is going to get out of jail.  And that detainer was

25   lodged with the Tom Green County Jail.  Tom Green County Jail

1    notified me the morning of October 16th saying that this person

2    is about to get out.

3    Q.    So a detainer was placed on him by immigration officials

4    because of the automated system, and then you were directly

5    notified when he was about to be released by Tom Green County?

6    A.    Yes.

7    Q.    Once you were notified by Tom Green County, did you try

8    to check the defendant's immigration records based on the

9    identifiers you could get from Tom Green County?

10   A.    Yes, I did.  I ran his name, date of birth, his

11   identifying numbers through our systems to verify who he was.

12   Q.    Were you able, with just those identifiers, to verify

13   that he was potentially in the country illegally?

14   A.    Yes.

15   Q.    Where did you actually encounter Mr. Marin-Pina for the

16   first time?

17   A.    122 West Harris in San Angelo, Texas, the Tom Green

18   County Jail.

19   Q.    So you encountered him at the street address at the Tom

20   Green County Jail in San Angelo?

21   A.    Yes.

22   Q.    Did you take him into custody at that time?

23   A.    Yes.

24   Q.    What did you do after you took him into custody?  Did you

25   take him to your office or another location?

1    **A.**    I transported him to the Eden sub office in Eden, Texas.

2    **Q.**    And is that for just furthering your investigation?

3    **A.**    Yes, to begin processing.

4    **Q.**    When you picked him up from the Tom Green County Jail,

5    was he in possession of any identifying documentation?

6    **A.**    Yes.

7    **Q.**    I'd like to turn your attention to Government's

8    Exhibit 2.  There should be a notebook in front of you

9    actually, if you can turn to Tab Number 2 in Government's

10   Exhibit 2.

11           Does that appear to be an accurate copy of a voter

12   identification card that the defendant had in his possession

13   when you took him into custody in October of 2015?

14   **A.**    Yes.

15   **Q.**    And is that a fair and accurate copy of that

16   identification card?

17   **A.**    Yes.

18           MR. LONG:  Your Honor, at this time, the government

19   would move to admit Government's Exhibit Number 2.

20           MR. SLOAN:  No objection.

21           THE COURT:  Admitted.

22           MR. LONG:  And we request permission to publish

23   that exhibit to the jury with the projector, Your Honor.

24           THE COURT:  Yes.

25   **Q.**    (BY MR. LONG)  All right, Agent.  This may be a little

1    bit difficult to see.  Co-counsel is zooming in there for me.

2    Is this the same copy that you're looking at in Government's

3    Exhibit Number 2?

4    **A.**    Yes.

5    **Q.**    And does it have a name of an individual?

6    **A.**    Yes.

7    **Q.**    And what is that name?

8    **A.**    Rafael Antonio Marin-Pina.

9    **Q.**    And do you have the pointer?  You may have a laser

10   pointer up there with you.

11   **A.**    Oh, yeah.

12   **Q.**    See if it's working.  I'd ask--  And co-counsel, again,

13   has already zoomed in on it.  Is that the name of the

14   individual that you--  Excuse me.  Is that the name of the

15   individual that you picked up at the Tom Green County Jail?

16   **A.**    Yes.

17   **Q.**    All right.  And zooming back out, does it also appear to

18   contain a photo--Government's Exhibit 2 contain a photo of the

19   defendant?

20   **A.**    Yes.

21   **Q.**    All right.  What is this document?  What is this card

22   that the jury is looking at?

23   **A.**    It's a voter registration card for Mexico.

24   **Q.**    And what is the authority that issues--or what would be

25   the authority that would issue such a card?

1    **A.**    The Mexican federal government.

2    **Q.**    Have you seen these cards on previous occasions?

3    **A.**    Yes.

4    **Q.**    And is it your understanding this is an identification

5    card issued by the Mexican government?

6    **A.**    Yes.

7    **Q.**    Once you arrived at the Eden processing station, did you,

8    yourself, actually fingerprint the defendant?

9    **A.**    Yes.

10    **Q.**    How do you go about doing that?

11    **A.**    It's by utilizing a digital scanner.  Each print is

12    enrolled into the national database and then uploaded to our

13    system.

14    **Q.**    All right.  So you actually print each of the defendant's

15    ten fingers?

16    **A.**    Yes.

17    **Q.**    And that's into a digital scanner?

18    **A.**    Yes.

19    **Q.**    And you said that gets uploaded to a national database;

20    is that correct?

21    **A.**    Yes.

22    **Q.**    If a match is found, does it give you certain results?

23    **A.**    Yes.

24    **Q.**    Was a match found of this defendant's fingerprints?

25    **A.**    Yes.

1   Q.   And who did those fingerprints return to?

2   A.   Rafael Marin-Pina.

3   Q.   Did you actually interview the defendant personally?

4   A.   Yes.

5   Q.   Before you interviewed him, did you inform him that he

6   had certain constitutional rights?

7   A.   Yes.

8   Q.   If I could turn your attention to Government's Exhibit

9   Number 1, I believe that's called a Form I-214.  Are there lots

10  of forms in immigration proceedings?

11  A.   Yes.

12  Q.   And they're generally an "I," dash, number of some sort?

13  A.   Yes.

14  Q.   What is an I-214?

15  A.   It's a warning as to constitutional rights and a waiver

16  of rights.

17  Q.   Okay.  And then on an I-214, after the waiver of rights

18  and the constitutional warnings, are there certain questions

19  that you're required to ask of someone who is potentially in

20  the country illegally?

21  A.   Yes.

22  Q.   Looking at Government's Exhibit 1, do you recognize that

23  document?

24  A.   Yes.

25  Q.   Is that a copy of an I-214 that you presented to Rafael

1    Marin-Pina in October of 2015?

2    **A.**    Yes.

3    **Q.**    Is that Government's Exhibit 1 an exact copy of that

4    document?

5    **A.**    Yes.

6    **Q.**    And is it in the same or substantially the same condition

7    as when you presented it to the defendant in October of 2015?

8    **A.**    Yes.

9              MR. LONG:  Your Honor, at this time, the government

10   would move to admit Government's Exhibit Number 1.

11             MR. SLOAN:  No objection.

12             THE COURT:  Admitted.

13             MR. LONG:  And again request permission to publish,

14   Your Honor.

15             THE COURT:  Yes.

16   **Q.**    (BY MR. LONG)  Looking at Government's Exhibit 1, is this

17   the I-214 you have been describing?

18   **A.**    Yes.

19   **Q.**    Okay.  And at the top--at the very top of the form, do we

20   see those warning as to rights that you just mentioned?

21   **A.**    Yes.

22   **Q.**    And is there a section below that and--  Well, let's talk

23   about the warning as to rights for just a moment.  Are these

24   what we would normally call Miranda warnings?

25   **A.**    Yes.

1    Q.    Certain constitutional rights anyone accused of a crime
2    can be informed of; is that right?

3    A.    Yes.

4    Q.    Now, are you able to give these in both English and
5    Spanish?

6    A.    Yes.

7    Q.    Did you give these in English or Spanish, or do you
8    recall?

9    A.    I gave them in English.

10   Q.    Do you recall why you gave them in English instead of
11   Spanish?

12   A.    Because Mr. Marin-Pina speaks English fluently.

13   Q.    Did he speak English well enough for you to be able to
14   read him the form and seem to understand what was happening?

15   A.    Yes.

16   Q.    Once you read those warnings, did he sign in the location
17   that waived those rights and he agreed to speak with you?

18   A.    Yes.

19   Q.    Okay.  And again, zooming in, does that appear to be his
20   signature next to his name right under those rights?

21   A.    Yes.

22   Q.    And also appears to have your signature as well?

23   A.    Yes.

24   Q.    Did you ask the defendant where he was born?

25   A.    I did.

1    **Q.**    And what was his response?

2    **A.**    Mexico City, Distrito Federal (phonetically), Mexico.

3    **Q.**    Okay.  And you spoke a couple of words in Spanish.

4    "Mexico City," I think most of us probably understand.  I think

5    you said "Distrito Federal"?  Is that correct?

6    **A.**    Yes.

7    **Q.**    What is Distrito Federal?

8    **A.**    It's a state in Mexico.

9    **Q.**    So is Mexico divided up into states, similar--similarly

10   to how the United States is divided up into states?

11   **A.**    Yes.

12   **Q.**    So Mexico City, is that the capital of Mexico?

13   **A.**    Yes.

14   **Q.**    And Distrito Federal, is that a state within Mexico

15   itself?

16   **A.**    Yes.

17   **Q.**    Did you ask the defendant of what country he was a

18   citizen?

19   **A.**    I did.

20   **Q.**    And what was his response?

21   **A.**    Mexico.

22   **Q.**    Did you ask the defendant if he had been previously

23   ordered deported, excluded, or removed from the United States?

24   **A.**    Yes.

25   **Q.**    And what was his response?

1  A.    Well, to clarify, I asked him--based on what I saw in his

2  history, I asked him if he had been ordered removed on

3  January 27th of 1999, to which he replied "yes."

4  Q.    Okay.  So you're able to--having run his fingerprints,

5  are you--do you already have available to you some of the

6  information, and that would be in his alien file, or his

7  A-file?

8  A.    Yes.

9  Q.    And that would include a prior deportation order?

10  A.    Yes.

11  Q.    So you were already aware of exactly the date and

12  location he had been deported from when you asked this

13  question; is that accurate?

14  A.    Yes.

15  Q.    So you asked him specifically, had you been deported on

16  January the 27th, 1999, through Eloy, Arizona?

17  A.    Yes.

18  Q.    Or, excuse me, ordered removed--

19  A.    Yes.

20  Q.    --from the United States, excuse me, on that date; is

21  that correct?

22  A.    Correct.

23  Q.    When you asked him if he was the individual that had been

24  ordered removed on that date, what was his response?

25  A.    I'm sorry.  What's that?

1   Q.    When you asked him if he had been previously ordered

2   removed on that date in that location, what was his response?

3   A.    "Yes."

4   Q.    So he confirmed with you that he had been previously

5   ordered removed from the country?

6   A.    Yes.

7   Q.    Did you also ask the defendant when, where, and how he

8   had illegally re-entered the United States on this particular

9   occasion?

10  A.    I did.

11  Q.    And can you read the defendant's response from

12  Government's Exhibit 1?

13  A.    He stated he did not remember.  He was smuggled across in

14  a car and didn't see where he crossed.

15  Q.    So he couldn't give you an exact location or date?

16  A.    Correct.

17  Q.    But the manner is, he had been smuggled in a car somehow?

18  A.    Yes.

19  Q.    Did you also ask the defendant if he had previously

20  applied to the Attorney General for permission to lawfully

21  re-enter the United States?

22  A.    Yes.

23  Q.    And what was his response when you asked him if he had

24  applied for lawful readmission?

25  A.    "No."

1    **Q.**    He had not re-applied?

2    **A.**    That he had not re-applied.

3    **Q.**    I'd like to discuss the defendant's alien file for just a

4    moment.  Can you tell the jury what an alien file, or A-file,

5    is?

6    **A.**    An A-file lists all incidents that a subject has with

7    immigration officers or any local, state, or federal law

8    enforcement.

9    **Q.**    So anytime someone who is in the country illegally

10   interacts with law enforcement, that encounter should be in

11   their alien file.  Is that a fair statement?

12   **A.**    Yes.

13   **Q.**    Are there occasions where someone who is in the country

14   illegally interacts with a state authority or city authority,

15   someone who is not a federal authority--are there occasions

16   where they can interact with state authorities and then that

17   interaction not be in their alien file?

18   **A.**    There are.

19   **Q.**    So if someone is interacting with state, city, or county,

20   nonfederal authority, and they're interacting with someone

21   who's in the country illegally, if they don't know to notify

22   yourself, like what happened with Tom Green County Jail, they

23   don't know to notify you or immigration officials, is there a

24   chance that their interaction would not be noted in their alien

25   file?

1    **A.**    There is.

2    **Q.**    But if someone has interacted with immigration officials

3    or been in immigration proceedings, should that documentation

4    be contained in their alien file?

5    **A.**    Yes.

6    **Q.**    Do the documents in the alien file set out activities

7    that are conducted by the officials of the Department of

8    Homeland Security?

9    **A.**    Yes.

10   **Q.**    Do the documents that are in the alien file record

11   matters that are conducted by those officials of the Department

12   of Homeland Security while they are under a legal duty to

13   report those things?

14   **A.**    Yes.

15   **Q.**    Just meaning, if you handle someone, for instance, with

16   the I-213 that we looked at--or, excuse me, this I-214 that

17   we're looking at, would that be something that you would be

18   required to record and place in an alien file?

19   **A.**    Yes.

20   **Q.**    As part of your job?

21   **A.**    Yes.

22   **Q.**    Are the documents that are in the alien file the official

23   custody of the Department of Homeland Security?

24   **A.**    Yes.

25   **Q.**    And would that be considered restricted access to those

1    documents?

2    **A.**    Yes.

3    **Q.**    I'd like to turn your attention to Government's

4    Exhibits 3, 4, and 6, if you can look at those, please.

5              And before testifying today, have you reviewed

6    those exhibits?

7    **A.**    Yes.

8    **Q.**    Are these exhibits documents that were taken from the

9    defendant's A-file?

10   **A.**    Yes.

11   **Q.**    And would these all fall within the category of things

12   that were under a duty to record in the possession of the

13   Department of Homeland Security with restricted access?

14   **A.**    Yes.

15             MR. LONG:  Your Honor, at this time, the government

16   would move to admit Government's Exhibits 3, 4, and 6.

17             MR. SLOAN:  No objection.

18             THE COURT:  Admitted.

19             MR. LONG:  And permission to publish, Your Honor,

20   to the jury.

21             THE COURT:  Yes.

22   **Q.**    (BY MR. LONG)  Turning to Government's Exhibit 6, Agent,

23   can you tell the jury what we're looking at in Government's

24   Exhibit 6?

25   **A.**    This is a Mexican birth certificate.

1    Q.    All right.  And the entire document is in Spanish; is

2    that correct?

3    A.    Yes.

4    Q.    And I'm going to get this incorrect, but what does "acta

5    de nacimiento" mean?

6    A.    Birth certificate.

7    Q.    And can we see, who does this birth certificate pertain

8    to the birth of?

9    A.    Rafael Antonio Marin-Pina.

10    Q.    And does this name match the name of the individual that

11    you were interviewing in October of 2015?

12    A.    Yes.

13    Q.    And does it also--  We can see there, "In Mexico"--the

14    first line of the box there, it says "In Mexico."  What's the

15    next two words?

16    A.    Distrito Federal.

17    Q.    And does that confirm for you where the defendant said he

18    was born?

19    A.    Yes.

20    Q.    And does it also contain a date of birth on there?

21    A.    Yes.

22    Q.    And we don't have to look at it, but did you also, at

23    some point, ask the defendant who his parents were?

24    A.    Yes.

25    Q.    So we didn't look at it on the I-214 that we just saw

1   where you were asking the defendant questions, but when you

2   asked the defendant those questions on the I-214, did his

3   answers match who it says that his parents are on this birth

4   certificate?

5   **A.**    Yes.

6   **Q.**    Turning to Government's Exhibit 3, can you tell the jury

7   what Government's Exhibit 3 is?  It's a little bit washed out.

8   **A.**    Uh-huh.  It's an order of an immigration judge in removal

9   proceedings.

10  **Q.**    All right.  So does this type of document encapsulate

11  what would happen in a removal proceeding?

12  **A.**    Yes.

13  **Q.**    Who is the subject of the proceeding?  We can see at the

14  top left-hand corner here.  Who is the subject of the

15  proceeding in Government's Exhibit 3?

16  **A.**    Rafael Antonio Marin-Pina.

17  **Q.**    And next to the word "Case Number," over to the right in

18  the heading, we see Case Number, semi-colon, "A," then a series

19  of numbers.  What are we looking at there?

20  **A.**    That's his alien registration number.

21  **Q.**    So alien registration number, is that a unique identifier

22  that is assigned to an illegal alien to document their

23  interactions with immigration authorities?

24  **A.**    It's assigned to both legal and illegal aliens just to

25  document encounters with Immigration.

1     **Q.**     Is this A-file number--did it match the A-file number

2     that came back whenever you scanned the defendant's

3     fingerprints in this case?

4     **A.**     Yes.

5     **Q.**     And would this A-file--and I'll read it for the

6     record--A92-578-173--was this A-file consistent throughout the

7     alien file of Mr. Marin-Pina?

8     **A.**     Yes.

9     **Q.**     All right.  If I could get my co-counsel to back up, I'm

10     going to ask you to read a certain portion, and if you could

11     read starting from the paragraph that's below the heading of

12     Order of the Immigration Judge through that first line where

13     the box is checked.  Can you read that for the jury?

14     **A.**     "Order of the Immigration Judge.  This is a summary of

15     the oral decision entered on January 27, 1999.  This memorandum

16     is solely for the convenience of the parties.  If the

17     proceedings should be appealed or reopened, the oral decision

18     will become the official opinion in the case."  And then the

19     box is checked next to, "The respondent was ordered removed

20     from the United States to MX," meaning Mexico.

21     **Q.**     Okay.  Is MX a short version of Mexico?

22     **A.**     Yes.

23     **Q.**     And down at the very bottom, is this order signed by

24     Immigration Judge?

25     **A.**     Yes.

1    Q.   And we read at the top it was dated January 27th, 1999.

2    Is that also down at the bottom?

3    A.   Yes, it is.

4    Q.   And did the defendant--would this have been the document

5    you were looking at, or similar records, when you asked the

6    defendant directly, were you ordered removed on January 27th,

7    1999?

8    A.   Yes.

9    Q.   And he agreed with you that he had been; is that correct?

10   A.   Yes.

11   Q.   All right.  Turn to Government's Exhibit 4.  What is this

12   document?

13   A.   This is an I-205, warrant of removal.

14   Q.   And what type of action does this document record?

15   A.   It's verification of removal or deportation from the U.S.

16   Q.   So once someone is actually ordered removed from the

17   U.S., does the action of physically removing them from the

18   country still have to happen?

19   A.   Yes.

20   Q.   And is that what an I-205 captures?

21   A.   Yes.

22   Q.   I'd like to ask you if you can read that top portion

23   where it starts, "Rafael Antonio Marin-Pina," and then read

24   through the section that we see highlighted for the jury.

25   A.   Okay.  "Rafael Antonio Marin-Pina, who entered the

1    United States at San Ysidro, California, on December 1st, 2007,

2    is subject to removal/deportation from the United States based

3    upon a final order by an immigration judge in exclusion,

4    deportation, or removal proceedings."

5    Q.    So this is ordering the immigration officer who is

6    executing this form to remove that defendant who had entered

7    the United States at San Ysidro, California, on December

8    the 1st, 2007, because he's subject to removal from the

9    United States based on a final order by an immigration judge?

10   A.    Correct.

11   Q.    I essentially just reread what you read.  But is this the

12   actual document that would be used to physically remove the

13   person from the country?

14   A.    Yes.

15   Q.    If we can turn to the second page of Government's

16   Exhibit 4.  Is this the back of that same form?

17   A.    Yes.

18   Q.    What information do we see listed on the first two lines

19   of the form?

20   A.    The name of the subject and the port, date, and manner of

21   removal.

22   Q.    Okay.  You say port, date, and manner of removal.  What

23   was the port that the defendant, Rafael Marin-Pina, was removed

24   through?

25   A.    San Ysidro.

1   Q.   Okay.  And it's kind of washed out.  Is this normally

2   done with a stamp?

3   A.   Yes.

4   Q.   And the stamp says "Deported," and it's hard to read, but

5   it says "SYS"; is that correct?

6   A.   Correct.

7   Q.   And is that an abbreviation for San Ysidro?

8   A.   Yes.

9   Q.   Where is that located?

10  A.   San Ysidro is in California.

11  Q.   And again, it's a little washed out, but what is the date

12  that the defendant was removed?

13  A.   August 7th, 2008.

14  Q.   And we see that below that, it says "afoot."  What does

15  that mean?

16  A.   It means he walked across the port-of-entry bridge.

17  Q.   So the individual immigration officer who is executing

18  this form, is he actually--what does he do when he's executing

19  this form?

20  A.   He would drive the individuals up to the port-of-entry

21  bridge and then direct them to walk back across the

22  port-of-entry bridge afoot, as opposed to driving them across.

23  Q.   So the immigration officer would stop at the U.S. side of

24  the border and order them to walk, afoot, across the bridge, or

25  wherever the location was?

1    **A.**    Yes.

2    **Q.**    And is that what this document states, that that was done

3    to Mr. Marin-Pina on August 7th, 2008?

4    **A.**    Correct.

5    **Q.**    All right.  If we zoom back out just a little bit, we see

6    below that particular section appears to be a photograph and

7    then a fingerprint; is that correct?

8    **A.**    Yes.

9    **Q.**    Who does that photograph appear to be of?

10   **A.**    Mr. Marin-Pina.

11   **Q.**    And I want to talk just a moment about the fingerprint

12   that's on this form.  When would this fingerprint that's rolled

13   on this form have been taken?

14   **A.**    It would have been taken the day he was removed.

15   **Q.**    So are you the one who actually took that fingerprint?

16   **A.**    No.

17   **Q.**    I asked you earlier if these documents appear to be in

18   substantially the same condition as they were when you took

19   them from his alien file.  Does there appear to be some

20   additional writing just next to the fingerprint on this form?

21   **A.**    Yes.

22   **Q.**    Are you the one that placed that writing there?

23   **A.**    No.

24   **Q.**    And it also appears to be dated.  Did you place that date

25   there?

1   **A.**   No.

2   **Q.**   So you didn't take the fingerprints that we see on this

3   particular exhibit; is that correct?

4   **A.**   Correct.

5   **Q.**   Did there come a time when you did, yourself, actually

6   take the defendant's fingerprints?

7   **A.**   Yes.

8   **Q.**   And we've described that earlier.  When you were

9   processing him, you had him digitally scan his fingerprints; is

10   that right?

11   **A.**   Yes.

12   **Q.**   I'd like you to turn to Government's Exhibit Number 5.

13   Can you briefly describe for the jury what Government's

14   Exhibit 5 is?

15   **A.**   This is an I-213.  Records an incident with a suspected

16   illegal alien.

17   **Q.**   Okay.  So you said it's an I-213 that records an incident

18   with a suspected illegal alien?

19   **A.**   Correct.

20   **Q.**   Is that something, again, you would be required to fill

21   out anytime you interacted with a potential illegal alien?

22   **A.**   Yes.

23   **Q.**   And does the I-213 normally contain some background data,

24   biological information about the defendant?

25   **A.**   Yes.

1    Q.   Now, looking at Government's Exhibit 5, has that been

2    redacted for court purposes in this particular proceeding?

3    A.   Yes.

4    Q.   Other than those redactions, does this form appear to be

5    in the same or substantially the same condition as it did when

6    you executed it back in October of 2015?

7    A.   It also has the red writing next to the fingerprint.

8    Q.   Okay.  So it also has the red writing next to the

9    fingerprint; is that correct?

10    A.   Yes.

11    Q.   Other than that red writing next to the fingerprint, are

12    there any other alterations or changes?

13    A.   No.

14         MR. LONG:  Your Honor, at this time, the government

15    would move to admit Exhibit Number 5.

16         MR. SLOAN:  No objection.

17         THE COURT:  Admitted.

18         MR. LONG:  And permission to publish, Your Honor?

19         THE COURT:  Yes.

20    Q.   (BY MR. LONG)  Looking at Government's Exhibit Number 5,

21    again, we see some information that's been redacted; is that

22    correct?

23    A.   Yes.

24    Q.   And is that, again, just more kind of biological

25    background information?

1    **A.**    Correct.

2    **Q.**    Do we see a photograph of an individual on this

3    particular page?

4    **A.**    Yes.

5    **Q.**    Who took that photograph?

6    **A.**    I did.

7    **Q.**    And did you cause it to be inserted into this document?

8    **A.**    Yes.

9    **Q.**    Who does that photograph depict?

10    **A.**    Rafael Marin-Pina.

11    **Q.**    And that's the individual that you interacted with and

12    interviewed that we have been discussing today; is that right?

13    **A.**    Correct.

14    **Q.**    I'd like to turn your attention to the items that are

15    next to the photograph.  Do there appear to be a couple of

16    fingerprints next to the photograph?

17    **A.**    Yes.

18    **Q.**    Did you, yourself, take those fingerprints?

19    **A.**    Yes.

20    **Q.**    Do you know those to be the fingerprints of the defendant

21    sitting in the courtroom here today?

22    **A.**    I do.

23    **Q.**    Did you examine the defendant's entire alien file before

24    testifying here today?

25    **A.**    Yes.

1    Q.    After examining his entire alien file, did you find any

2    consent from the Secretary of Department of Homeland Security

3    or the Attorney General of the United States for the defendant

4    to apply for readmission to the United States since the time of

5    his previous deportation on August the 7th of 2008?

6    A.    No, I did not.

7    Q.    If the defendant had obtained that consent, would that

8    have been contained in his alien file?

9    A.    Yes.

10   Q.    Are you familiar with what we call the Computer-Linked

11   Application Information Management System?

12   A.    Yes.

13   Q.    I think it goes by the acronym CLAIMS.

14   A.    Correct.

15   Q.    What information is stored in the CLAIMS database?

16   A.    CLAIMS tracks all applications for immigration benefit

17   and any changes to the status of those applications.

18   Q.    So if someone wanted to apply for naturalization and

19   become a citizen, is that something that would be tracked in

20   the CLAIMS system?

21   A.    Correct.

22   Q.    If they have filed an application, if they have been

23   given some type of permanent residency status, or even full

24   citizenship, is that something that would be in the CLAIMS

25   database?

1    **A.**    Yes.

2    **Q.**    If they had something in their background that would

3    potentially make them eligible for citizenship and they filed

4    such the appropriate application, would that be--would that be

5    found in the CLAIMS database?

6    **A.**    Yes.

7    **Q.**    Did you review the CLAIMS database for the records that

8    related to the defendant Rafael Marin-Pina prior to testifying

9    here today?

10   **A.**    I did.

11   **Q.**    And a similar question.  After examining that database,

12   did you find any consent from the Secretary of the Department

13   of Homeland Security or the Attorney General of the

14   United States for the defendant to apply for readmission to the

15   United States since he had been previously ordered removed and

16   deported on August the 7th of 2008?

17   **A.**    No.

18   **Q.**    If the defendant had obtained such consent, would that

19   have been found in the CLAIMS database?

20   **A.**    Yes.

21               MR. LONG:  Pass the witness, Your Honor.

22               MR. SLOAN:  May it please the Court.

23                         CROSS-EXAMINATION

24   BY MR. SLOAN:

25   **Q.**    Mr. Felps, who is Enrique Camarena; do you know?

1    **A.**    I do not.

2    **Q.**    Kiki Camarena?  Does that ring a bell?

3    **A.**    Yes.

4    **Q.**    Who was he?

5    **A.**    He was a DEA agent.

6    **Q.**    What happened to him?

7    **A.**    He was tortured and killed.

8    **Q.**    Where?

9    **A.**    I honestly don't remember.  I think it was Colombia, or--

10   **Q.**    Did that--is that a story that gets passed around the

11   Border Patrol where you were at?

12   **A.**    It's passed around most federal agencies, I believe.

13   **Q.**    Okay.  The voter registration card that's Government's

14   Exhibit Number 2, do you have that in front of you?

15   **A.**    Yes, sir.

16   **Q.**    Okay.  What you have is a copy.  What happened to the

17   original of that document?

18   **A.**    It's still in his--his A-file.

19   **Q.**    Okay.  The original is in his A-file or a copy of the

20   original?

21   **A.**    As far as I know, the original is still in his A-file.

22   **Q.**    Okay.  I want to draw your attention to Government

23   Exhibit Number 1, and I want to ask you some questions related

24   to that exhibit.  What's a credible fear interview?

25   **A.**    It's performed by an asylum officer to determine if

1    someone has credible fear of their--of returning to their

2    country of origin.

3    **Q.**    Okay.  So it's a screening process for an asylum

4    determination.  Right?

5    **A.**    Correct.

6    **Q.**    And when persons are apprehended for immigration

7    violations, they are asked a series of questions, and that's

8    what's in Government Exhibit Number 1.  Right?

9    **A.**    Correct.

10   **Q.**    That's a standard intake form?

11   **A.**    Yes.

12   **Q.**    All right.  And in that I-214 form, there's a question

13   that asks, "Do you have any fear or concern about being

14   returned to your home country or being removed from the

15   United States?"  Correct?

16   **A.**    Yes.

17   **Q.**    All right.  And if we could zoom in on that.  Thank you.

18              What was Mr. Marin's answer to that question?

19   **A.**    "Yes."

20   **Q.**    He answered "yes," that he did have a credible fear?

21   **A.**    Correct.

22   **Q.**    If a person answers "yes" to that question, were any

23   follow-up questions asked?

24   **A.**    No, I'm not an asylum officer, so whenever he comes back

25   to Department of Homeland Security custody, he would be

1    referred to an asylum officer.

2    **Q.**    So he could be referred to an asylum officer?

3    **A.**    No, he will be since he claimed fear.

4    **Q.**    Okay.  Is there a--are you familiar with Title 8, Aliens

5    and Nationality, and Chapter 12?

6    **A.**    No.

7    **Q.**    Are you familiar with the legal requirements of an asylum

8    application?

9    **A.**    No.

10   **Q.**    All right.  Do you know whether a person who has an

11   aggravated felony can get asylum?

12   **A.**    I honestly don't know.

13   **Q.**    You don't know the answer to that question?

14   **A.**    No.

15   **Q.**    Okay.  Do you keep in contact with the members of the

16   Border Patrol that you used to work with?

17   **A.**    Yes, sir.

18   **Q.**    All right.  And the Border Patrol has lost agents to the

19   drug cartels in Mexico, haven't they?

20   **A.**    Correct.

21   **Q.**    That's happened on both sides of the border, hasn't it?

22   **A.**    Yes.

23   **Q.**    And some of those men were murdered by people who

24   appeared to be members of the Mexican military; isn't that

25   right?

1   **A.**    Yes.

2   **Q.**    And some of them appeared to have been murdered by cartel

3   members?

4   **A.**    Yes, I mean, I--

5   **Q.**    If you don't know, just--that's fine.

6   **A.**    Yeah, I mean, they were killed violently, but I don't

7   really know who they were working for.

8   **Q.**    Okay.

9            MR. SLOAN:  No further questions.

10                    REDIRECT EXAMINATION

11  BY MR. LONG:

12  **Q.**    Agent, when someone makes a claim of fear, as

13  Mr. Marin-Pina has in this case when you interviewed him,

14  what's the process after that?

15  **A.**    When he comes back to Department of Homeland Security

16  custody, he will be referred to an asylum officer.

17  **Q.**    And will that asylum officer make more inquiry into

18  whether that's a credible fear or not?

19  **A.**    Correct.  They would do a more in-depth interview of his

20  claim.

21  **Q.**    So are you responsible for deciding whether someone would

22  be granted asylum or not?

23  **A.**    No.

24  **Q.**    And would that be part of a separate proceeding than a

25  criminal proceeding for someone violating the law, a federal

1    statute?

2    **A.**     Yes, it would be separate.

3    **Q.**     As far as you are aware, is Mr. Marin-Pina, whatever his

4    criminal history may be, going to be given an asylum interview?

5    **A.**     As far as I know, he will be.

6    **Q.**     When you worked as a Border Patrol agent, did you ever

7    have to work on the border, at border checkpoints and things of

8    that nature?

9    **A.**     I worked on the border and at checkpoints.

10   **Q.**     When you worked on the border or at checkpoints, did you

11   ever have individuals that made claims of needing asylum or

12   having fear of being returned to Mexico?

13   **A.**     Yes.

14   **Q.**     At that point, did you just say, "No, I don't care,

15   you're going back to Mexico"?

16   **A.**     No.

17   **Q.**     What is your job, what is your duty, what does policy

18   require of you, even at a border checkpoint, where it's Mexico

19   and the United States behind you, what does your policy require

20   if someone comes to you and makes a claim of fear or need of

21   asylum?

22   **A.**     To refer them to an asylum officer.

23   **Q.**     And whether they stroll up to you with bags packed or

24   come running with people chasing them, if they claim fear and

25   need of asylum, are they going to be given some type of hearing

1    or interview for that to be determined?

2    **A.**    Yes.

3    **Q.**    And that's just procedure?

4    **A.**    Yes.

5    **Q.**    So at no point would an individual, if policy were

6    followed, be refused at the border if they were claiming

7    asylum.  Is that a fair statement?

8    **A.**    I'm sorry.  What was that?

9    **Q.**    By policy, would an individual who comes to a border

10   station checkpoint, border crossing, if they were claiming a

11   need for asylum, by policy, they should never be immediately

12   refused and sent back to Mexico; is that correct?

13   **A.**    Correct.  No.

14            MR. LONG:  No further questions.

15            THE COURT:  All right.  You may step down.

16            Call your next witness.

17            MR. HAAG:  Your Honor, the United States calls

18   Detective Garland Timms.

19            THE COURT:  If you'll raise your right hand,

20   please.

21       (THE OATH IS ADMINISTERED BY THE COURT)

22            THE COURT:  Please be seated.

23

24

25

1          GARLAND TIMMS,

2     GOVERNMENT'S WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

3                    DIRECT EXAMINATION

4     BY MR. HAAG:

5     **Q.**    Garland, would you please state your name for the jury.

6     **A.**    My name is Garland Timms.

7     **Q.**    Garland, how are you currently employed?

8     **A.**    I'm employed with the City of Lubbock Police Department

9     as a commissioned police officer.

10    **Q.**    How long have you served with the Lubbock Police

11    Department?

12    **A.**    May will be 31 years.

13    **Q.**    Are you assigned to a particular division within the

14    Lubbock Police Department?

15    **A.**    Yes, I am.  I'm assigned to the Identification Section.

16    **Q.**    As part of your duties in the Identification Section, do

17    you conduct fingerprint examinations?

18    **A.**    Yes, I do.

19    **Q.**    Let's talk a little bit about your vast experience with

20    fingerprint comparisons.  Do you have any specialized training

21    or experience in fingerprint comparisons?

22    **A.**    Yes, sir.  I've been through the basic identification

23    class, the intermediate identification, advanced

24    identification.  I've also had advanced ridgeology comparison

25    and advanced--the investifying of palm prints and comparisons.

1  **Q.**    In addition to your formalized training, do you receive

2  on-the-job training daily in your duties as an Identification

3  Section officer?

4  **A.**    Yes, sir.  I look at latent fingerprints just almost

5  daily.

6  **Q.**    And, Garland, if you could speak up just a little bit.

7  **A.**    Okay.

8  **Q.**    Thank you, sir.

9         How long have you been conducting fingerprint

10  examinations?

11  **A.**    Since 1996.

12  **Q.**    During the course of your career, could you estimate for

13  the jury, how many fingerprint comparisons have you made?

14  **A.**    I do actual fingerprint comparisons and examinations

15  every morning.  So since 1996, I've done over probably

16  10,000 actual examinations and comparisons of looking at

17  fingerprints.

18  **Q.**    Have you ever testified in state court as an expert in

19  fingerprint comparison?

20  **A.**    Yes, I have.

21  **Q.**    About how many times?

22  **A.**    About 50 times, I would say, yes.

23  **Q.**    Have you ever testified here in federal court as an

24  expert in fingerprint examination?

25  **A.**    Yes, sir.

1    **Q.**    And approximately how many times?

2    **A.**    Ten, fifteen times.

3    **Q.**    Let's talk a little bit about fingerprint examination and

4    explain that a little bit to the jury.  What is an inked

5    fingerprint?

6    **A.**    Inked fingerprints are usually a known print that you

7    obtain from an individual.  And you also have what's known as

8    latent fingerprints, which is normally fingerprints that are

9    found at crime scenes that are the unknown.

10   **Q.**    So if it's an inked fingerprint, is it a fingerprint that

11   you take the person and physically roll their print onto a card

12   so you can say to a certainty, I know that's that person's

13   fingerprint?

14   **A.**    Yes, it is.

15   **Q.**    Are fingerprints specific as to each individual?

16   **A.**    There have never been two persons to have the same

17   fingerprints.  We're all born with a ridge characteristic or

18   ridge formation of fingerprints on the bulbs of our fingers, on

19   the palms of our hands, and on the soles of our feet.  And

20   every person's prints are different.

21   **Q.**    In the history of fingerprinting through all of your

22   reviews of periodicals, books, texts, databases, has there ever

23   been an occasion where two people have had the exact same

24   fingerprint?

25   **A.**    No, there has not.

1  Q.    Let's go ahead and go to the demonstrative exhibit and

2  just talk a little bit about how you compare fingerprints.  If

3  you'll turn to the next slide, please.

4         And if you would, just review this slide for the

5  jury and the information contained on this slide.

6  A.    Okay.  Like we've said, every person--

7  Q.    And I'm sorry, Garland.  There's a laser pointer on

8  there.  There should be a red dot in the center, and that will

9  activate the laser.

10  A.    Like I said, every person's fingerprints are different.

11  We are born with that fingerprint pattern on the bulbs of our

12  fingers, the palms of our hands, and soles of our feet, and we

13  carry that same fingerprint pattern ridge flow from the day we

14  are born, we continue with that same fingerprint flow until the

15  day we die.  Fingerprints never change.  Like I said, it's on

16  the bulbs of our fingers, the palms of our hands, the soles of

17  our feet.

18         We do the fingerprint comparisons to determine

19  identity, nonidentity, and we also have inconclusive patterns,

20  which normally our inconclusive is when the quality of our

21  fingerprints is usually not very well done.  We find a lot of

22  inconclusive comparisons in latent fingerprint comparisons.

23  Q.    So if there's not a sufficient detailed fingerprint that

24  you can make a comparison, you just determine it to be

25  inconclusive?

1   **A.**    Inconclusive, yes.

2   **Q.**    Go to the next slide, please.

3        And let's talk about--in doing a comparison of a

4   person's fingerprints, are there different levels of

5   comparison?

6   **A.**    Normally have about two different levels or steps that we

7   do to determine if the fingerprints are the same or not the

8   same.  The first level we would look at, we do--we normally

9   just begin looking at the classification or the pattern type of

10  the fingerprints.

11  **Q.**    And let's go ahead and go to the next slide and talk

12  about that.

13  **A.**    We basically have three different pattern types of

14  fingerprints.  We have arches, loops, and whorls.  And within

15  the arch pattern, we have two different types of arches.  We

16  have a tented arch and a plain arch.

17       Within the loop pattern, we have two different

18  types of loops.  We have a right-slope loop and a left-slope

19  loop.

20       And within the whorl pattern, we have four

21  different types of patterns.  We have a plain whorl, we have a

22  central pocket loop whorl, an accidental whorl, and a double

23  loop whorl.

24       So in our first classification, what we're doing is

25  we're going to look to see, is our fingerprint in this person,

1    in our known and our unknown, is it the same fingerprint

2    pattern.

3    Q.    And let's go ahead and look at some of those patterns in

4    the next slide.

5    A.    And this is our patterns here.  Like I said, we have the

6    right- and left-slope loops, the plain and the tented arch, and

7    then the four pattern--whorl patterns: the plain, the central

8    pocket loop, the double loop, and the accidental whorl.

9    Q.    And if you would, just to show the jury--probably like me

10   and have probably difficulty seeing some of the things that, as

11   a 20-year veteran, you can see.  Would you explain, like in

12   that first upper left slide where it says right-slope loop,

13   would you point for the jury where the fingerprint does the

14   right-slope loop?

15   A.    What we basically have is, the flow of the fingerprint

16   comes in one side of the fingerprint pattern, it goes up, and

17   it comes back out the same side, and which every side it goes

18   in or out of will we determine if it's a right-slope or a

19   left-slope loop.

20   Q.    Okay.  And let's go ahead and go on to the next slide and

21   talk about the next level of friction ridge detail where you

22   start to do the real analysis.

23   A.    In the Level 2 or the second level of the fingerprint

24   comparison, this is where we actually determine, yes or no, if

25   it is the same person or not.  What we begin looking for is, we

1    begin to look for individual class characteristics inside the

2    fingerprint.  There's five individual class characteristics.

3    We have an ending ridge; a bifurcation; we have dots;

4    enclosures, or also known as ridge islands; and then we have

5    short ridges.

6         And what we will look for in this is, we will look

7    for this individual class characteristics, the ending ridges,

8    bifurcations, and dots.  But we will also look at the

9    relationship where this one bifurcation is in the known print

10   to the unknown, and they have to be in the same exact position

11   within the--both of the same fingerprints.

12   **Q.**   Okay.  And let's go to the next slide so we can look at

13   exactly how this is done.

14   **A.**   And what we do is, we will look inside the fingerprint

15   pattern itself for this.  This would be your bifurcation where

16   you have a ridge that begins, and then it forks off into two or

17   more ridges.  Then we have just this short ridge,

18   self-explanatory; the ending ridge, also self-explanatory; the

19   dot, pretty much self-explanatory.  It's just a dot in the

20   fingerprint where the ridge is usually just slightly longer

21   than it is the width of that ridge.  And then we have the

22   enclosure or ridge island, where we have a single ridge that

23   forks, bifurcates off and then comes back to a single ridge.

24        Them are the five characteristics that we're

25   looking for in the unknown and the known to determine if it is

1  the same person or not.

2  **Q.**    If we'll go to the next slide, please.  And go to the

3  next slide.

4  **A.**    So basically, like I said, we're going to do the two

5  levels.  First thing we're going to do is look at the pattern

6  type to determine, in our known, if we have a right-slope loop,

7  left-slope loop, and in our unknown.  If our pattern type is

8  the same, then we will continue to our Level 2, to our step--

9  next step.  This is where we will begin to look for the points

10  of identification within the two fingerprints itself.

11  **Q.**    Go to the next slide, please.  And go ahead and--one more

12  time.

13  **A.**    So what we will do is, we will find these types of

14  patterns or these types of individual characteristics.  We have

15  a dot here, an ending ridge here.  We will find these two

16  points in our known print.  We will look for these two exact

17  points in our unknown print, and they have to be in the same

18  relationship in both--in both fingerprints.  Once we find these

19  two, then we will continue up one ridge to a next point.  If

20  that continues in that point, we will continue this process

21  until we determine, by the amount of points, that, yes, this

22  print is the same as this print.

23  **Q.**    Let's turn to your fingerprint comparison in this case.

24  I want to turn your attention to the book in front of you,

25  Government's Exhibits 4 and 5, and that's going to be the

1   I-205, Warrant of Removal/Deportation for the defendant, and

2   the I-213, Record of Inadmissible Alien.

3           We've heard testimony earlier about some red

4   writing on those documents.  Do you know who made those red

5   writing--or made the red writing marks on the documents?

6   **A.**   Yes, sir, I do.

7   **Q.**   And how do you know that that's your handwriting?

8   **A.**   It's mine.  It has my case number that I assigned in this

9   case.  It's my name, my initials, and my badge number.

10  **Q.**   Did you conduct a fingerprint examination of the

11  defendant's fingerprints when taken when he was removed from

12  the United States and the fingerprints taken by Agent Felps?

13  **A.**   Yes, I did.

14  **Q.**   What was the result of your examination?

15  **A.**   They were of the same person.  They are the same person.

16  **Q.**   Did you ask anyone in your office to verify your

17  conclusion?

18  **A.**   Yes, I did.

19  **Q.**   Who did you ask?

20  **A.**   Detective John Barber.

21  **Q.**   And did he verify your conclusion that the same person's

22  fingerprints were in Government's Exhibits 4 and 5?

23  **A.**   Yes, he did.

24           MR. HAAG:  I pass the witness, Your Honor.

25           MR. SLOAN:  No questions.

```
 1                    THE COURT:  All right.  You may step down.
 2                    Call your next witness.
 3                    MR. HAAG:  Your Honor, may this witness be excused?
 4                    THE COURT:  Yes.
 5                    MR. HAAG:  Thank you, Your Honor.
 6                    MR. LONG:  The United States rests, Your Honor.
 7                    THE COURT:  Mr. Sloan?
 8                    MR. SLOAN:  Yes, Your Honor.  We would call Bibiana
 9     Cortez-Marin.  And my paralegal is going to have to go get her.
10          (PAUSE)
11                    THE COURT:  If you'll raise your right hand.
12          (THE OATH IS ADMINISTERED BY THE COURT)
13                    THE COURT:  Please be seated.
14                         BIBIANA CORTEZ-MARIN,
15     DEFENSE WITNESS, TESTIFIED ON HER OATH AS FOLLOWS:
16                         DIRECT EXAMINATION
17     BY MR. SLOAN:
18     Q.   Could you state your name for the jury?
19     A.   Yes, Bibiana Cortez-Marin.
20     Q.   And how old are you, Bibiana?
21     A.   I'm thirty-three years old.
22     Q.   And how do you know the defendant, Rafael?
23     A.   He's my husband.
24     Q.   When did you meet him?
25     A.   In the year 2000.
```

1   Q.   Okay.  And did you guys get married?

2   A.   Yes.

3   Q.   Do you have any kids together?

4   A.   Four kids.

5   Q.   How old are they?

6   A.   Thirteen, twelve, ten, and eight.

7   Q.   Did there come a time when Rafael and you guys moved to

8   Mexico?

9   A.   Yes, several times.

10  Q.   Okay.  And where all have you lived in Mexico?

11  A.   We lived in Central Mexico where I was born, Michoacan,

12  and in Yucatan, and we lived in Acuna for a while.

13  Q.   Okay.  Now, you were born in Central Mexico, but you're

14  a--are you a U.S. citizen?

15  A.   Yes, naturalized.

16  Q.   You're a naturalized U.S. citizen.  Were your children

17  born in the U.S.?

18  A.   Yes.

19  Q.   All right.  So they're all U.S. citizens.  Right?

20  A.   Yes.

21  Q.   Okay.  Did there come a time when you started living in

22  Acuna?

23  A.   Yes.

24  Q.   All right.  Where is Acuna?

25  A.   It's the border to Del Rio here in Texas.

1    Q.    Okay.  So it's across the Texas border--

2    A.    Yes.

3    Q.    --from the City of Del Rio?

4    A.    Yes.

5    Q.    Where were your kids going to school?

6    A.    They were going to school in Del Rio.

7    Q.    Why did you choose Acuna?

8    A.    It seemed like a good option to--so the kids could go to

9    school in the United States, and maybe I could work in the

10   United States.

11   Q.    Were you working in the United States while the--

12   A.    Yes, part-time.

13   Q.    Okay.  Did your money go a little further if you earned

14   it in the United States then spent it in Mexico?

15   A.    Definitely, yes.

16   Q.    All right.  Where did you live in Acuna, the first place

17   you lived?

18   A.    The first place was, I guess, government houses that they

19   sell to people.  They're called Los Altoses (phonetically).

20   Q.    Okay.  It's a government house called a what?

21   A.    It's Los Altos (phonetically), The Heights--

22   Q.    Okay.

23   A.    --in English.  It's just who we were renting from, from

24   an individual there.

25   Q.    Okay.  Was that like an apartment or an individual house

1   or what?

2   **A.**    It's individual houses.

3   **Q.**    Okay.  Do you own a dog?

4   **A.**    Yes.

5   **Q.**    What kind of dog?

6   **A.**    He's a German Shepherd.

7   **Q.**    When you were living at the Los Altos, did you interact

8   with your neighbors?

9   **A.**    A little bit.

10  **Q.**    Did there come to be some rumors about your husband while

11  you were there?

12  **A.**    Yes.  They would ask questions if he was working for the

13  government here in the United States.

14  **Q.**    Okay.  Who would ask those questions?

15  **A.**    Neighbors.

16  **Q.**    They would ask if he was working for the government?

17  **A.**    Yes.

18  **Q.**    Was he working at all?

19  **A.**    In Mexico, he was--at the time, no, but he was looking

20  for work.  But at the time when those rumors were going on, no.

21  **Q.**    Okay.  Now, he--was he seeking a job, like, as an English

22  teacher?

23  **A.**    Uh-huh, yes.

24  **Q.**    But at the time, he wasn't working; is that right?

25  **A.**    Yes, uh-huh.

1    Q.    And you owned a German Shepherd?

2    A.    Yes.

3    Q.    And did the neighbors say why they thought he was a

4    federal agent?

5    A.    Did they say why?  Well, maybe because--so the dog--

6    They didn't really say.  They would ask questions.  Maybe

7    because he really didn't fit into the community there, because

8    he--he would go out and walk the dogs.  We had a couple of

9    dogs.  And I think it was because of that.

10   Q.    Okay.  You say he didn't fit into the community there.

11   Does--a person who was raised in American schools, does the

12   Spanish have an accent to it?

13   A.    Yes.  He doesn't speak--his Spanish is not very--it's--

14   he speaks Spanish, but it's--he has an accent, and he has--he

15   won't--certain words, he won't pronounce them correctly.

16   That's--

17   Q.    Okay.  So is it obvious to a native Spanish speaker that

18   he's from somewhere else?

19   A.    Yes.

20   Q.    Did there come a time when you moved away from Los Altos

21   to a different neighborhood?

22   A.    Yes.

23   Q.    Where was that?

24   A.    It was--the colonia was called Gamas (phonetically), more

25   towards the center of the city.

1   Q.   Okay.  And it--it's called a colonia?  Does that mean

2   neighborhood?

3   A.   Right, yes.  That's what they call it in Mexico,

4   different colonias or different neighborhoods.

5   Q.   Is that a standard, stand-alone house, or was that like

6   an apartment?

7   A.   It was a--well, it was a house, but it's a little house,

8   two-bedroom.  Just two bedrooms, kitchen, and one bedroom

9   (sic).  But it was--it was a house.

10  Q.   Did you continue to receive questions about him being a

11  federal agent at your new house?

12  A.   Not from the neighbors there, but of--we'd be--we were

13  being watched by certain people.

14  Q.   Okay.  You say you were being watched.  How did you know

15  you were being watched?

16  A.   We saw them.  There were black SUVs parked across the

17  street, and they would--they would just watch us.  They would

18  follow us too, so--

19  Q.   Okay.  So there were people in black SUVs that would

20  follow you?

21  A.   Uh-huh.

22  Q.   Were these people armed?

23  A.   Yes.

24  Q.   Okay.  How were they armed?

25  A.   With guns, in their--

1  **Q.**    Like sidearm guns--

2  **A.**    Right, yes.

3  **Q.**    --or long rifles or--

4  **A.**    Well, I saw them in their--on their side.  Usually go

5  like that, too (indicating), I guess for intimidation; I don't

6  know.

7  **Q.**    Oh, so pistols?

8  **A.**    Right.

9  **Q.**    And sometimes they would move their jacket back so you

10  could see the handle and kind of--

11  **A.**    Uh-huh.  Right.  They were big men too, so pretty

12  intimidating.

13  **Q.**    You said they were big men?

14  **A.**    Yes.

15  **Q.**    You mean physically large men?

16  **A.**    And tall.

17  **Q.**    Okay.  And did you figure out who they were?

18  **A.**    I have my suspicions.  I think they were cartel members,

19  because we--we got threatened, or my husband did, and they

20  would follow us, so--

21  **Q.**    Okay.  So you saw these men with guns, and sometimes they

22  would follow you?

23  **A.**    Yes.

24  **Q.**    Was there a time when your house was searched?

25  **A.**    Yes.

1   **Q.**   What happened?

2   **A.**   There was just--we weren't home, and they went in there,

3   and there was--nothing was taken, except there was paperwork

4   moved around.

5   **Q.**   Okay.  Was the house--when you came back to the house,

6   had it obviously been somebody else in there?

7   **A.**   Uh-huh.

8   **Q.**   But nothing was removed?

9   **A.**   No, there was nothing taken.

10   **Q.**   Okay.  Was there a time when you, yourself, were

11   physically confronted by somebody?

12   **A.**   Yes.  One morning when I was taking my children to

13   school--

14   **Q.**   Well, let's--

15   **A.**   Oh.

16   **Q.**   I know it happened more than once, so let's start with

17   the first one, to make sure we're talking about that one.  When

18   was the first time that happened?

19   **A.**   The first time when I was blocked into the house, is--

20   **Q.**   The first time that you had a physical confrontation with

21   these people.

22   **A.**   A physical confrontation was when I was taking my

23   children to school in the morning.

24   **Q.**   Okay.  What happened?

25   **A.**   I was driving my regular route to go to the--to the

1    border, and I stopped at a stoplight, and one of the men got

2    out of the car and went to the passenger's seat with my--where

3    my son was sitting, started banging on the window, yelling,

4    making signs so I could roll it down.  I didn't have time to do

5    anything.  When the light turned green, I just--I left.

6    **Q.**   Okay.  So just to clarify, this man who came up, had you

7    seen him before?

8    **A.**   Yes.  It was the same vehicles--one of the same vehicles

9    that--

10   **Q.**   So it was one of the same vehicles where they had been

11   following you and these men were armed?

12   **A.**   Uh-huh.

13   **Q.**   Is it legal to carry guns around in Mexico?

14   **A.**   Not for a civilian, no.  Only police are allowed to do

15   that.

16   **Q.**   Okay.  Did this man appear to be a policeman in police

17   uniform?

18   **A.**   No.

19   **Q.**   Are you allowed to have a gun in your house for

20   self-protection?

21   **A.**   No, not in Mexico.

22   **Q.**   Okay.

23   **A.**   That's why we had dogs.  That was one of the reasons.

24   **Q.**   Are there people that carry guns even though they're not

25   police?

1    **A.**    The cartels are known to do that.

2    **Q.**    Okay.  You talk about the cartels.  What are you talking

3    about when you mean a cartel?

4    **A.**    The people that control the area, that sell drugs or

5    pack--bring drugs to the United States or distribute drugs

6    around there.

7    **Q.**    Okay.  So--

8    **A.**    They're usually very violent.

9    **Q.**    Do different cartels live in different cities?

10   **A.**    Yes.

11   **Q.**    All right.  And Acuna is a city that's on the border with

12   Texas; is that right?

13   **A.**    Uh-huh, yes.

14   **Q.**    And would there be drug traffic moving out of Acuna into

15   the United States?

16   **A.**    Yes, I assume so.

17   **Q.**    Okay.  All right.  When was the next time that you,

18   yourself, were confronted by these people?

19   **A.**    I went to my house to get something real fast.  My kids

20   and my husband were somewhere else.  I went to the house to get

21   something, ran in, ran back out, and these people were blocking

22   me, and I couldn't--

23   **Q.**    Okay.  So you went--you were with your whole family, and

24   you left wherever you were.  Where were you guys at?

25   **A.**    It was a skating rink that they put sometimes during the

1    winter in Acuna.

2    **Q.**    Okay.  So you left the skating rink and went--drove to--

3    drove home to get something?

4    **A.**    Yes, uh-huh.

5    **Q.**    Okay.  And you went in the house and came out?

6    **A.**    Uh-huh.

7    **Q.**    And these people had blocked you in?

8    **A.**    Yes.

9    **Q.**    How had they done that?

10   **A.**    They put their vehicles behind me.  It was a--the parking

11   space was kind of a little hill where I used to go up, and they

12   put their vehicles right behind me so I--I wasn't able to back

13   up or leave or anything.

14   **Q.**    Okay.  And at this point, had you already been offered or

15   threatened about running drugs?

16   **A.**    Yes.

17   **Q.**    Okay.  How did you--what was your reaction to the

18   proposal that you run drugs?

19   **A.**    Absolutely not.  I--there's no way.  I was just--I was

20   surprised that they would do that, but I--I was surprised and a

21   little afraid, too, when they--when they said that, because

22   I've never been--I have never done any such thing like that.

23   **Q.**    Okay.  So you refused--

24   **A.**    Right.

25   **Q.**    --to run drugs across the border for them?

1    **A.**    Yes.

2    **Q.**    Okay.  And when they blocked you in, this was after you

3    had refused?

4    **A.**    Yes.

5    **Q.**    What did you do?

6    **A.**    I grabbed my dog and I went inside the house and waited.

7    And there was shootings that day right after I went inside in

8    the house.

9    **Q.**    You say right after you went in the house, there was

10   shooting?

11   **A.**    Uh-huh.

12   **Q.**    Like in the street?

13   **A.**    On the street, yes.

14   **Q.**    How long after you got in your house would you say there

15   was shooting and whatnot going on?

16   **A.**    A couple minutes.  It wasn't long.  A couple minutes.

17   **Q.**    Okay.  So you went in the house, and a couple minutes

18   later--

19   **A.**    The shooting started.

20   **Q.**    Like a gunfight, or just shooting in the air, or do you

21   know?

22   **A.**    Later on, I found out that it was a gunfight between

23   the--the GATES that they call, it's like a military that they

24   send to--between them and the cartel, one of the cartel--the

25   cartel members.

1  **Q.**   Okay.  So there was a gunfight between the cartel people

2  and some kind of law enforcement people right there in your

3  street?

4  **A.**   Uh-huh.  Uh-huh.

5  **Q.**   Did you think that you, yourself, were in physical

6  danger?

7  **A.**   Yes.

8  **Q.**   Did you think that you had specifically been targeted?

9  **A.**   Yes.

10         Specifically myself, or my family?

11  **Q.**   Well, you, your family--

12  **A.**   Yes.

13  **Q.**   Okay.  Did you continue to hear rumors or stories that

14  Rafael was some sort of a federal agent?

15  **A.**   Yes.

16  **Q.**   Where did you hear those from?

17  **A.**   From different people there.  I know that they found out

18  that he was in the military, so that's probably what--one of

19  the reasons that they believed that.

20  **Q.**   After your house had been searched, did the cartel people

21  seem to know more about you, like the details of your life?

22  **A.**   Yes.

23  **Q.**   Okay.  Now, you didn't actually see them in your house

24  looking through your stuff?

25  **A.**   Oh, no, no.

1   Q.   Did your--were the vehicles--your vehicle tires slashed a

2   couple of times?

3   A.   Yes.

4   Q.   When you got up in the morning, was there a procedure you

5   went through before you took the kids across the border as far

6   as the car goes?

7   A.   Yes.  My husband would get out of the--turn on the car

8   and look around the car and would get actually underneath the

9   car to check if anything was being put there.

10  Q.   Okay.  Like--anything like drugs or a bomb or something

11  like that?

12  A.   Right.

13  Q.   In Acuna, were you--did you become aware that people had

14  been murdered?

15  A.   Yes.

16  Q.   Was that a fairly regular occurrence or was it rare?

17  A.   While we were there, it was pretty--pretty common in

18  those--the years that we lived there.

19  Q.   Going back to this incident when the guy came up to your

20  car window and banged on it to roll down the windows, was there

21  law enforcement nearby?

22  A.   Yes, there was a police car parked in a little--kind of

23  like a 7-Eleven, called an (speaking Spanish).  They were

24  parked there.

25  Q.   Did they do anything to help you?

1    **A.**    No.

2    **Q.**    Could they see what was going on?

3    **A.**    Yes.  There were several people there who could.

4    **Q.**    All right.  And you're saying these are the same people

5    that had been following you around with pistols in their

6    waistbands?

7    **A.**    Yes.

8    **Q.**    Which one of you decided to come back to the

9    United States?

10   **A.**    I'm sorry, I didn't hear that.

11   **Q.**    Between the two of you, which one of you decided to come

12   back to the U.S.?

13   **A.**    I did.

14   **Q.**    Okay.  And why?

15   **A.**    Because of fear that they might get one of our kids and

16   harm them, or one of them.

17   **Q.**    Was kidnapping something that you heard about was pretty

18   regular down there?

19   **A.**    Yes.

20   **Q.**    Okay.  Did you become aware that they shot at your

21   husband?

22   **A.**    I'm sorry?

23   **Q.**    Did you become aware of when they shot at your husband?

24   **A.**    Yes, I was aware.

25   **Q.**    Was that also something that led you to want to get out

1    of there?

2    **A.**    Yes.

3    **Q.**    After you came back to the United States, where did you

4    relocate?

5    **A.**    We moved to an area in San Angelo called Grape Creek.

6    It's out in the country, outside of San Angelo.

7    **Q.**    Grape Creek in San Angelo?

8    **A.**    Yes, uh-huh.

9    **Q.**    And did you take any steps once you got there to avoid

10   the cartels finding out where you were?

11   **A.**    Yes.  We moved out to the country.  We--nobody knew where

12   we lived.  Still, a lot of people don't know where we live.  My

13   family, we have to go pick them up and take them to my house if

14   they visit.  The house is not under our name.  Pretty much--

15   **Q.**    What about your kids?  Are they in public school?

16   **A.**    No, they--they're home-schooled.

17   **Q.**    Had they previously been in public school?

18   **A.**    Yes.

19   **Q.**    Why did you take them out of public school and

20   home-school them?

21   **A.**    Several reasons, one of them being that I don't want--I

22   wanted to watch them be under my supervision so that in case

23   anybody found out where we were, they would be with me.  I

24   mean, it's a--it's a fear that I still have.

25   **Q.**    When you left Acuna and came to the United States, do you

1    think that that made the cartel think even more likely that

2    your husband was DEA?

3    A.    It's possible, yes.

4    Q.    How long have y'all been in San Angelo?

5    A.    I've been here almost three years--or, well, two and a

6    half.

7    Q.    So you came back in the spring of 2014?

8    A.    Well, no.  I came here and got the place and would go see

9    him back and forth at the--at the end of 2013 or early 2014.

10   Q.    Okay.

11   A.    I came in 2013.

12   Q.    Okay.  And you got--

13   A.    Me and the children.

14   Q.    You got things set up?

15   A.    Yes.

16   Q.    All right.  And then you brought him?

17   A.    Yes.  Well, he--he came.

18   Q.    All right.

19             MR. SLOAN:  I'll pass the witness.

20                         CROSS-EXAMINATION

21   BY MR. LONG:

22   Q.    Ma'am, my name is Sean Long.  I represent the

23   United States Attorney's Office in this proceeding.  I'm going

24   to ask you a few questions.  If you don't understand my

25   question, please just ask me to repeat it and I'll be glad to.

1    Okay?

2    **A.**    Sure.

3    **Q.**    Do you go by Ms. Cortez?  Ms. Cortez-Marin?  Does it

4    matter?

5    **A.**    Doesn't matter.  Cortez-Marin is okay.

6    **Q.**    Okay.  Ms. Cortez-Marin, when would you say these

7    encounters that you've described with the cartels started?  If

8    you could give us an approximate month and year.

9    **A.**    They started in 2013.  We moved there in 2012.  They

10   started at the end of 2012, early 2013.

11   **Q.**    And you said it started essentially with hearing rumors

12   of people asking questions, hey, does your husband work for the

13   government?

14   **A.**    Yes.

15   **Q.**    You told the jury previously that your husband wasn't

16   working--is that correct?--while he was in Mexico?  He wasn't

17   working anywhere in Acuna?

18   **A.**    Not at the time when those rumors were going on, no.

19   **Q.**    What was he doing before?

20   **A.**    Before, he was in Yucatan, in Yucatan in Mexico, South

21   Mexico.  He was working as an English teacher.

22   **Q.**    Where is Yucatan?

23   **A.**    It's close to Cancun, I guess, if that helps.  It's at

24   the end of Mexico, the little tail.

25   **Q.**    Okay.  South Mexico, I mean, pretty far away.  Would that

1    be a fair statement?

2    **A.**    Uh-huh.

3    **Q.**    How did your husband get down to Yucatan?

4    **A.**    In 2008, he was deported, and he went to live in Yucatan.

5    **Q.**    So in 2008, the jury has heard testimony he was deported

6    through San Ysidro, California.  Does that sound familiar to

7    you?

8    **A.**    Yes.

9    **Q.**    So you're saying when he was deported through California

10   at San Ysidro, he made his way down to Yucatan?

11   **A.**    Yes.

12   **Q.**    Was he by himself?  Were you with him?

13   **A.**    At the beginning, he was by himself.  In 2010--no, 2009,

14   I moved there with the kids.

15   **Q.**    So in 2009, you took your family--  How many children did

16   you have at that time?

17   **A.**    Four.

18   **Q.**    Four?

19   **A.**    Uh-huh.

20   **Q.**    2009, you took all four of your children down to Yucatan?

21   **A.**    Yes.

22   **Q.**    Let me ask, did Mr. Marin-Pina--did Rafael have any issue

23   getting--that you're aware of, from where he was deported,

24   San Ysidro, California, down to Yucatan, did he have any issues

25   getting down there?

1  **A.**    Any issues?  I don't know of any.  I don't know the

2  details.  I don't know.

3  **Q.**    And what I mean by that, was he able, through language

4  and his knowledge of Mexico, to navigate his way down to

5  Yucatan?

6  **A.**    He took a--I believe he took a bus.  I don't know if

7  that--if he had any issues doing that.  I don't know.

8  **Q.**    When did the cartels start threatening you while you were

9  in Yucatan?

10  **A.**    In Yucatan?

11  **Q.**    Yes.

12  **A.**    There was some kind of fights and shootings in Yucatan,

13  but it didn't happen in Yucatan.  That's not why we--  The

14  shootings and threats happened in Acuna.

15  **Q.**    So after he was deported and was in Yucatan, did you

16  receive specific threats from the Zetas, through the other

17  military personnel that you've been describing here in court

18  today?  In Yucatan, did you receive any of those threats?

19  **A.**    No.

20  **Q.**    But ultimately you made the decision to move to Acuna; is

21  that correct?

22  **A.**    I moved back to the United States in two thousand--I

23  stayed a year in Yucatan with him.  I moved back to the

24  United States because the children were having trouble in

25  school.  They were not--one of them was in first grade and was

1   not able to read by the end of the year, because they didn't

2   read the Spanish language.  So I moved back.  He stayed in

3   Yucatan.

4           After a while, I moved to Texas with my parents.  I

5   went back to California, from Yucatan to California.  I came to

6   Texas with my parents, were buying a house here with them.  I

7   ended up losing the house, and that's when I decided that we

8   wanted our family together, so we moved to Acuna, as--we didn't

9   really know much about it.  It was just trying it out.

10  **Q.**    How did your husband get from Yucatan to Acuna?

11  **A.**    He took a plane.

12  **Q.**    He took a plane?

13  **A.**    Uh-huh.

14  **Q.**    He flew?

15  **A.**    Yes.

16  **Q.**    Was he able to fly within the Country of Mexico because

17  he was a Mexican citizen?

18  **A.**    Yes.

19  **Q.**    Was he able to take a bus within Mexico because, again,

20  he was a Mexican citizen?

21  **A.**    Yes.

22  **Q.**    Any issues traveling from Yucatan to Acuna that you're

23  aware of?

24  **A.**    I'm sorry, I didn't hear that.

25  **Q.**    Did he have any issues when he traveled from Yucatan to

1    Acuna--

2    **A.**    Not that I know of.

3    **Q.**    --that you're aware of?

4    **A.**    No, not aware.

5    **Q.**    Did he have any family in Yucatan or Mexico City or

6    anywhere else in Mexico?

7    **A.**    I believe he has aunts that live there, but that's--

8    that's it.  He doesn't really know them.  He grew up in the

9    United States, so--

10    **Q.**    So how did--was it your decision to go to Yucatan?  Your

11    husband's?  Who made the decision to travel there?  Was there a

12    particular reason that area was chosen?

13    **A.**    Well, because his parents were born there, and that's

14    where he--I believe he had been in the past there.  In '99, he

15    had been in Yucatan and he had worked as an English teacher, so

16    that's--I assume that's the reason.  He wanted to go there in

17    the first place, in 2008, and after he got deported, I--I chose

18    to move there with the kids and to be with him.

19    **Q.**    So he had some--I don't want to say connections, but

20    maybe some history in Yucatan that made that a desirable

21    location, at least in his mind?

22    **A.**    Yes.

23    **Q.**    When you started--  Let's talk about when your vehicle

24    was blocked into your driveway.  You stated you were by

25    yourself on that location--excuse me--at that time?

1    **A.**     Yes.

2    **Q.**     Tell us again, when was that?

3    **A.**     That was at the end of--that was at the end of 2014.

4    That was one of the last times that that--that--that's actually

5    the reason why I got so afraid and wanted to--just for him to

6    come back.

7    **Q.**     You said the end of 2014?

8    **A.**     No, I'm sorry, end of 2013.

9    **Q.**     Okay.

10   **A.**     Yes, I'm sorry.

11   **Q.**     No, that's okay.  I just wanted to be clear on the time

12   period.  End of 2013 is when your vehicle was blocked in; is

13   that correct?

14   **A.**     Uh-huh.

15   **Q.**     You said that was one of the last incidents that you had

16   directly with who you believed to be cartel members?

17   **A.**     Yes.

18   **Q.**     Did they ever identify themselves to you as, hey, we're

19   from the cartel?

20   **A.**     No.

21   **Q.**     But they did flash their gun at you and--

22   **A.**     Yes.

23   **Q.**     --and let you know that they have a gun?

24   **A.**     And it--  Yes.  And it's well known in Mexico that they

25   will drive black vehicles, black trucks or black--black

1   vehicles.  That's what they drive.  That's what they're

2   identified.

3   **Q.**   And was it that occasion you said that you went back into

4   your house and there was a gunfight sometime thereafter?

5   **A.**   Yes.

6   **Q.**   You said it was approximately a couple of minutes that

7   the gunfight occurred; is that correct?

8   **A.**   Uh-huh.

9   **Q.**   Who do you believe the parties were that were involved in

10  that gunfight?

11  **A.**   I know, because of finding out later, it was the cartels

12  fighting with the police force there.

13  **Q.**   So is it safe to say that the cartels didn't operate with

14  free rein everywhere, that there was some opposition to the

15  cartels in Acuna specifically?

16  **A.**   Well, yeah, those years the government brought in the

17  police force, and that's when it got really bad.  The shootings

18  between them got--it actually got worse because of that.

19  **Q.**   So the cartel wasn't necessarily running the government

20  totally.  There was opposition to them.  Is that a fair

21  statement?

22  **A.**   That's what it--that's what it seems, but I know that

23  there is government people involved in the cartels there.  Most

24  people there know that.

25  **Q.**   And these sorts of conflicts were happening closer to the

1   end of your time there in Acuna?

2   **A.**   It happened throughout--throughout the whole time there.

3   It just intensified when we moved to the second house, the

4   threats and the being watched.  But these shootings were

5   happening since 2012, since we moved there.

6   **Q.**   So are you telling this jury that your living there is

7   what caused these shootings and these conflicts?

8   **A.**   Us living there?  No, that's not what I'm saying.

9   **Q.**   Okay.  And what I mean to ask is, are these sorts of

10   conflicts and shootings things that other people in the

11   neighborhood were also being exposed to?

12   **A.**   Yes.

13   **Q.**   Other people in Acuna being exposed to?

14   **A.**   Yes.

15   **Q.**   But again, none of those problems in Yucatan; is that

16   correct?

17   **A.**   I'm sorry?

18   **Q.**   Did you have any of those problems in Yucatan?

19   **A.**   Not really.  There was also shootings and police once in

20   a while, but not directly--direct threats to us.

21   **Q.**   So sort of general threats the community would have to

22   deal with, but no specific threats towards you or your family?

23   **A.**   There was specific threats to us and the family.  The

24   fact that they come to me and follow me and try to talk to me

25   while I'm driving, I--

1  Q.    Yes, ma'am, and I apologize.  I mean in Yucatan, there
2  was--

3  A.    Oh, in Yucatan?

4  Q.    --general threats, not specific to you?

5  A.    Right, yes.

6  Q.    So the specific threats, you're saying, happened in
7  Acuna; is that correct?

8  A.    Yes.

9  Q.    When your husband was unemployed in Acuna, what would he
10 do during the day?

11 A.    He would walk the dogs, take hikes with the dogs.

12 Q.    How was he trying to apply for jobs, or was he applying
13 for jobs?

14 A.    Yes.  He was trying to apply for teaching jobs, and
15 there's also--I don't know what they call it in English--
16 (speaking Spanish), a place where they--I don't know what it's
17 called.  There's different places where he--where one of a--a
18 person that we knew there, a man was actually driving him to
19 different places to try to find a job for him to recommend and
20 to--to try and find a job for him.

21 Q.    So he was actively looking for a job?

22 A.    Yes.

23 Q.    Who was the first one to mention--or how did you come to
24 know that the cartel wanted you and your family to do drug runs
25 over the border?  Where did that information come from?

1    **A.**    I believe it was told to him.  They never talked to me

2    directly, but--

3    **Q.**    Okay.  So they didn't talk to you directly; they talked

4    to your husband--

5    **A.**    Right.

6    **Q.**    --and he relayed to you, they want us to run drugs?

7    **A.**    Right.

8    **Q.**    What was your understanding of how that arrangement was

9    going to work?

10    **A.**    There was no arrangement or anything.  It was just told--

11    the thing is that they told he's--he's practically a traitor

12    because he's--he was in the Marines in the United States.

13    They--they--my understanding is that they wanted him to prove

14    himself to them that he wasn't a type of a traitor.

15    **Q.**    And he would prove that by having his wife and children

16    run drugs to the United States?

17    **A.**    Uh-huh.  Uh-huh.

18    **Q.**    Was he supposed to accompany you with the drugs?

19    **A.**    No, I don't think so.

20    **Q.**    Supposed to send you by yourself with the drugs over the

21    border; you would do whatever was required and come back?

22    **A.**    I believe so.  That's--I--we never got as far as

23    discussing anything like that because there's just no way.

24    **Q.**    When did that proposal happen?

25    **A.**    I would say the beginning of 2013.

1  Q.   Okay.  Beginning of 2013?  So that would have been well

2  before you were blocked into your driveway?

3  A.   Uh-huh.

4  Q.   When you refused to cooperate in any type of arrangement

5  for smuggling drugs, is that--was it after that that the

6  incident where the individuals knocking on your window

7  occurred--of the window of your vehicle?

8  A.   Yes, that was after.

9  Q.   Okay.  So he makes the proposal--someone makes the

10  proposal, according to your husband, that you need to run drugs

11  to prove that you don't work for federal law enforcement; you

12  refuse; and then subsequent to that, someone knocks on your

13  window and someone blocks you in the driveway.  Is that

14  correct?

15  A.   Yes.  Well, he refused.  He just commented--made the

16  comment to me, this is what's going on; there's being--I'm

17  being threatened and the family is being threatened.  And

18  that's--yes, that's after, that's correct.

19  Q.   When did the conversation happen that, hey, we need to

20  get out of here; we need to go somewhere else?  When did that

21  conversation happen?

22  A.   We've been--we were talking it over practically all the

23  time.  I was actually trying to submit applications to USCIS to

24  have him come here legally.  I filled them out.  There was a

25  money issue though.  Those applications are expensive.  And so

1    I was trying to--I was talking about it the whole time, waiting

2    to--to get out of here.  This is mainly because of the

3    children, and the shootings were getting worse.

4    **Q.**    So you mentioned that you had filed--you said USCIS?

5    **A.**    Yes.  It's an application to ask for permission for him

6    to re-enter the United States, or reapply.  I didn't file it.

7    I filled out the applications.  I was thinking about doing

8    that.  There's actually a $600 fee to file one of those

9    applications and, I believe, 500 for another that needs to go

10   with that one.

11   **Q.**    So you were aware there was an application process and a

12   way for your husband to lawfully enter the United States?

13   **A.**    Yes, I knew that there was a way.  I know more now.  I

14   know that he qualifies for citizenship based on his military

15   background.  I actually--we have actually filed the application

16   already.  Back then, I didn't know.  I only know about those--

17   that specific application that--that I had gotten from the

18   Internet, read the instructions, and was planning to file it as

19   soon as I got the money together.

20   **Q.**    When did you make the decision that you were going to

21   leave and take your family but leave your husband back in

22   Mexico?  When did you make that decision?  When did that

23   actually happen?

24   **A.**    That happened--  Gosh.  I made the decision way before I

25   left.  I mean, it was just a matter of getting scared enough to

1  just come and just look for a place.  I had a brother that was

2  living in Eldorado, Texas, and I came to stay with him first to

3  look for a place, and we would go and stay there.  And then

4  from there, it just went slowly.  It didn't really--it wasn't a

5  decision that, I'm leaving today and I'm not coming back.

6  **Q.**  Okay.  Did you take your children with you when you went

7  to Eldorado?

8  **A.**  Yes.

9  **Q.**  Okay.  When, do you know--month, year--that that

10 happened?

11 **A.**  Month and year?  2013, I visited my brother.  I actually

12 visited Eldorado a few times, because I had lived there and I

13 had a couple of things that--clothing and stuff, and so I--it

14 wasn't the only time that I went.

15 **Q.**  You said that was the--  Would that be around the end of

16 2013?

17 **A.**  About the end, yes, I would say so.

18 **Q.**  So after you took your children out--and let's say it was

19 the end of 2013, if that's when the threat where you were

20 blocked in your driveway happened--you said that was the end of

21 2013.  If you--did you move your children after that threat or

22 before the threat?

23 **A.**  It was before.

24 **Q.**  Okay.  So you had gone back when that threat happened?

25 **A.**  Yes, I was--yes.

1      THE COURT:  All right, Counsel.  We're going to

2  stop at this point and recess for lunch.

3      Members of the jury, we're going to be in recess

4  until 1:30.  Please keep all my instructions in mind.  I'll

5  have the marshal take you out through this door here, and he'll

6  show you how to get back to the jury room without having to

7  come back through the courtroom.  Please be back in the jury

8  room at 1:30.

9      Court will stand in recess.

10  (LUNCH RECESS TAKEN)

11  **Q.**   (BY MR. LONG)  Ms. Cortez-Marin, I'd like to pick up

12  where we left off.  We were discussing a little bit about the

13  timeline of you were going back and forth from Mexico to the

14  United States.

15  **A.**   Uh-huh.

16  **Q.**   And what I wanted to start back with was by asking, when

17  did you get the residence in the San Angelo Grape Creek area?

18  **A.**   It was in mid of 2013.

19  **Q.**   I'm sorry, when was that?

20  **A.**   Mid-2013.

21  **Q.**   Middle of 2013?

22  **A.**   Uh-huh.

23  **Q.**   Would that have been the address 9869 Possum Hollow?

24  **A.**   Yes.

25  **Q.**   So for your entire time that you were residing in

1    San Angelo, was that your residence?

2    **A.**    Yes.

3    **Q.**    Was that a trailer house?

4    **A.**    I'm sorry?

5    **Q.**    Is that a trailer or duplex?  Apartment?

6    **A.**    It's a trailer.

7    **Q.**    That's located, I think you already stated, in Grape

8    Creek, Texas?

9    **A.**    Yes.

10   **Q.**    Is that just north of San Angelo?

11   **A.**    Yes, a little bit north.

12   **Q.**    So mid-2013, you had a residence in San Angelo; is that

13   correct?

14   **A.**    Yes.

15   **Q.**    Were you still, at that time, going back and forth to

16   Acuna to see Mr. Marin-Pina?

17   **A.**    Yes.

18   **Q.**    Would you take your family when you went with--when you

19   went back to Mexico?

20   **A.**    Yes, my four children.

21   **Q.**    So you had made the decision to leave because Acuna was

22   not going to be a safe location for you and your family; is

23   that correct?

24   **A.**    Yes.

25   **Q.**    But you would still, on occasion, take your family back

1    to Acuna to be at the same residence that y'all were living at

2    in Acuna where Mr. Marin-Pina was?

3    **A.**    Yes.

4    **Q.**    How often--let's just go from mid-2013 when you had the

5    residence in San Angelo, how often did you return to Acuna with

6    your family?

7    **A.**    Mostly weekends.

8    **Q.**    Ma'am?

9    **A.**    Mostly weekends.

10   **Q.**    Pretty much every weekend, you would return to Acuna?

11   **A.**    Pretty much.

12   **Q.**    With your children?

13   **A.**    Uh-huh.

14   **Q.**    Any issues crossing the border getting back into Mexico?

15   **A.**    Getting into Mexico?

16   **Q.**    Yes, ma'am.

17   **A.**    No, not really.

18   **Q.**    With just you and your children, is what I'm asking.

19   When you would take your children, would Mr. Marin-Pina be with

20   you as you were crossing the border on these occasions?

21   **A.**    No.

22   **Q.**    But you and your children, no issues going to Acuna from

23   the United States?

24   **A.**    That's right.

25   **Q.**    Any issues returning from Acuna back to San Angelo?

1    **A.**    You mean at the border.  Right?

2    **Q.**    Yes, ma'am.

3    **A.**    No.

4    **Q.**    And I don't want to minimize the threats that you have

5    stated to the jury about, but were the threats of such a nature

6    that you still felt safe taking your children back to that

7    residence on the weekends?

8    **A.**    We wanted to see my husband, and we have grown accustomed

9    to being together, so at the moment, I was filling out

10   applications for--to turn in to the USCIS, so we were talking

11   about that and getting ready to file the applications.  I--I

12   felt scared, but I just wanted to see my husband.  Wanted to

13   see--

14   **Q.**    Sure.  You didn't think it was irresponsible, as a

15   mother, to take your children to see your husband in Acuna?

16   **A.**    Not if I was watching them, if--I mean, not with me.  I

17   mean, if I was sending them with somebody else, maybe.

18   **Q.**    But you felt that you were in a position, or at least

19   when you got to Acuna, you and your husband would be able to

20   protect your family and children for those weekends?

21   **A.**    Yes, at least try.

22   **Q.**    You stated that while you were in the United States, you

23   were also working on the application process to allow

24   Mr. Marin-Pina to lawfully enter the United States; is that

25   correct?

1    **A.**    Yes.

2    **Q.**    Is that why he had not joined you already?

3    **A.**    Yes.

4    **Q.**    So were you aware that it would have been illegal for

5    Mr. Marin-Pina to come with you from Mexico to the

6    United States on those trips?

7    **A.**    Yes.

8    **Q.**    You stated previously that you were waiting to get the

9    fees, the filing fees for that application and that's the

10   reason it had not been submitted; is that correct?

11   **A.**    Uh-huh, yes.

12   **Q.**    Were you working anywhere in San Angelo or did you have

13   any type of gainful employment in San Angelo?

14   **A.**    Yes, I worked as a waitress for a while at the beginning.

15   Mainly as a waitress.

16   **Q.**    But were you being required to pay the rent at the

17   residence that you were living at at--on Possum--excuse me--

18   Possum Hollow Road?

19   **A.**    Yes.

20   **Q.**    Do you recall what your rent was?

21   **A.**    450.

22   **Q.**    450?  Would that be per month?

23   **A.**    Yes.

24   **Q.**    When did Mr. Marin-Pina join you in San Angelo?  How did

25   that come about?

1    **A.**    I'm sorry?

2    **Q.**    When did your husband join you in--  Did there come a

3    time when your husband joined you in San Angelo?

4    **A.**    Uh-huh.

5    **Q.**    Do you recall when that was?

6    **A.**    Early 2014.

7    **Q.**    Early in 2014?

8    **A.**    (Witness nods head up and down.)

9    **Q.**    What is your understanding as to how he crossed the

10   border?

11   **A.**    I brought him in.

12   **Q.**    You brought him in?

13   **A.**    Yes.

14   **Q.**    Okay.  How did you bring him in?

15   **A.**    In my car.

16   **Q.**    And how exactly--  What kind of car was it?

17   **A.**    It's an older Nissan Pathfinder.

18   **Q.**    An older Nissan Pathfinder?

19   **A.**    Uh-huh.

20   **Q.**    So did you just secrete him in the back and hide him

21   under some things?  How did you get him across the border?

22   **A.**    Well, he just sat in the back seat.  He stayed in the

23   back, in the--in the back seat.

24   **Q.**    So he just sat in the back seat; you went through the

25   border checkpoint, no issues?

1    **A.**    No, no issues.

2    **Q.**    Did they ask who he was?

3    **A.**    No, they didn't.  They--they--it was early in the

4    morning, so no.  It was pretty much just Border Patrol.

5    **Q.**    Were you, at some point, stopped, either right at the

6    border or at some checkpoint, where somebody with immigration

7    authority or immigration official had to verify your

8    documentation--

9    **A.**    Yes.

10   **Q.**    --on this particular trip where you smuggled

11   Mr. Marin-Pina back into the country?

12   **A.**    Yes.

13   **Q.**    Were your children with you on this trip?

14   **A.**    Yes.

15   **Q.**    So your children were with you when you smuggled

16   Mr. Marin back to the country?

17   **A.**    (Witness nods head up and down.)

18   **Q.**    Did they verify your documentation on this particular

19   occasion at some point?

20   **A.**    Mine, yes.

21   **Q.**    Did they verify your children's documentation?

22   **A.**    No.

23   **Q.**    Did they verify your husband's documentation?

24   **A.**    No.

25   **Q.**    So whoever was looking in the vehicle or stopping the

1  vehicle just never--  Did they notice Mr. Marin-Pina in the

2  back?

3  **A.**    I don't know.  I don't know.  They--there was the

4  children in the back, but I don't think so, no.

5  **Q.**    But your testimony is that he was sitting up--  Would he

6  have been obvious to someone who was looking in the vehicle?

7  **A.**    Probably.  I don't know.  I--I would think so.

8  **Q.**    Let me ask about the circumstances that you brought

9  Mr. Marin-Pina across the border.  Did you start from your

10  house, from your residence location in Acuna and just drive to

11  the border--

12  **A.**    Yes.

13  **Q.**    --or did you meet him somewhere else?

14  **A.**    It was at the house.

15  **Q.**    So you got in your vehicle at your house.  Did y'all pack

16  some things?

17  **A.**    No.

18  **Q.**    Did you leave whatever his belongings were just at the

19  home there in Acuna?

20  **A.**    Yes.

21  **Q.**    What time did you set out from Acuna?

22  **A.**    Don't remember the exact time.  It was early in the

23  morning.

24  **Q.**    Early in the morning?

25  **A.**    (Witness nods head up and down.)

1    **Q.**    Dark?  Light outside?

2    **A.**    Uh-huh, dark.

3    **Q.**    Dark?

4              Were there any vehicles following you when you went

5    to the border?

6    **A.**    They didn't follow us.  I noticed the vehicles that had

7    been watching us just parked.  No one followed us though.

8    **Q.**    Did any of the vehicles follow you as you went to the

9    border checkpoint?

10   **A.**    I didn't notice if they did.

11   **Q.**    Was there much traffic on the road that morning when you

12   drove to the border checkpoint?

13   **A.**    The usual, I think.  It's--it's--there's usually a lot of

14   traffic, so--I really didn't think about--didn't notice if

15   there was.

16   **Q.**    Well, let me ask it this way.  Did you feel that you were

17   being followed or pursued when you left Acuna to go to the

18   border?

19   **A.**    I was afraid that we were being followed.

20   **Q.**    But did you actually see any vehicles--

21   **A.**    Did I see any?

22   **Q.**    --or anybody following you?

23   **A.**    No.  I didn't pay attention to it.

24   **Q.**    Was it such a threat that you felt like you should tell

25   somebody--the immigration officer that you visited with, did

1   you tell him about any specific threats you had been receiving

2   while in Mexico?

3   **A.**   No, I didn't.

4   **Q.**   Did Mr. Marin-Pina, from the back seat, mention to the

5   immigration officers, hey, I'm illegal; I'm trying to flee the

6   cartel?

7   **A.**   No.

8   **Q.**   Did he try to present any type of documentation to the

9   immigration officers?

10  **A.**   No.

11  **Q.**   And again, no issues leaving with Mr. Marin-Pina in your

12  vehicle and heading north?

13  **A.**   No.

14  **Q.**   At some point, did the immigration officer ask you or

15  anyone else in the vehicle if they were--if you were all U.S.

16  citizens?

17  **A.**   No.  I showed my--my passport card.

18  **Q.**   So you showed them your passport to verify your

19  citizenship; is that correct?

20  **A.**   Yes, yes.

21  **Q.**   And you're a naturalized United States citizen; is that

22  correct?

23  **A.**   Yes.

24  **Q.**   Where is your family from?

25  **A.**   My parents, you mean?

1    Q.    Yes, ma'am.

2    A.    They are from Mexico.

3    Q.    Where do they live in Mexico?

4    A.    They lived in Michoacan.  They live in California now.

5    Q.    Okay.  They now live in California?

6    A.    Yes.

7    Q.    Are they also naturalized?

8    A.    They are legal residents and naturalized.

9    Q.    So they're here lawfully in the country?

10   A.    Yes.

11   Q.    Back to my previous question, did the immigration officer

12   ever ask you or anyone else in the vehicle if they were

13   United States citizens?

14   A.    No.

15   Q.    So at no point did Mr. Marin ever have to address an

16   immigration officer whenever you were stopped going from Acuna

17   to Del Rio that day?

18   A.    No.

19   Q.    Where did you go after you crossed the border?

20   A.    We stayed at--we went to a park, actually, and stayed

21   there for a little bit and we headed to Eldorado.

22   Q.    Where did you go to a park at?  In Del Rio or somewhere

23   else?

24   A.    In Del Rio.

25   Q.    So you actually stopped at a park in Del Rio?

1    **A.**    Uh-huh.

2    **Q.**    What did you do at the park in Del Rio?

3    **A.**    Just sit there and talk and just sit there, watch the

4    kids play.

5    **Q.**    Did you feel like, after you had gotten across with

6    Mr. Marin--was that a nervous situation for you?

7    **A.**    Yes.

8    **Q.**    Why is that?

9    **A.**    Because I was nervous; nervous, in the first place,

10   because I was afraid of what was going on.  It got--it had

11   gotten too--it was too much, what was going on there, that I

12   was nervous about that.  I was nervous about coming back here.

13   **Q.**    Why were you nervous about coming back here?

14   **A.**    Because I would--because of the fear of being followed.

15   **Q.**    So you were afraid of being followed?

16   **A.**    Yes.

17   **Q.**    Were you afraid of being caught potentially violating

18   federal laws by assisting an alien coming to the United States?

19   **A.**    No, I was not afraid of that.  If they had caught us, I

20   would have said the truth.

21   **Q.**    Which would have been you were under duress?

22   **A.**    Yes.  We were, yes.

23   **Q.**    You were being chased by the cartel?

24   **A.**    Yes.

25   **Q.**    But you didn't think it was pertinent to tell immigration

1    officials right then and there?

2    A.    No, I didn't.  I didn't think about that, and I didn't

3    know that you could do that.  I didn't know things that I know

4    now.

5    Q.    After you stopped at the park in Del Rio, you said you

6    were nervous of being pursued; is that correct?

7    A.    Yes.

8    Q.    But at some point, the situation was such you thought it

9    was okay to stop at a park?

10   A.    Yes.  Once in the United States, yes.

11   Q.    So once you got into the United States, were some of

12   those fears of being pursued--were those sort of relieved?

13   A.    A little bit, yes.

14   Q.    How long were you at the park?

15   A.    Not long.  I don't recall.  Maybe half an hour,

16   45 minutes.

17   Q.    And I apologize if I already asked this, but I just want

18   to be sure on the timeline.  About when is this happening?  Did

19   you say early 2014?

20   A.    Uh-huh, yes.

21   Q.    Where did you go from Del Rio?

22   A.    We went to Eldorado.

23   Q.    And is that where you had some relatives living?

24   A.    I had a brother living there.

25   Q.    How long did you stay in Eldorado?

1    **A.**    We just visited and then we came to San Angelo.

2    **Q.**    And, again, felt comfortable enough that you weren't

3    being pursued, and you stopped in Eldorado; is that right?

4    **A.**    Yes.  We stopped to see my brother.

5    **Q.**    Where did you go from Eldorado?

6    **A.**    To San Angelo, to the place we have, the place we have

7    there.

8    **Q.**    And that's the residence that you had been staying at for

9    some time?

10   **A.**    Yes.

11   **Q.**    How long had you been staying there prior to when you

12   brought Mr. Marin-Pina there?

13   **A.**    Less than a year.

14   **Q.**    Less than a year?

15   **A.**    Uh-huh.

16   **Q.**    You stated that you didn't put the trailer in your name;

17   is that correct?

18   **A.**    Yes.

19   **Q.**    Why is that again?

20   **A.**    To not be able to be found, not--so people wouldn't know

21   that we were living there or staying there.

22   **Q.**    So that people who were to look in, I guess, wherever

23   that information might be found, they wouldn't be able to find

24   your name?

25   **A.**    Right.

1   **Q.**   Or your children's names?

2   **A.**   Yes.

3   **Q.**   Same reason you didn't put them in school; is that

4   correct?

5   **A.**   They were in school for a little bit; then I pulled them

6   out.

7   **Q.**   So they were actually registered for school?

8   **A.**   Yeah, they finished--they--they didn't--they went for a

9   little bit to Grape Creek Middle School; then I--I pulled them

10   out.

11   **Q.**   Why did you pull them out?

12   **A.**   For fear that they might--they might--somebody from there

13   might come here and see them in the newspaper or, you know,

14   field trips and all that stuff.

15   **Q.**   Did you tell the school administrators at Grape Creek

16   that's why you were removing your children from school?

17   **A.**   No, I didn't tell them that.

18   **Q.**   Did there come several occasions where law enforcement

19   were actually called out to your residence at 9869 Possum

20   Hollow?

21   **A.**   Yes.

22   **Q.**   I'd like to first talk about December the 25th of 2014.

23   Do you recall law enforcement having to be called out on that

24   day?

25   **A.**   Yes.

1  **Q.**   That's Christmas Day; is that correct?

2  **A.**   Yes.

3  **Q.**   I don't want to go into the substance of what happened,

4  but I want to talk about who was there.

5  **A.**   Yes.

6  **Q.**   Did you, yourself, have to call the Tom Green County

7  Sheriff's Office?

8  **A.**   I called them, yes.

9  **Q.**   And I say called the sheriff's office.  Did you call the

10  sheriff's office directly, or was it a 9-1-1 call?

11  **A.**   I don't remember.  I had gotten home, and I don't

12  remember if it was the sheriff--well, they both go to the

13  sheriff's.  I don't know.  I don't remember.

14  **Q.**   And that was a bad question.  What I'm trying to ask is,

15  sometimes you call 9-1-1 and then they'll just dispatch the

16  appropriate law enforcement for that area.  Did you call the

17  Tom Green County Sheriff's Office--

18  **A.**   Yes.

19  **Q.**   --at a direct number, or did you just dial 9-1-1 and they

20  dispatched--

21  **A.**   I believe I called 9-1-1.  I didn't know the sheriff's

22  number.

23  **Q.**   Okay.  And that's what I meant to ask--

24  **A.**   Right, yes.

25  **Q.**   --was whether you just dialed 9-1-1 or you actually knew

1   the sheriff's office number.

2   **A.**   Yes.

3   **Q.**   Okay.  So you dialed 9-1-1 on December 25th, 2014.  And

4   again, not going to the substance of what happened, but was

5   your husband there at the residence with you--

6   **A.**   Yes.

7   **Q.**   --when you dialed 9-1-1?

8          And when--  Did officers, at some point, arrive?

9   **A.**   Yes.

10  **Q.**   And was that in the evening hours of December 25th, 2014,

11  or do you recall?

12  **A.**   It was in the evening.  My parents were in town, and they

13  went--had gone back home.

14  **Q.**   Did the sheriff's office actually send some deputies out

15  to the residence?

16  **A.**   Yes.

17  **Q.**   And when they arrived, was yourself, the defendant

18  Mr. Marin-Pina, and the deputies there present at your

19  residence?

20  **A.**   Yes.  Yes.

21  **Q.**   Would this have been before or after you had your

22  children removed from the Grape Creek school system?

23  **A.**   That was after.

24  **Q.**   Did you give those law enforcement officers your real

25  name?

1    **A.**    Yes.

2    **Q.**    Did you also give them the defendant's name, or did he

3    give them his name, or do you recall?

4    **A.**    I don't remember if he did.  I know I gave them my

5    information.

6    **Q.**    Did you also give them the information of your children?

7    **A.**    I don't remember.

8    **Q.**    If that information is in the reports, would that

9    information have come from you?

10   **A.**    Yes, most likely.

11   **Q.**    So at some point, you did give your information to law

12   enforcement agents in Tom Green County.  Is that a fair

13   statement?

14   **A.**    Yes.

15   **Q.**    Did you feel threatened by the Tom Green County sheriff's

16   deputies that arrived on scene to help?

17   **A.**    No.

18   **Q.**    Are you aware if Mr. Marin-Pina felt threatened by those

19   deputies who arrived on scene?

20   **A.**    I don't--I don't think so.  It was just a call so I could

21   go in the house and get some clothes, because we were having an

22   argument and I wanted some clothes to go back to my brother's

23   house because my parents were visiting, so--

24   **Q.**    Yes, ma'am.  And again, I don't want to get too much into

25   the substance of any conflict that was there--

1    **A.**    Right, uh-huh.

2    **Q.**    --but I do want to ask, at any point, did you tell these

3    sheriff's office deputies that you had come to San Angelo

4    because of fear of being pursued by the cartel in Mexico?

5    **A.**    No.

6    **Q.**    Are you aware if Mr. Marin-Pina told the deputies that

7    information?

8    **A.**    I'm not aware of that.

9    **Q.**    Was there also an occasion on January the 19th, 2015,

10   where sheriff's deputies were called out to your residence

11   again?

12   **A.**    Yes.

13   **Q.**    And was that call-out actually made by an individual by

14   the name of Sheila Pardue?

15   **A.**    I'm sorry?

16   **Q.**    Sheila Pardue, is she the one who made the call, or did

17   you make the call?

18   **A.**    I believe she did.  She's a neighbor--

19   **Q.**    Okay.  So who is that to you?  Who is Sheila Pardue?

20   **A.**    She lives, let's see, about two, three houses away from

21   where I live.

22   **Q.**    So she lived in the neighborhood near your trailer?

23   **A.**    Yes, she does.

24   **Q.**    But she's actually the one who called the officers on

25   that date; is that correct?

1    **A.**    Yes, I believe so.

2    **Q.**    And on January 19th, 2015, did deputies again arrive at

3    your residence on Possum Hollow?

4    **A.**    Yes.

5    **Q.**    And without going into any substance of any conflict or

6    anything, I want to ask, by the time that deputies arrived at

7    the residence, was Mr. Marin-Pina still at the residence?

8    **A.**    Yes.

9    **Q.**    He was?

10   **A.**    He was.

11   **Q.**    You believe he was there and did visit with deputies?

12   **A.**    I believe so.  I don't remember exactly the whole--the

13   details, but I believe he was there.

14   **Q.**    Okay.  Were you there when deputies arrived to the

15   residence?

16   **A.**    I believe I talked to one of them.

17   **Q.**    Okay.  And again, similar question to what happened in

18   December.  Did you tell those deputies at that time that you

19   were running in fear from the cartel in Mexico?

20   **A.**    No.

21   **Q.**    If Mr. Marin-Pina was present, do you have any knowledge

22   about whether he would have told deputies that on that date?

23   **A.**    I don't know.

24   **Q.**    A similar incident occurred on April the 7th, 2015.  Did

25   you, yourself, have to call out emergency services to the

1   residence?

2   **A.**     Yes, I believe so.

3   **Q.**     And by "emergency services," I mean to say law

4   enforcement.  Did law enforcement get called out to your

5   residence again?

6   **A.**     Yes.

7   **Q.**     And this is on April the 7th of 2015; is that correct?

8   **A.**     Yes.

9   **Q.**     In that situation, were you present when law enforcement

10  officers arrived?

11  **A.**     Yes.

12  **Q.**     Was your husband, Rafael Marin-Pina, present also?

13  **A.**     I believe so.

14  **Q.**     And same question.  Not going into the substance of any

15  conflict or dispute, did either of you tell law enforcement

16  officers that you were running in fear of being pursued by the

17  cartel?

18  **A.**     No.

19  **Q.**     I'd like to turn to May 16 of 2015.  Were law enforcement

20  officers from the Tom Green County Sheriff's Office again

21  dispatched to your location there at 9869 Possum Hollow?

22  **A.**     In May, you said?

23  **Q.**     May 16th of 2015.

24  **A.**     I don't recall dates, but I suppose so, yes.

25  **Q.**     Okay.  Any reason to dispute that they were called out to

1   your residence on May 16th, 2015?

2   **A.**    I'm sorry.  Can you repeat that?

3   **Q.**    Do you have any reason to disagree with the fact they

4   were called out to your residence on that date?

5   **A.**    No.

6   **Q.**    Any reason to believe that didn't happen?

7   **A.**    No, I don't.

8   **Q.**    On that occasion, do you recall whether Mr. Marin-Pina

9   was there when officers arrived?

10  **A.**    I believe he was there.

11  **Q.**    Were there occasions when you would call the police and

12  Mr. Marin-Pina would leave before they would arrive?

13  **A.**    Leave?

14  **Q.**    Yes, ma'am, that he would not be present at the scene

15  after you had contacted law enforcement?

16  **A.**    Well, I didn't call the police all those times, that's--

17  that's for sure.  I remember one time he wasn't there, but no,

18  the other times, I remember he was--he--he had spoken to them

19  too.

20  **Q.**    Okay.  And even assuming he was there on May 16th of

21  2015, do you have any information that he told law enforcement

22  that he had been pursued by the cartel and that's why he was in

23  San Angelo, Texas, or Grape Creek, Texas?

24  **A.**    I don't think he did.  I don't know.  I--

25  **Q.**    Did you mention that to law enforcement officers?

1    **A.**    Did I mention that?

2    **Q.**    Yes, ma'am.

3    **A.**    No.

4    **Q.**    And this is now multiple times that you have called for

5    service from the sheriff's office.  Did you have any reason to

6    believe that they weren't trustworthy or would not have handled

7    that type of information properly?

8    **A.**    I think they're trustworthy.  I don't--I really didn't

9    tell anybody about the situation.  Nobody really knew about

10   what--why we came here or that he was here illegally.  So I

11   didn't see a reason to tell them.

12   **Q.**    Did you have any reason to believe that those sheriff's

13   deputies were affiliated with the cartel?

14   **A.**    No.

15   **Q.**    And again, you also shared your personal information and

16   the information of your children; is that right?

17   **A.**    Yes.

18   **Q.**    I'd like to turn lastly to September the 13th of 2015.

19   Is that the last occasion that you can recall that sheriff's

20   deputies were dispatched to your residence on Possum Hollow?

21   **A.**    Yes.

22   **Q.**    And on September 13th of 2015--again, not going into the

23   underlying substance of any conflict or disagreements--was

24   Mr. Marin-Pina and yourself present when those deputies

25   arrived?

1    **A.**    Yes.

2    **Q.**    Did you visit with deputies on that occasion?

3    **A.**    Yes.

4    **Q.**    Did Mr. Marin-Pina visit with deputies on that occasion?

5    **A.**    Yes.

6    **Q.**    And same question.  Did either of you tell those deputies

7    that you were running from the cartel for fear of your life?

8    **A.**    I didn't, no.

9    **Q.**    I want to talk specifically about September the 13th of

10   2015.  Again, I don't want to go into the specifics of what

11   happened, but was part of the issue that Mr. Marin-Pina had

12   disappeared from the residence for several days and had just

13   returned?

14   **A.**    He was at the neighbor's house actually.  He watches--we

15   used--he used to watch the neighbor's house, and he was there,

16   right--right next door.

17   **Q.**    So if you would have told officers that your husband had

18   been gone for three days and that he had just come home that

19   day, is that what you meant?  That he was just next door for

20   three days?

21   **A.**    Yes.  I told them he was next door.  I don't remember if

22   he was gone for three days; I just told them that he had been

23   gone for the night and probably the day before that.

24   **Q.**    Okay.  If they documented that you said he had been gone

25   for three days, would you have any reason to dispute that?

1   **A.**     I don't know if I have a reason.  I--he might have been

2   there for three days.  I don't--we were having an argument, so

3   he would--so he--he left.  I don't remember exactly how long he

4   was gone.

5   **Q.**     What was Mr. Marin-Pina doing--if you brought him over in

6   early 2014, up and through September of 2015, what was he doing

7   for employment?

8   **A.**     He was working for the lay pastor in the church doing

9   remodeling; then he went on to working construction and

10  roofing.

11  **Q.**     So he was employed while in the United States?

12  **A.**     He was working, yes.

13  **Q.**     Was he helping pay the rent?

14  **A.**     Yes.

15  **Q.**     At this point, where were you at in the application

16  process for his lawful admission into the United States?

17  **A.**     Can you repeat that, please?

18  **Q.**     Now that he's present in San Angelo and working, were you

19  still attempting to allow him to lawfully reapply for admission

20  to the United States?

21  **A.**     Yes.  I had filled out different applications, because

22  the one that I was planning to submit when he was in Mexico

23  can't be submitted from the--when he's in the United States.

24  So I was looking and doing research on the application that can

25  be filed from here while he's living here.

1    Q.    So it was actually impossible for you to file that

2    application while he was illegally present in the

3    United States?

4    A.    Right.  You have to do it from outside the country.

5    Q.    And that's all information that you had researched, and

6    it was available to you; is that correct?

7    A.    Yes.

8    Q.    That was before you developed the plan to get a residence

9    in San Angelo and then help your husband come across the border

10   and then live in the United States?

11   A.    Yes.

12              MR. LONG:  Pass the witness, Your Honor.

13                   REDIRECT EXAMINATION

14   BY MR. SLOAN:

15   Q.    Bibiana?

16   A.    Yes.

17   Q.    On cross-examination, you talked about dates that things

18   happened, 2013, 2014, 2015, things like that.  And I just want

19   to ask you, are you nervous today?

20   A.    Yes, very much.

21   Q.    Okay.  So when you said that, in 2015, that you were

22   receiving threats, that wasn't accurate, was it?

23   A.    Oh, no.

24   Q.    Okay.  So do you have some--do you have some trouble

25   remembering the dates exactly in terms of getting that right?

1    **A.**    Yes, I do.

2    **Q.**    Okay.  When you were living in the Yucatan--  On

3    cross-examination, you talked about how easy it was to travel

4    back and forth in Yucatan.  When you were in Yucatan, had

5    anybody, at that point, accused your husband of being in the

6    DEA?

7    **A.**    In Yucatan?

8    **Q.**    In Yucatan.

9    **A.**    Not that I know of.

10   **Q.**    Okay.  You, at one point, indicated that you thought

11   there was a way to get your husband into this country legally

12   if you stayed in Mexico.  Did it stay safe in Mexico where you

13   felt like you could go through that process?

14   **A.**    It didn't stay safe, no.

15   **Q.**    Other than the danger that you felt you were in, was

16   there any other reason to leave Mexico?

17   **A.**    Other than danger?

18   **Q.**    Right.

19   **A.**    I think I would have stayed in Mexico if there weren't

20   any shootings, if there weren't any threats.

21   **Q.**    So if the threats hadn't been made, you wouldn't have

22   left Mexico?

23   **A.**    No.

24   **Q.**    Okay.  Mr. Long talked about getting a residence in

25   San Angelo and planning for him to come across.  When you

1    originally got that residence in San Angelo, was your plan to

2    bring him across legally?

3    **A.**    Illegally?

4    **Q.**    Legally.

5    **A.**    Legally, yes.

6    **Q.**    All right.  And you had started some petitions trying to

7    save up the money for the filing fee and things like that?

8    **A.**    Yes, yes.

9    **Q.**    Okay.  And Mr. Long asked you about issues coming back,

10   and you indicated you didn't have any issues coming back from

11   Mexico into the United States?

12   **A.**    No.

13   **Q.**    There was one occasion when you--when these guys came up

14   and attacked your vehicle; is that right?

15   **A.**    Well, that was when I was bringing the kids to school,

16   yes.

17   **Q.**    Okay.  Your parents are lawful permanent residents in the

18   United States?

19   **A.**    Yes.

20   **Q.**    At the time that you came back and brought Rafael back,

21   did you have a place in Mexico other than where you were

22   living, like family you could go and live with where you would

23   be safe?

24   **A.**    No, we don't have a house in--we didn't have anything--

25   anywhere else to go in Mexico.  Besides, we didn't have the

1    money to move and start renting a place.

2    **Q.**    When you called the Tom Green Sheriff's Office out--or

3    when they got called out to your house, were they respectful

4    with you?

5    **A.**    Very respectful, yes.

6    **Q.**    Did they always treat you in a respectful and a good way?

7    **A.**    Yes.

8    **Q.**    Did you have any fear of calling them out?  I mean, they

9    were good officers; is that right?

10   **A.**    They were good officers.  They have been called three

11   times in the past month and a half.  Somebody else keeps

12   calling the police, and they have always been respectful.  Two

13   days ago was the last time somebody called them.

14   **Q.**    And so as far as when Mr. Marin was there versus when

15   they came or when they didn't come, do you remember exactly

16   which days he was there when they came and which days he

17   wasn't?

18   **A.**    I remember one situation when he wasn't there.  I don't--

19   I don't--I can't tell you which time.  I don't remember

20   exactly.

21   **Q.**    Okay.  So there--

22   **A.**    I know that December the--December 25th, he was there,

23   because-

24   **Q.**    Okay.  So there were some times when he was there and

25   some times when he wasn't?

1    **A.**    Yes.

2    **Q.**    Okay.

3              MR. SLOAN:  I'll pass the witness.

4              THE COURT:  All right.  You may step down.

5              Call your next witness.

6              MR. SLOAN:  Your Honor, we would call Rafael

7    Marin-Pina.

8              THE COURT:  Raise your right hand.

9         (THE OATH IS ADMINISTERED BY THE COURT)

10             THE COURT:  Please be seated.

11                     RAFAEL MARIN-PINA,

12   DEFENSE WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

13                     DIRECT EXAMINATION

14   BY MR. SLOAN:

15   **Q.**    Could you state your name for the Court?

16   **A.**    Rafael Antonio Marin-Pina.

17   **Q.**    Okay.  And you are the defendant in this case.  Right?

18   **A.**    Yes, sir.

19   **Q.**    How old are you, sir?

20   **A.**    Forty-one.

21   **Q.**    I'm sorry.  How old?

22   **A.**    Forty-one.

23   **Q.**    Forty-one?

24             Where were you born?

25   **A.**    Mexico City.

1   Q.   Are your parents U.S. citizens right now?

2   A.   Yes, sir.

3   Q.   Were they U.S. citizens when you were born?

4   A.   When I was born?

5   Q.   When you were born, were they U.S. citizens?

6   A.   Oh, no.  No.

7   Q.   When did they become naturalized U.S. citizens?

8   A.   In mid-nineties, I want to say.

9   Q.   How old were you when you first came to the

10  United States?

11  A.   Too young to remember.

12  Q.   Okay.  If your A-file says you came across--or came in

13  1978, would that have made you three years old?

14  A.   About.

15  Q.   Where did you go to elementary school?

16  A.   Russell Elementary in Santa Ana, California.

17  Q.   Where did you go to middle school?

18  A.   Fitz--Fitz Intermediate in--also in Santa Ana,

19  California.

20  Q.   What about high school?

21  A.   I went to Los Amigos High School in Fountain Valley,

22  California.

23  Q.   Did you graduate high school?

24  A.   Yes, sir.

25  Q.   Did you do any college?

1    **A.**    Yes, sir.

2    **Q.**    All right.  About how much college did you do?

3    **A.**    About--almost two years, like a semester and a half.

4    **Q.**    Okay.

5    **A.**    Like a year--three semesters.  Like a year and a half of

6    school.

7    **Q.**    And did you, at some point, join the United States Marine

8    Corps?

9    **A.**    Yes, sir.

10   **Q.**    When was that?

11   **A.**    After the first semester of college.  I was getting bad

12   grades, and so I figured I wasn't smart enough for college yet,

13   so I joined the military.

14   **Q.**    Okay.  And how long were you in the Marines?

15   **A.**    About two years.

16   **Q.**    All right.  And what happened?  How did you wind up

17   getting out of the Marines?

18   **A.**    I had a motorcycle accident, a severe motorcycle accident

19   where I broke, like, 42 bones in my body.  I was in a coma,

20   wheelchairs, and stuff like that.  But that's how I was

21   discharged out of the Marines.

22   **Q.**    Okay.  Did they determine you weren't combat-ready and so

23   they had to let you go?

24   **A.**    Yes.

25   **Q.**    Was part of the reason you joined the Marines--was that

1    to try to get your citizenship?

2    A.    Yes, that was part of the enlistment incentive, the fast

3    track to citizenship, and also the GI bill for college.

4    Q.    Right.  And the citizenship part, that application never

5    got--never got submitted, did it?

6    A.    I did submit it.  I did.

7    Q.    You did try to start it?

8    A.    Yes.

9    Q.    Did you--and you tried to start that through your

10   military situation?

11   A.    In the military.

12   Q.    Okay.

13   A.    We have to in order to join the military.

14   Q.    All right.  In 1996, did you get convicted of an

15   aggravated battery?

16   A.    It was 1997, I believe.  I caught the charge in '96; it

17   didn't go to trial until '97.

18   Q.    All right.  So you were convicted of that offense; is

19   that right?

20   A.    Yes, sir.

21   Q.    Were you later deported from the United States due to

22   that conviction in 1999?

23   A.    Yes.

24   Q.    When you first went--when you were first deported in 1990

25   to Mexico--1999 to Mexico, how did things go?

1    **A.**    Not too good.  I mean, it was fun for a while, because I

2    was young and single, and it--but it--I took it as a vacation

3    almost, but it's really hard to acclimate to a foreign country

4    that you're--you're not familiar with the culture.  But I did

5    try and make it over there, but it's--

6    **Q.**    All right.  So you--

7    **A.**    It wasn't going to happen.  Back then, I didn't speak

8    that much Spanish.

9    **Q.**    Did you have some back and forth between the

10   United States and Mexico over the years?

11   **A.**    Yes.

12   **Q.**    All right.  And in 2008, you were deported; is that

13   right?

14   **A.**    Yes, because--

15   **Q.**    And in 2008, were you already married?

16   **A.**    Yes.

17   **Q.**    And how many of your kids did you already have?

18   **A.**    Four.

19   **Q.**    Okay.  What did--how did you--  Did you determine that

20   something different was going to happen this time in Mexico?

21   **A.**    My wife and I, we--  See, I was deported in 2008 because

22   I caught a DUI, and--

23   **Q.**    Okay.  Did you determine that you were going to change

24   things this time in Mexico?

25   **A.**    Yeah.  Yeah, I quit drinking and got--got spiritual.  I

1    was saved and went to church and worked on my marriage and on

2    my addiction to alcohol, and my family actually came--was--came

3    to live with me in Mexico.  And I got further education--

4    Q.    Where did you live first?

5    A.    Yucatan.

6    Q.    And did you have some kind of problems in Yucatan?

7    A.    Not real problems.  Money problems, but those--those are

8    everywhere.

9    Q.    Okay.  At some point, did you decide to move to Del Rio--

10   I mean, I'm sorry, to Acuna?

11   A.    Yes.

12   Q.    Okay.  Why did you decide to move to Acuna?

13   A.    Because my--my kids and my wife, we all went to live in

14   Yucatan, but my kids were being called dumb and slow and--and

15   that was by the teachers, because they couldn't read in

16   Spanish.  And it's--you know, my kids are--they don't speak

17   Spanish at all.  And so they actually knocked them down a

18   grade.  Like in California, my kids were actually going to go

19   up a grade, and then they came to live in Mexico and they got--

20   they went into the grade they were--they should have been at,

21   and they said these kids are too stupid; we're going to knock

22   them down a grade.  And so they knocked them down a grade, my

23   son and my oldest daughter.

24   Q.    All right.  Did you decide they would do better in

25   American schools?

1    **A.**    Yes.

2    **Q.**    And are there--  Is Acuna a border town?

3    **A.**    Yes.

4    **Q.**    Was commuting into Acuna--or into Del Rio for school part

5    of why you went to Acuna?

6    **A.**    Later down the road, yes.  But that didn't happen

7    immediately.

8    **Q.**    Okay.  When you moved to Acuna, where was the first place

9    you lived?

10   **A.**    As my wife stated, in what's called Los Altos

11   (phonetically), The Heights.

12   **Q.**    Is that a fairly nice neighborhood?

13   **A.**    It's new.  It's new houses, newer houses, paved roads.  I

14   mean, for a third-world country, a newer house with a paved

15   road, that's--yeah, that's nice, I guess.

16   **Q.**    Okay.  Did you begin to hear some rumors about yourself?

17   **A.**    Not in that neighborhood.  It wasn't until we moved.

18   **Q.**    So you moved out of what you called Los Altos--

19   **A.**    Los Altos.

20   **Q.**    --and you moved to a different place?

21   **A.**    Yes.

22   **Q.**    All right.  And what were the rumors you were hearing?

23   **A.**    In the new neighborhood, in the--what'd she call--Colonia

24   Gamas (phonetically), it's that I was a federal agent.

25   **Q.**    Where did you first hear that?

1    **A.**    At the local store, at the little general store,

2    mom-and-pop-type store.

3    **Q.**    Who told you that?

4    **A.**    The owners of the store.

5    **Q.**    They told you they thought you were a federal agent?

6    **A.**    No.  They told me to beware of certain men because

7    they're asking questions about me.

8    **Q.**    Okay.  By "certain men," who did they--who were they

9    talking about?

10   **A.**    Suspected members of the cartel.

11   **Q.**    Did they tell you what kind of questions they were asking

12   about?

13   **A.**    Yes, what I--who I--who was I; what I do, like, for a

14   living; and if they knew anything about me.  And those people

15   back then, they--they thought we were missionaries, but we

16   weren't.

17   **Q.**    Okay.  At some point, did your house get busted into?

18   **A.**    Yes.

19   **Q.**    How did you--how did you discover that?

20   **A.**    Just--just to look.  I mean, you--things are turned

21   about, things are out of place, things aren't put away where

22   they're supposed to.  We had suitcases with just clothes, and

23   they were opened and looked like they were gone through.

24   **Q.**    Okay.  Did you have an encounter with some of these men?

25   **A.**    Yes.

1   **Q.**   When did that happen?

2   **A.**   I want to say it was 2013.

3   **Q.**   Okay.  I don't mean the year.  I mean, what was the

4   circumstances?  Were you working, or--?

5   **A.**   Oh, no.  One of those days that's just--  What I would do

6   is buy the morning paper, look for the jobs, because I wanted

7   to stay--I wanted to keep teaching, because I earned a teaching

8   credential when I was in Yucatan, and I wanted to keep

9   teaching.  But all they had in Acuna is factory work, which is

10   the work my wife does if--when she got--

11   **Q.**   Okay.  (Speaking Spanish), that's the word?

12   **A.**   Yeah, (speaking Spanish) is--that means factory, but it's

13   an American factory, so it's--that's the only kind of work

14   there was.  But I wanted to keep teaching, so I presented

15   basically a--my basic English 101, presented it to the general

16   managers at the (speaking Spanish), and I wanted to teach their

17   employees so that they can better communicate, and that's what

18   I was trying to do, is establish a teaching job.

19   **Q.**   Okay.  So how did--what were the circumstances under

20   which you had an encounter with these people you suspected to

21   be in the cartel?

22   **A.**   Well, after one of those interviews, I dressed, you know,

23   not fancy, but like you-all, but--like this, like I am now.

24   And, you know, coming back from an interview, and so they see

25   me like this, and then they see me duck into my little house

1    and come out in just regular jeans and T-shirt.  And so back

2    then, I used to smoke, and I was having a cigarette, and two of

3    those guys, they called me over, and--and I thought they were,

4    like, concrete workers or something, because they called me--

5    they were standing in front of a house that's not finished.

6              And so I went over there, and they just started

7    talking and saying, hey, what are you doing?  What are you up

8    to?

9              And I just tell them I was just looking for work,

10   you know.

11   **Q.**   Okay.  So what happened next?

12   **A.**   And that's when one of those black SUVs pulled up.  Two

13   other men came out of those and they said, get him in the

14   house.

15             And that's when I was, like, what's going on?

16             And they take me into the house and they--then

17   those guys asked me--the guys that have guns in their

18   waistbands--who do I work for.

19             And I am telling them, I don't have a job.  I'm

20   trying to get work.

21             You know, I thought these were just bullies that

22   want free money or trying to rob me.  I said, I don't have

23   money.  I don't work for nobody.

24             I didn't catch on until they started asking more

25   questions, specific questions.

1    Q.    Okay.  What more questions did they ask you?

2    A.    They--if I was part of the--in Spanish, they pronounce--

3    they don't pronounce D-E-A the way we do; they just pronounce

4    it--they read it and they say if I was--they asked me if I was

5    part of the Dea.

6              And I was, like, Dea?  What the heck is Dea?  And I

7    didn't--it didn't--I didn't put two and two together until I

8    was, like, wait a second, these guys got the wrong guy.

9              And they said if I was--and then when they asked me

10   if I was FBI, and then--FBI, they did break it down into the

11   letters, (speaking Spanish).

12             And I was, like, oh, no.  I was--no, you got the

13   wrong guy, man.  That's not me.

14   Q.    Did they have you do anything?

15   A.    Yeah.

16   Q.    What?

17   A.    They had me take my shirt off.  They said (speaking

18   Spanish).  One guy gave the order to the others.  (Speaking

19   Spanish) means to get me naked, and that's when I said these

20   guys were serious trouble.  And they--supposedly I was wearing

21   a mike.

22   Q.    Did they say something about you having a microphone or a

23   wire?

24   A.    Yeah.

25   Q.    Okay.  So did you take off your shirt for them?

1    **A.**    They took it off.  They took it off.  I was, like, hey,

2    hold on, just hold--slow down a minute.

3              By then, they were ripping my clothes off and they

4    were, like, (speaking Spanish).  They were, like, be still,

5    stupid.

6              You know, now they're--now I know it's hostile.

7    **Q.**    Okay.  After they had your shirt off, what happened?

8    **A.**    They looked at me and then they turned me around, and I

9    have the Marine Corps emblem right here, which kind of looks

10   like that eagle up there above the Exit sign, but it says USMC.

11   And they thought it was like some kind of federal emblem, like

12   that, and they said (speaking Spanish), meaning--pardon the

13   French--you know, hey stupid F, or--thought you said you

14   weren't a cop.

15             And I said, no, I'm not a cop.  I'm not a cop.

16   **Q.**    Okay.  So they took the tattoo on your shoulder to mean

17   you were a policeman?

18   **A.**    Yeah, they--they confused it with an agent type of

19   emblem, but it's just the United States Marine Corps emblem.

20   **Q.**    Right.  And what did they tell you?

21   **A.**    They told me that they're going to kill me.  They told

22   me--and that's when I came clean and I told them, you know

23   what?  You guys got it wrong.  I am not, in no--no way, an

24   agent.  I'm actually a deported veteran.  I'm deported.

25             Nobody in the neighborhood, in any neighborhood

1  that I had lived in in Mexico, I had confessed that to, because

2  it's kind of humiliating.  But that's what I told those guys.

3  Man, I'm coming clean.  I'm actually deported, man.  I'm

4  opposite of police.  I'm actually deported.

5  **Q.**   What did they say?

6  **A.**   They said to prove it.  They said to prove it.

7  **Q.**   Did they say something about plata?

8  **A.**   They said to go to work for them.  They said in order to

9  prove it to them, to go to work for them.  And they say, plomo

10  or plata.  And plomo is lead, plata is silver, meaning you

11  either work for us and prove it, or not, and then they kill

12  you.  You either work for them and they pay you or you deny

13  them.

14  **Q.**   Okay.  So the payment is silver; the bullet is lead?

15  **A.**   Yes.  Those are your options.  You either go to work for

16  them or you don't.  Once they got their eyes set on you,

17  they're going to have you--  You know, and to them--they said,

18  what better guy to work for as in a, you know, marine.  This

19  guy will get--he'll get our product across the border.

20          There's no way I'm going to get their product

21  across the border.

22  **Q.**   Okay.  Did they talk to you about your wife?

23  **A.**   Yes.

24  **Q.**   What did they say about her?

25  **A.**   That she could do it, that--that--

1  Q.   What did they know about your wife?

2  A.   They knew her schedule to take the kids to school and

3  they knew her route.

4  Q.   Did they talk about specifically how she was to go about

5  doing it?

6  A.   Yes, in the car.  They said for her--for us to drop off

7  her car at the car wash.  They would just--the car wash, like--

8  Q.   Okay.  So you're supposed to drop your car off at the car

9  wash, then come pick it up and just run your regular schedule?

10  A.   They said that they would (speaking Spanish), which means

11  fix, like rig it, and we wouldn't know what's in it or where it

12  was.  And that's when I told them, my wife can't do that.

13  Q.   Okay.  Did you--I mean, what did you say about it to

14  them?

15  A.   I told them, we can't do that.  We serve a God that won't

16  allow us to do that.  We cannot do that.

17  Q.   Okay.  Did they give you some time to think about it?

18  A.   Yeah.

19  Q.   Okay.  How did that happen?

20  A.   Well, when my--when I talked to my wife about it, she's,

21  like, you're crazy.  Those guys are crazy.

22       I said, there's no way we can do this.

23       And she's saying we--"Just tell them no, you

24  can't--we can't do this.  We can't, you know, get in trouble.

25  We're not going to support them," which I would never do.

1   Q.    Okay.  When you were--  After this happened, were you in

2   a situation where other things started to happen?

3   A.    Yes.  They began kind of harassing, annoying-type--it

4   wasn't--it was almost like they were just bothering us or

5   they--like--like their plans got spoiled in not--okay, guess

6   this guy is not going to be our drug mule.  And they--that's

7   when they started slashing our tires and busting our windows,

8   like stupid things like that.

9   Q.    Were they hanging around your house?

10  A.    Breaking into our house, intimidating my wife, showing

11  off their guns, stuff like that.

12  Q.    You say showing off their guns--

13  A.    Yeah, like--like--like I know Mr. Felps has a sidearm,

14  and, you know, if he were to go like this (indicating), he--you

15  know, and say, I'm going to get you, like that's what they

16  would do.  Or any one of these officers with a sidearm.

17  Q.    Would they do that around your house?

18  A.    Yes.

19  Q.    Did they talk to you some more about making your wife run

20  this load?

21  A.    Yes.  My--the lady I rented from actually had come out

22  and yelled at them; older lady, probably in her--sixty-five,

23  somewhere around there.  She said, leave these people alone,

24  they're good people, they're God-fearing people, leave them

25  alone.

1          But they weren't afraid of the locals.  They

2    weren't afraid of the local law enforcement.  But--

3    **Q.**    Why do you think they weren't afraid of local law

4    enforcement?

5    **A.**    They're on their payroll.

6    **Q.**    Okay.  Did you come to figure out which cartel these guys

7    belonged to?

8    **A.**    Yes.

9    **Q.**    What was that?

10   **A.**    Zeta, with a "Z".

11   **Q.**    Okay.  And Zeta, that's just the letter Z in Spanish.

12   Right?

13   **A.**    Yes.

14   **Q.**    So the members of this--I mean, that's a regular known

15   cartel; is that right?

16   **A.**    Yes.  Yes, it's--

17   **Q.**    Did your wife run into trouble with these folks?

18   **A.**    Yes.

19   **Q.**    And did she tell you about it?

20   **A.**    Yes.

21   **Q.**    Did that bother you?

22   **A.**    Yes.  It scared me.

23   **Q.**    Okay.  Was there an occasion where they made an attempt

24   on your life?

25   **A.**    Yes.  After everything that happened with my wife, and

1   she comes and stays--first, she stayed, like, a while in

2   Del Rio, Texas, but that didn't work out.  She went a little

3   further up north to Eldorado, Texas, where her brother was.

4   But I stayed back, because I couldn't come across.  But I--I

5   was staying with a friend from church.  I stayed at their

6   house, which is actually--that address on my ID, that's the

7   address I was--that's the last address that I was at, because

8   those guys helped me to get that ID card.  You know, they

9   said, well, get one of these IDs, you know; that will prove to

10  them that you're Mexican.  You know, if they check you, they'll

11  know that you're legitimate Mexican, because this is a Mexican

12  ID.

13          So, you know, I went about doing things to be more

14  safe and precautious on my end.  I moved--while she was in

15  the--on the American side and I had to stay on the Mexican

16  side, I moved to the--to stay with this guy from church, which

17  is that address.

18  Q.   Would she come and visit you?

19  A.   Yes.

20  Q.   All right.  What were you doing when this attempt on your

21  life occurred and how did it happen?

22  A.   Well, I was left with one dog.  Our two dogs were

23  American dogs.  They had American pedigrees.  But this German

24  Shepherd was actually a rescue that I found in the middle of

25  the desert, and I rescued it and I nurtured it and cured its

1   mange and--and that dog stayed with me and--the German

2   Shepherd, because we didn't have an American pedigree to bring

3   her across the border.

4          But that dog--on one occasion, I was walking it

5   down--just down the street.  I was walking with that dog, and

6   when--all of a sudden I heard heavy motors, like big motors,

7   like big diesel truck motors revved up, and then I heard

8   gunshots.

9   **Q.**   Okay.  Did you turn and--

10  **A.**   Multiple blasts.

11  **Q.**   Did you turn and look?

12  **A.**   I looked over my shoulder to see what was going on, and

13  it's just chaos.  It's--it's a fire--a firefight.  This was--

14  to me, it feels like a scene out of a combat movie, Urban

15  Combat.  And then I just drug this dog to safety, and myself, I

16  ran to safety.  And they tried to ambush me, but luckily for

17  me, they couldn't go down the road that I went because oncoming

18  traffic was coming in their direction.  It was a one-way road.

19  And that's--

20  **Q.**   Okay.  You were on foot and they were in a vehicle?

21  **A.**   Yes.

22  **Q.**   So they were unable to follow you the way that you ran?

23  **A.**   Yes.

24  **Q.**   Do you have any doubt they were shooting in your

25  direction?

1    **A.**    No, none.

2    **Q.**    All right.  Did you feel like they were specifically

3    targeting you?

4    **A.**    Yes.  The thing is, is that the GATE police in--that came

5    to Acuna is a federal police funded by the United States

6    government.  It's not Mexican police.  It's not your local

7    state cops, state trooper-type cops, or municipal police.  The

8    GATE police--it's an acronym.  It's for something in Spanish.

9    But the GATE police, they--they were SWAT, commando-style,

10   tactical-style police that was part of the war on drugs.  And

11   these guys, they--they're so afraid of the cartels is that

12   they--they wear ski masks.  These are cops that wear ski masks

13   to hide their identity from the cartels.

14   **Q.**    Did you become associated in some way with these GATE

15   police?

16   **A.**    No, no.

17   **Q.**    I mean, in the--as far as the perception--  Did you

18   believe that the cartel thought you had put them on them?

19   **A.**    That's what--they what they--that's why they put a hit on

20   my life.  When they shot at me, it was because there was

21   already an order to kill me, thinking that I am the DEA agent

22   that snitched on them in Mexico to this GATE police that all of

23   a sudden wasn't there, and all of a sudden this guy that looks

24   like I look, speaks like I speak, all of a sudden this guy

25   comes and these tactical police show up and they start wiping

1  them out.

2  **Q.**   Okay.  So you have kind of a military appearance, and the

3  military shows up right after you do.  Is that--

4  **A.**   It's a--it's a special group.  I don't know what the

5  acronym is for, but it's a special group.  Not even--not even

6  the local cops, or even the state cops, know who these GATE

7  police are.  And rumor has it that the GATE police is

8  actually--there's some American police or agent in that GATE

9  police, but I don't know.  You folks would know better.

10  **Q.**   After this--after the drive-by shooting--I'm going to

11  call it a drive-by.

12  **A.**   Yes, it was.

13  **Q.**   After the drive-by shooting, was that before or after

14  your wife wound up being blocked in after the skating rink?

15  **A.**   That was after.  The drive-by shooting was the last, and

16  I just told her to go.  And then that's when she said, I'm not

17  going to leave you, I'm not going to leave you.

18  **Q.**   Okay.  So you told her to--

19  **A.**   I told her to just never come back.  I was telling her,

20  don't ever, ever come back.  Don't ever come across the border.

21  Don't bring anybody--the kids back.  I'll--I'll--I'll survive,

22  but I can't with you here.

23        And she says, we can't leave you.  The kids need

24  you.  You're their dad.

25  **Q.**   Okay.  So at some point, did she bring you across into

1    the States?

2    **A.**    Yes.

3    **Q.**    And were you--do you remain worried about this--what

4    happened in Mexico?

5    **A.**    Yes.

6    **Q.**    Even in the United States?

7    **A.**    Yes, sir.

8    **Q.**    Why?

9    **A.**    Even more so, I mean, because the cartel members, they're

10   already on this side, and if anybody wants to deny it, then

11   they're fooling themselves.  They're already on the American

12   side.  They operate on both sides of the borders.

13   **Q.**    Okay.  This direction to kill you, I mean, you don't know

14   who made that order or how it happened, do you?

15   **A.**    The Zeta cartel.

16   **Q.**    Okay.  Well, I mean, that's who tried to kill you.

17   Right?

18   **A.**    Yes.

19   **Q.**    Okay.  And you believe it's because they think you're

20   some sort of a federal agent?

21   **A.**    Yes.

22   **Q.**    Okay.

23   **A.**    And that's the thing about these cartels.  The Gulf

24   cartel and the Zeta cartel, they're at war with each other.

25   But when it comes to killing the undercover federal DEA agent,

1    me--which I'm not, obviously--they come and they actually team

2    up, and then they put bounties on your head, and whoever kills

3    you and makes this gruesome video and posts it on social media,

4    they win.  That's how sick these people are.

5    **Q.**    All right.  When you came across to the United States,

6    you said you continued to be concerned about what happened in

7    Mexico.  Did you take some precautions to try to avoid being

8    identified?

9    **A.**    Well, the thing is, is that I couldn't exactly legally go

10   to work.  I couldn't exactly legally even drive.  I couldn't

11   exactly legally pay my taxes.  I couldn't exactly legally do

12   anything.  So everything was done under--our house is in a

13   different name, our kids are out of school, my wife's car got

14   sold, she's--or we saved up enough money to get a car so that

15   we can sell her car, and she's having to drive me around like I

16   was part of her carpool, her, you know, just--I felt like the

17   giant kid.

18          And--and it's just stressful.  It's hard to live in

19   fear.  It's hard to live looking over your shoulder.  Look over

20   my right shoulder, make sure the cops aren't going to chase me

21   because I'm an illegal alien.  Even though I have an honorable

22   discharge from the United States Marine Corps, I'm an illegal

23   alien.  And look over my left shoulder and who knows if there's

24   a cartel guy.  I mean, it's hard to live that way.

25   **Q.**    When you came across the border with your wife, did you

1    feel like you could stay in Mexico safely?

2    **A.**    Not in that state.  The state where that--Ciudad Acuna is

3    Coahuila, Mexico, not the United States.  I mean, that's--it's

4    pretty bad.  It was bad at the time that we were there.  It was

5    at its peak, actually, the drug wars, and--  No, not there.  I

6    don't think so.

7    **Q.**    Did you feel like the threat of violence against you was

8    an imminent threat?  It could happen anytime?

9    **A.**    Yes.

10   **Q.**    Did you feel like it was a present threat?

11   **A.**    Yes.

12   **Q.**    Did you feel like there was another option for you

13   besides leaving Mexico?  Like seeking asylum?

14   **A.**    No.  Once I was targeted by the two cartels that are at

15   that border, there's no way.  I can't even go back to

16   Michoacan, because the Pacific--there's another cartel there,

17   and then there's another cartel.  You know, now, you can't,

18   because they bulletin you.  They say, hey, we have pictures of

19   the DEA agent, the American DEA agent.  This is his face.  This

20   is his--hey, he's got a military tattoo all over his right

21   shoulder.

22          Those guys are going to--you know, they're always

23   going to find you, wherever you go.

24          MR. SLOAN:  I'll pass the witness.

25

CROSS-EXAMINATION

BY MR. LONG:

**Q.**   Mr. Marin, again, my name is Sean Long.  I am the Assistant United States Attorney handling this proceeding.  I'm going to ask a few questions, and if you don't understand my question, please let me know, and I'll be glad to rephrase it. Okay?

**A.**   Yes, sir.

**Q.**   When did you obtain your lawful permanent resident status in the United States?

**A.**   I want to say, like, in the eighties through the Reagan Administration.

**Q.**   And your testimony was that your parents had come over, I think Mr. Sloan said--

**A.**   In the seventies.

**Q.**   --in the late seventies?

**A.**   Yeah.

**Q.**   At that time, were they admitted as lawful permanent residents?

**A.**   We came over with passports back then.  I don't know. It's in the A-file.

**Q.**   So at some point--here's what I want to ask.  At some point, did you receive lawful permission to be in the United States as a lawfully admitted permanent resident?

**A.**   Yes, sir.

1    Q.    And that allowed you to go to the schools you discussed?

2    A.    Yes, sir.

3    Q.    Also allowed you to enroll in the college that you

4    discussed?

5    A.    Yes.

6    Q.    And that also allowed you to enroll in the military with

7    the Marine Corps?

8    A.    Yes, sir.

9    Q.    You mentioned there was a Fast Track To Citizenship

10   program.  Was one of your motives in joining the Marine Corps

11   that you could get fast-track citizenship?

12   A.    Yes, sir.

13   Q.    So had you looked at other alternatives, and that would

14   be one of the ways you could get your citizenship?

15   A.    Yes, sir.

16   Q.    You said that--  What type of discharge did you receive

17   when you left the Marine Corps?

18   A.    Honorable.

19   Q.    Would it surprise you if it was listed as a general

20   discharge?

21   A.    My--from active duty, it's a general discharge.  No, it

22   wouldn't surprise me.  That's what I told Immigration in '98 or

23   '97 when they first interviewed me.  It's a general--

24   Q.    So did you receive a general discharge or honorable?

25   A.    General discharge, because at the time of my discharge, I

1   was broken into 42 different pieces.  You know, I was banged up

2   from my accident.

3   **Q.**   When was that accident?

4   **A.**   In May of '95.

5   **Q.**   So May of '95, how many years of service had you put in?

6   **A.**   About a year and--year and a half.

7   **Q.**   About 18 months?

8   **A.**   Something like that.

9   **Q.**   What was your tour required to be in order for you to be

10  eligible for that fast-track citizenship program?

11  **A.**   I don't know if--the specifics, but I know that the

12  application process had already been initiated at that time.

13  **Q.**   So you had initiated the application process that if you

14  would have successfully completed your tour, you would have

15  been eligible for that fast track to citizenship?

16  **A.**   I believe so.

17  **Q.**   But you weren't able to complete your tour; is that

18  correct?

19  **A.**   I think, as far as eligibility, I was already eligible to

20  become a U.S. citizen, but the--the only difference between my

21  parents getting their citizenship and me getting my citizenship

22  is that I went in the military, so it takes months instead of

23  years.  Back then, it was a lengthy process.

24  **Q.**   So was it your--

25  **A.**   But eligibility-wise, like you directed your question, I

1   think I was already eligible.

2   **Q.**   So it was your understanding, even if you had gone

3   through the slow track like your parents, the process was still

4   available to you; it just might have taken a little bit longer

5   than the fast track would have?

6   **A.**   Exactly.

7   **Q.**   And you were, again, in the country lawfully, as a

8   lawfully admitted permanent resident?

9   **A.**   Yes, sir.

10   **Q.**   And we're talking about the mid-nineties; is that right?

11   **A.**   Yes.

12   **Q.**   So let's turn to--  You said you caught a charge in 1996.

13   Do you recall the exact description of that charge that you

14   were charged with?

15   **A.**   Yes, the--

16        MR. SLOAN:  Your Honor, if I could approach?

17        THE COURT:  Yes.

18   ----------------------------------------

19   (AT THE BENCH)

20        MR. SLOAN:  Your Honor, we discussed this prior to

21   the hearing, and we have a stipulation that it's an aggravated

22   battery.  And I may not have asked him that on direct, but I

23   don't think he knows the legal description of the charge.  This

24   is a charge that's a felony.  He's subject to impeachment by

25   virtue of this felony.  But going into the details of it is

1   beyond--beyond impeachment and beyond the nature of our

2   stipulation.

3            THE COURT:  What's the point of going any further

4   than what we--

5            MR. LONG:  I just want to--  It's listed as an

6   aggravated domestic battery.  That's all--that's just the title

7   of the offense that's listed in his criminal history.  I just

8   want to ask if that's what the charge was.

9            MR. SLOAN:  Okay.

10           MR. LONG:  It's important because--

11           THE COURT:  I'll let you ask that question, but

12   don't go any further.

13           MR. LONG:  Yes, sir.

14           MR. SLOAN:  If I could have just a second to tell

15   my client.

16           THE COURT:  All right.

17   ----------------------------------------

18       (PAUSE)

19       (IN OPEN COURT)

20   **Q.**   (BY MR. LONG)  Mr. Marin, I was just going to ask if you

21   were aware of what the offense was called.  And so I would like

22   to ask, do you recall the offense that you were convicted of--

23   allegedly occurred in 1996; you were convicted in 1997--as

24   being called aggravated domestic battery?  Does that sound

25   familiar?

1    A.    Yes.

2    Q.    Now, at that time, you were a lawfully admitted permanent

3    resident; isn't that correct?

4    A.    Yes.

5    Q.    But after sustaining that conviction, removal proceedings

6    were initiated against you; isn't that correct?

7    A.    That's not correct.

8    Q.    Okay.  Well, then, tell us how it came to be, after you

9    were convicted of the crime, that you got into removal

10   proceedings.

11   A.    Well, I--I pled to it at--released out of county jail,

12   but I had to waive any right to an appeal for a new trial, and

13   I was placed on probation.

14   Q.    So you were--

15   A.    I was released out of county after.  After the judge and

16   jury found me guilty, I was released out of county.

17   Q.    So after you were found guilty, you were given a

18   probation; is that correct?

19   A.    Yes.

20   Q.    What was your--  Let me ask, when you were given that

21   probation, were you allowed to keep your permanent resident

22   status--

23   A.    Yes.

24   Q.    --or was it revoked immediately?

25   A.    I kept it.

1   **Q.**   You kept it?

2         And so what happened that caused you to be removed?

3   **A.**   I violated the probation, and then the Judge brought me

4   back to court and he says, well, now I kinda have to send you

5   to--sentence you to jail--to prison.  And he sentenced me to

6   two years, but he gave me credit for the time that I had been

7   in--fighting the case.

8   **Q.**   So was your probation revoked and you were finally

9   convicted of that aggravated domestic battery?

10  **A.**   Yes.

11  **Q.**   And is that when removal proceedings were initiated?

12  **A.**   At--no, because I never had an ICE hold, so that's not

13  when.  It's when I put in a petition to the California

14  Department of Corrections saying that, hey, guys, the Judge

15  striked the strike and he said it's not aggravated, and why are

16  you holding me?  We're seven months over my release date.

17        And then they--then they put an ICE hold on me and

18  deported me, only after they had kept me wrongfully in prison

19  after seven months.

20  **Q.**   At the time that you were sentenced to prison in

21  California, were you still just a lawfully admitted permanent

22  resident, or were you a naturalized United States citizen?

23  **A.**   No, I was a permanent resident.

24  **Q.**   So as a permanent resident, was it your understanding you

25  were subject to removal because of that conviction potentially?

1    **A.**    It wasn't my understanding until after my--California

2    Department of Corrections realized that they had held me extra

3    time, and then they called Immigration and said, hey, let's

4    deport this guy.  And that's when they deported me.

5    **Q.**    So you believe the California Department of Corrections

6    had a role in your being deported in 1999?

7    **A.**    Yes.

8    **Q.**    Was it your understanding, from going through those

9    proceedings, that that conviction led to the revocation of your

10    permanent residency status?

11    **A.**    I know my permanent residency status was when--was taken

12    when--after they released me from prison to Immigration

13    custody.  Immigration said, hey, sign here; don't--don't--don't

14    fight this, and you could get immigration probation or you

15    could get deported, but we don't know.

16           And I just--and I signed it and I went into court

17    and they deported me.  They didn't even ask about my schooling

18    like you just did, which I appreciate.  They didn't ask about

19    my military service like you just did, which I appreciate.

20    They didn't ask about my discharge, which, at that time, was a

21    general discharge.  But, see, this is where it gets funny.

22    They deport me in '99 and I get an honorable discharge in 2002.

23           MR. SLOAN:  Your Honor, I'm going to object.  This

24    is nonresponsive.

25           THE COURT:  Overruled.

1    Q.   (BY MR. LONG)  It will make it easier if I ask a question

2    and you answer the question directly.

3    A.   Okay.

4    Q.   Let me back up just a little bit for timeline's sake.

5    From the time you had your injury--was that in '95, you said?

6    A.   Yes.

7    Q.   --until the time I'm going to say you committed the

8    offense, in 1996, during that time, did anyone initiate removal

9    proceedings to have your permanent residency revoked or remove

10   you from the country?

11   A.   '96?  No.

12   Q.   '97, did they initiate proceedings to have you removed

13   from the country?

14   A.   No.

15   Q.   And like we have just discussed, that didn't happen until

16   1999?

17   A.   Yes.

18   Q.   And you feel that you were misled?  Is that a proper

19   characterization?  That you were misled into signing the

20   documents that led to your removal?

21   A.   Well, I don't have a law degree.  I don't even have any

22   type of degree.  So, yes.

23   Q.   You didn't understand that you were signing documents--

24   A.   I didn't understand I was waiving my right to be in the

25   country that I served in the military and swore to defend, no.

1    I didn't know the United States did that to its military,

2    especially its Marines.

3    **Q.**    Yes, sir.  And let me ask you this question.  You were

4    allowed to stay in the country after your military service;

5    isn't that correct?

6    **A.**    After my military service?

7    **Q.**    Yes, sir.  Immediately following your discharge, general

8    or whatever, you were allowed to stay in the country as a

9    lawful permanent resident?

10   **A.**    I was already a lawful permanent resident.  What are you

11   talking about?

12   **Q.**    I'm saying you weren't forced out of the country after

13   your military service--

14   **A.**    I thought we were talking about the deportation.  No,

15   not--

16   **Q.**    We'll get there, sir.

17          You were allowed to stay in the country--  Was it

18   your understanding you could have followed the same track your

19   parents had followed as far as being a permanent resident

20   lawfully and then applying for naturalization, just as your

21   parents did?

22   **A.**    Now you're--now you're losing me the same way you--you--

23          THE COURT:  It's a simple question.

24          THE WITNESS:  No, it's not that simple, sir.

25          THE COURT:  Listen--

1     THE WITNESS:  It's--I don't understand it.

2     THE COURT:  It's a simple question.

3     Just ask the question one more time, and you're

4     going to answer it.

5     **Q.**   (BY MR. LONG)  When you discharged from the military, did

6     you have your permanent resident status still active?  Were you

7     still lawfully in the country?

8     **A.**   Yes.

9     **Q.**   Was it your understanding you had the same availability

10    to apply for citizenship that your parents, in fact, used and

11    were naturalized?

12    **A.**   When I was discharged?

13    **Q.**   Yes.

14    **A.**   Yes.

15    **Q.**   You could have either potentially used the fast track--

16    maybe that was up in the air because of your discharge--

17    **A.**   Okay.

18    **Q.**   --but at least you could have applied the same way that

19    your parents applied.  Is that your understanding?

20    **A.**   Yes.

21    **Q.**   But the difference in your situation and your parents' is

22    that you were subsequently convicted of an aggravated felony

23    and removed; is that correct?

24    **A.**   Yes.

25    **Q.**   So as far as treating service members, it wasn't because

1   of your service that you were removed; it was in spite of your

2   service and your subsequent conduct; is that correct?

3   A.   Yes, yes.

4   Q.   Were you actually removed from the country in 1999?

5   A.   They told me to sign a paper, that voluntary return paper

6   or whatever it was, whatever it's called.

7   Q.   And I'm not really concerned with what papers you had to

8   sign or anything.  Were you physically returned at some point

9   to Mexico--

10  A.   Yes.

11  Q.   --immediately after you were ordered removed?

12  A.   Yes.

13  Q.   And Mr. Sloan had asked, had you gone back and forth from

14  the United States to Mexico several times between then and 2008

15  when you were most recently removed?

16  A.   Yes.

17  Q.   How would you normally come back across?

18  A.   Walk across.

19  Q.   Yes, how would you normally come back into--

20  A.   Walk across.

21  Q.   Yes, sir.

22  A.   Yes.  That's the answer.  I'd walk across.

23  Q.   You would walk across?

24  A.   Yes.

25  Q.   Different locations?

1   **A.**    Mainly Tijuana port of entry.

2   **Q.**    And is that in California?

3   **A.**    California.

4   **Q.**    You mentioned to Mr. Sloan that because you were in the

5   country illegally on this most recent occasion when you came

6   in, that you weren't able to legally do anything.  You weren't

7   able to purchase cars and get work and things of that nature.

8   **A.**    Yes.

9   **Q.**    Were you able to function in the United States, even

10   being here illegally, from 1999--when you returned to the

11   country between 1999 and 2008?

12   **A.**    Yes.

13   **Q.**    You stated that you have four children that were all

14   United States citizens; is that correct?

15   **A.**    Yes.

16   **Q.**    So as far as those types of services, those were

17   available to you and your wife?

18   **A.**    Yes.

19   **Q.**    You said that you--I think the terms you used were

20   "caught a DUI" and that's why you were removed in 2008?

21   **A.**    Yes.

22   **Q.**    Is that correct?

23   **A.**    Yes.

24   **Q.**    So again, that was--was it that conduct that led you to

25   be in Immigration custody?

1    **A.**    Yes.

2    **Q.**    You stated before that, at that time-- Or let me ask for

3    clarification.  You mentioned something about an addiction to

4    alcohol.  Did you say that you were working on that after 2008?

5    Before 2008?  Can you tell the jury what you meant by that?

6    **A.**    I started going to--in Mexico, to the AA that they have

7    there that's similar to here, just in Spanish, and to going to

8    church, to my wife's church in Mexico.

9    **Q.**    Where was your wife's church in Mexico?

10   **A.**    It's--the denomination is--it's called--

11   **Q.**    Let me pause.  I'm not really concerned about the

12   denomination.  Where was it-- Was this in Yucatan, or was

13   this--

14   **A.**    Oh, in Yucatan.  That's where I got rehabilitated was in

15   Yucatan.  That's where I got my teaching credentials and that's

16   where I got spiritual and that's where I went to AA and got

17   rehab.

18   **Q.**    So some of the incidents that led to some of your

19   problems with law enforcement in the United States, did you

20   feel you had addressed those?

21   **A.**    Yes, I think.  I don't know.

22   **Q.**    You mentioned that when you got your Mexican voter

23   identification, that there were some individuals in Acuna who

24   helped you do that and let you use their residence as an

25   address; is that correct?

1    A.    Uh-huh.  A man from church.

2    Q.    Did you have other--I mean, did you have people available

3    to you in the community that would help you with things like

4    that?

5    A.    No, just him.  Just one.  One guy from church.

6    Q.    But he allowed you to use his residence--

7    A.    His water bill.

8    Q.    --and his water bill--

9    A.    And his residence.

10   Q.    --and he allowed you to put your name with his residence

11   in Acuna?

12   A.    No, he allowed me to put his water bill under my name for

13   his--for an address.  You need--you need a permanent address to

14   get one of those voter registration cards, and obviously I

15   didn't have a permanent address in Acuna.  But yes, he helped

16   me that way.

17   Q.    So were you using--is it his address that appears on that

18   voter card?

19   A.    That's his address, yes.

20   Q.    Feel any issues with putting his address on the voter

21   card with the cartel after you?

22   A.    No.

23   Q.    At what point did your wife leave Acuna and start living

24   in San Angelo; do you recall?

25   A.    No.  I want to say it's toward the end of 2013 or early

1    2014.  I don't recall the dates.  I'm not good with dates.

2    Q.    So the end of 2013 is about the time that she left--

3    A.    That's what I'm thinking.

4    Q.    --and I think she stated that it was sometime in early

5    2014 that you were smuggled across?

6    A.    Yes, sir.

7    Q.    So how many weekends would you approximate that she would

8    bring the kids down to visit you, as she testified?

9    A.    As she testified, I can't say, because I don't remember

10   it being every weekend.  I remember her staying with her

11   brothers and not being able to make it every weekend.  But it

12   was months after she had come.  It was--I recall it because I

13   recall it by--by the seasons.  It wasn't winter when I came

14   across.  It was close to Easter, springtime.

15   Q.    So you think it was a little bit later in 2014 when you

16   came across?

17   A.    Yeah.  Yes, sir.

18   Q.    Let's talk about some of these threats that you had

19   described for the jury.  You mentioned that there was an

20   occasion where you were strip searched.  Do you recall when

21   that happened?

22   A.    No.

23   Q.    Approximate time of the year or what year it was?

24   A.    It was 2013.

25   Q.    Think it was 2013?

1   **A.**    Yes, sir.

2   **Q.**    Early 2013?  Late 2013?

3   **A.**    I'd say probably February or March of 2013, is what I

4   would say.

5   **Q.**    And so we'll say maybe early spring of 2013--

6   **A.**    Yeah.

7   **Q.**    --is when the strip search occurred; is that correct?

8   **A.**    That's what I would say, yeah.  Could have been later,

9   could have been--it could have been later, not sooner.

10  **Q.**    And is that when you were first propositioned to be a

11  drug courier for the cartel to prove your, I guess,

12  allegiances?

13  **A.**    Yes.

14  **Q.**    And you told the jury you initially refused those

15  requests; is that right?

16  **A.**    Yeah, first, I--yes, I did refuse.

17  **Q.**    You stated there was also an attempt on your life and

18  that you believe that was done because they put out a hit on

19  you; is that correct?

20  **A.**    Yes.

21  **Q.**    Did people tell you they put out a hit on you, or that's

22  just what you gathered from the circumstances?

23  **A.**    That's the message I got when I had to duck from bullets

24  to hitting my head, yes.

25  **Q.**    Okay.  So when they were shooting at you, you felt like

1    they--

2    A.    I knew it was--I mean, I knew it was for real.  It wasn't

3    intimidation fact or anything like that.  It wasn't harassment

4    or annoyance anymore.  It was real.

5    Q.    Okay.  And you say "harassment," and you mentioned that

6    after you refused to be a drug courier, that they--I think the

7    words you stated is that they started messing with you and

8    your family.  Would that be the slashed tires and things like

9    that?

10   A.    Harass, yeah.  Yes.

11   Q.    So when did the shooting occur, the attempted hit that

12   you described?  When did that occur?

13   A.    In 2014.

14   Q.    Do you recall about what time of the year it was?

15   A.    About this time of the year.

16   Q.    Okay.  So early 2014?

17   A.    Yes.

18   Q.    Would it have been during the time period that your wife

19   was traveling to and from San Angelo to Acuna to visit you on

20   weekends?

21   A.    Yes.  After that was the last time she came.  That was

22   the last time.

23   Q.    Okay.  So--

24   A.    That happened, that was it.  That's when there was no

25   more hiding from these guys, where it was just time--  There

1   was no more let me look it up on the Internet, see what we can

2   file to get you legally across.  At that time, that was, like,

3   when there was no--no other choice to--but to come across.

4   Q.   So that incident occurred, and then your wife

5   subsequently came, and that was the trip that you left on?

6   A.   Yes.

7   Q.   So when that shooting occurred when you believe they shot

8   at you, where did you go?  Did you go home?  Go to the police

9   station?  Where did you go?

10   A.   To the man from church's house.  His name is Bocha

11   (phonetically).  He's just a guy that goes to church.  That's

12   where I was staying.  I didn't go back to the residence where

13   her and I lived with the kids, no, not by any means.  No, I was

14   staying somewhere else.

15   Q.   I believe she testified previously that when you left to

16   cross the border, that you left from your residence.  Is that

17   correct or incorrect?

18   A.   Where I was staying.  My residence where I was staying.

19   Not our residence where we used to stay.  This is a separate

20   address, separate house.

21   Q.   So when she mentioned that you left your belongings there

22   at the residence, she meant the belongings that you would have

23   taken from the residence you had fled to go stay with your

24   friend?

25   A.   When we abandoned that house, we abandoned the house, and

1   that went with what I could take to a friend's house from

2   church.  And that's where I stayed and kept just indoors and

3   stayed basically hidden until we could figure out some way for

4   us to--

5   **Q.**   So you did return to your previous residence to gather

6   some things before going to your friend's house--

7   **A.**   No.

8   **Q.**   --I believe is what you just stated.

9   **A.**   No.  No, those things were left.  Those things are just

10  materialistic things.  They're junk.

11  **Q.**   I understand, sir, but I believe you just said that you

12  gathered some things from your residence--

13  **A.**   When she left--

14  **Q.**   --and took them to your friend's house.

15  **A.**   --and I knew I had to leave, we couldn't stay at that

16  house, I took what I could, she took what she could, and we

17  abandoned the rest.  And then I took up new residency, which is

18  that address that you have my ID on--that's on my ID, and

19  that's the residence that--my last residence.

20  **Q.**   Did you have time to apply for that ID card, or is that

21  something that had already happened?

22  **A.**   No, it takes--no, it takes time to apply for that ID

23  card.  You go in and you show them your paperwork and your

24  birth certificate, and then they process it, take your picture;

25  then you come back later and pick it up.

1   Q.   Let's talk about the residences just a little bit more.

2   How did your wife know to go to this alternate address of your

3   friend's house?

4   A.   Oh, we were in communication.  She had a phone.

5   Q.   So you contacted her?

6   A.   Oh, she knew where I was the whole time.  When she left--

7   Q.   And you--  Excuse me.  And you informed her that it

8   wouldn't--did you inform her it wouldn't be safe for her to

9   return to your previous residence?

10  A.   She knew.

11  Q.   Because you were under such a threat and duress--

12  A.   She knew, yes.

13  Q.   --that you couldn't return to that residence?

14  A.   Yes.

15  Q.   But you still allowed her to bring herself and your

16  children back to Acuna?

17  A.   Yes.

18  Q.   So would you say it was hours, days, weeks that passed

19  from the time of the shooting to when you left out in that

20  late-model Nissan Pathfinder to cross the border?  How long had

21  passed between the shooting and then your crossing of the

22  border?  A few days?

23  A.   It was months.  No, months, months.

24  Q.   Months?

25  A.   Months.

1    **Q.**    Okay.

2    **A.**    I'd say it turned into months.

3    **Q.**    So there were several months where you were still in

4    Mexico after the shooting, essentially figuring out how--

5    **A.**    Yes.  I was hiding.  I hid at the friend's house.  I

6    didn't come out no more, I stopped looking for work, and I just

7    stayed where I was.

8    **Q.**    So you were in hiding for months.  Did any other

9    shootings--

10   **A.**    Not a lot of months.  I'm saying month, month and a half,

11   two months at the most probably.

12   **Q.**    Several days?  Several weeks?

13   **A.**    Yes.

14   **Q.**    During those several weeks, what other threats or

15   incidents were occurring directed at you?  Or were you in

16   hiding, staying--

17   **A.**    I was in hiding.  But what was going around me was that

18   GATE police was doing--doing their sweeps, their raids, their--

19   where they were just going to war with these cartel guys.

20   **Q.**    And you believed that was related to you?

21   **A.**    I have nothing to do with it.  That's the whole--that's

22   the whole issue.  They think that I had something to do with

23   it, but I had nothing to do with it.  I'm not--I'm not

24   affiliated with DEA or with the Mexican federale police.  I

25   have no ties with law enforcement.

1    Q.    But you believe the Zetas and the gangs thought--

2    A.    Those guys think that I'm an agent.

3    Q.    When you crossed the border, your wife testified that she

4    doesn't recall you ever being directly questioned.  Is that

5    your recollection as well?

6    A.    When I crossed the border?  What was--I can't--

7    Q.    When you crossed the border with your wife, I believe she

8    stated--I don't want to misstate it.  I think she said it was

9    sometime in early 2014.  You said it was around maybe Easter

10   2014.

11   A.    That's what I remember.

12   Q.    Okay.  When that occurred and you drove across the

13   border, did you ever have any direct interaction with

14   immigration officials?

15   A.    No.

16   Q.    Were there cartel or members of the cartel that you

17   suspected to be following you at that time?

18   A.    No.

19   Q.    When--approximately how long was it that you were still

20   in Mexico and your wife was having to essentially commute on

21   the weekends to see you?  How long was that time period?

22   A.    A few weeks.

23   Q.    A few weeks?

24   A.    Before she came back to see me?

25   Q.    Yes.

1   A.    After she had left?  I--

2   Q.    Well, when she got her residence in San Angelo and was

3   visiting you, how long was that time period between then and

4   when you were smuggled across?

5   A.    It was--it was a couple weeks, maybe a few weeks.

6   Q.    How did the cartel react to her no longer being or living

7   in Acuna?

8   A.    I think that they think that that confirms their

9   suspicions.

10  Q.    But they would have known--based on the detail you're

11  giving this jury about their knowing of your whereabouts, daily

12  procedures, they would have known that she left the residence.

13  Would that be a fair statement?

14  A.    Yes.

15  Q.    And after she left and kept coming back, did the cartel

16  ever capture your children or your wife?

17  A.    No.

18  Q.    Ever make any more specific threats to you of, hey, we

19  know your wife has left; you better get her back here?

20  A.    No.  Other than the shooting?  No.

21          THE COURT:  Counsel, we're going to take a

22  15-minute recess.

23      (RECESS TAKEN)

24  Q.    (BY MR. LONG)  Mr. Marin, I believe we were discussing

25  when you crossed the border.  I think you stated it was maybe

1    around Easter of 2014.  Does that sound about correct?

2    **A.**    Yes.

3    **Q.**    And I may have already asked, but I want to ask again,

4    when you crossed, do you recall where all the vehicle was

5    stopped by immigration officials?  Was it just one time,

6    multiple times, or do you recall?

7    **A.**    I don't recall.

8    **Q.**    Do you know if it was stopped immediately at the border

9    from Acuna to Del Rio?

10   **A.**    Yes.

11   **Q.**    And that would be the actual border between the

12   United States and Mexico?

13   **A.**    Yes.

14   **Q.**    At that location, were you asked for your identification?

15   **A.**    No, sir.

16   **Q.**    Did you volunteer at that time that you were under duress

17   because of actions being taken by the Zetas cartel?

18   **A.**    No.

19   **Q.**    Did you hear your wife disclose that information to the

20   immigration officers questioning her about her documentation?

21   **A.**    No.

22   **Q.**    And do you recall ever being stopped at a subsequent

23   checkpoint past Del Rio, between Del Rio and Eldorado?

24   **A.**    Yes.

25   **Q.**    And would that also have been by immigration officials as

1   well?

2   **A.**    Yes.

3   **Q.**    Did yourself or your wife mention to those immigration

4   officials that you were fleeing, being pursued by the Zetas

5   cartel?

6   **A.**    No.

7   **Q.**    Do you also recall, as your wife did, that you did stop

8   at a park in Del Rio for just a moment?

9   **A.**    Yes.

10  **Q.**    And then you subsequently drove to Eldorado and then to

11  San Angelo?

12  **A.**    Yes.

13  **Q.**    Would this have been the first time you had visited the

14  location at 9869 Possum Hollow in Grape Creek?

15  **A.**    Yes.

16  **Q.**    And was that your residence for all intents and purposes

17  from the time you arrived in the United States up until you

18  were arrested on September the 16th, 2015?

19  **A.**    Yes, sir.

20  **Q.**    Or, excuse me, September 13th of 2015.  I misstated that.

21  **A.**    September 13th, yes.

22  **Q.**    Yes, sir.

23          I won't go through each specific incident, but I do

24  want to mention the dates to ask if you recall whether you were

25  present on the scene when the Tom Green County Sheriff's

1    officers arrived at 9869 Possum Hollow.

2            The first date that was recorded that they were

3    dispatched was Christmas Day 2014.  Do you recall sheriff's

4    deputies from Tom Green County Sheriff's Office being

5    dispatched to your residence?

6    **A.**    Yes.

7    **Q.**    Did you visit with those deputies on that date?

8    **A.**    Yes.

9    **Q.**    Did you tell them that you were fleeing for your life

10   from the Zetas cartel?

11   **A.**    No, sir.

12   **Q.**    Same question on January the 19th of 2015.  Do you recall

13   sheriff's deputies being dispatched to your residence in Grape

14   Creek, Texas?

15   **A.**    I don't recall, but yes.

16   **Q.**    Is it possible they were dispatched to your location?

17   **A.**    Yes, yes.

18   **Q.**    And the main question I wanted to ask, at that time, did

19   you or your wife tell the sheriff's officers that were

20   dispatched to your house that you were fleeing threats of the

21   cartel?

22   **A.**    No.

23   **Q.**    Turning to April 7th, 2015, same question.  Do you recall

24   being present when sheriff's deputies were dispatched to that

25   same location?

1   **A.**   No.

2   **Q.**   You don't recall being present when they were dispatched?

3   **A.**   That one, I don't recall ever happening, but--but I don't

4   think I was there.

5   **Q.**   Were there times when your wife would call sheriff's

6   deputies and you would leave the residence?

7   **A.**   No.  I would--no.

8   **Q.**   You said no?

9   **A.**   No.  The times that I recall, I was there.  I stayed

10  there.  I spoke with the deputies, and they would say, well,

11  just be cool, really.  There wasn't--that's all they would say

12  to me.  And I'd say yes, sir, and they would leave.

13  **Q.**   Okay.  I'm having problems hearing you.  If you could

14  speak up just a little bit.

15  **A.**   I spoke--the times that I spoke to the deputies, I'm sure

16  it's in the report, and there was--all they would tell me is

17  to, like, you know, just don't fight, you know, don't--they

18  don't want to see nothing happening.  That's it.

19  **Q.**   And again, I don't want to get into the substance of any

20  actual conflicts you were having with--

21  **A.**   Well, it wasn't a conflict.  No, there wasn't conflicts.

22  There was just--it just--I relapsed, is what it was, and I'll

23  tell you the truth.  I relapsed, and she didn't like it.

24  **Q.**   What do you mean by "relapsed"?

25  **A.**   I started drinking again.

1  Q.   Let's turn to May 16th, 2015.  Was that another

2  occasion--or are you aware that the sheriff's deputies were

3  called out to your residence on that occasion?

4  A.   Yes.

5  Q.   Did you interact with the sheriff's deputies on that

6  occasion?

7  A.   I don't recall.

8  Q.   Do you recall, if you would have interacted with them,

9  whether you would have told them about the threats that you had

10  received from the Zetas?

11  A.   Yes.

12  Q.   Did you tell them that?

13  A.   No.

14  Q.   September 13th of 2015, were you actually arrested by

15  deputies on that date?

16  A.   Yes.

17  Q.   And did you have interaction with those deputies on that

18  date as far as them asking you questions?  Did you have

19  opportunity to visit with them?

20  A.   Yes.

21  Q.   And during any of those conversations, did you tell those

22  deputies that you were being persecuted by the Zetas cartel?

23  A.   No.

24  Q.   In fact, would you agree with me that your position with

25  regards to being prosecuted--or, excuse me, being persecuted by

1    the Zetas was initially first mentioned on October the 16th of

2    2015?  That would have been the date that you were interviewed

3    by Agent Lonnie Felps.

4    **A.**    Yes, sir.

5    **Q.**    And that would have been after you were in Immigration

6    custody potentially looking at deportation.  Would you agree?

7    **A.**    Yes.

8    **Q.**    You stated you had some fear that your family's vehicle

9    might be subject to being tampered with by the cartel; is that

10   correct?

11   **A.**    Yes.

12   **Q.**    Did you believe that threat persisted when they left

13   Acuna and were now living in San Angelo?

14   **A.**    Yes.

15   **Q.**    You believed your family was still in harm's way in

16   San Angelo, Texas?

17   **A.**    Yes.

18   **Q.**    In fact, you've testified that anybody who thinks that

19   the Zetas and the cartels are not present in the United States

20   is, I think you said, kidding themselves?  Fooling themselves?

21   **A.**    Yes.

22   **Q.**    That's because you believe that the cartels have a very

23   strong presence in the United States.  Would that be correct?

24   **A.**    Yes.

25   **Q.**    So much so that you felt like you shouldn't give your

1    information to the local schools or law enforcement; is that

2    correct?

3    **A.**    Yes.

4    **Q.**    But, in fact, you did give your personal information to

5    the law enforcement officers that responded to your residence

6    in San Angelo; isn't that correct?

7    **A.**    On which date?

8            I did, yes.

9    **Q.**    Did you give your personal information to the law

10   enforcement officers--

11   **A.**    Yes, yes.

12   **Q.**    --when they responded?

13           Because they couldn't have gotten it from

14   documentation, because you didn't have any; is that correct?

15   **A.**    Yes.

16   **Q.**    So if your correct name and date of birth appears in

17   those reports, that would be because you or your wife gave it

18   to them?

19   **A.**    Yes.

20   **Q.**    But again, you're testifying that you believe the threat

21   was still pending against your wife and children on all of

22   these dates because the Zetas and the cartel are so prevalent

23   and present in the United States; is that correct?

24   **A.**    Yes.

25   **Q.**    And, yet, at no point was that threat so imminent or

1  present or pending that you thought you should mention it to

2  these law enforcement officers?

3  **A.**   I don't understand the question, sir.  Can you give me

4  the--in another form?

5  **Q.**   Yes, sir.  You testified that the cartel is present in

6  the United States; isn't that correct?

7  **A.**   Only my opinion, yes.

8  **Q.**   In fact, to this day, would you say that you're still

9  under threat of a cartel?

10  **A.**   Yes.

11  **Q.**   But you didn't feel that threat was so imminent or

12  pressing that each time that these officers--these deputies

13  responded to your residence in San Angelo, Texas--at no point

14  did you ever mention to them, I've got this imminent fear of

15  threat from the Zetas in my residence here in San Angelo?

16  **A.**   Correct.

17  **Q.**   So it wasn't so pending or imminent that you mentioned it

18  to them?

19  **A.**   Should I explain to you why?

20  **Q.**   Did you mention it to them?

21  **A.**   No, I didn't.

22  **Q.**   What threats did you receive from the cartel while in the

23  United States?

24  **A.**   None, sir.

25  **Q.**   Did you ever file a report or anything related to those

1    incidents where you were threatened or purportedly assaulted by

2    the Zetas while in Acuna?  Did you ever file any reports

3    related to that?

4    **A.**    No.

5    **Q.**    So you never reported that to any authorities?

6    **A.**    No.

7    **Q.**    Immigration or otherwise?

8    **A.**    Correct.

9    **Q.**    And you also previously testified--I believe you said

10   that you told your wife whenever you were telling her not to

11   come back to Mexico, that, "I'll be safe here without you," and

12   you told her to leave?

13   **A.**    Uh-huh, yes.

14   **Q.**    Did you believe that?

15   **A.**    No.

16   **Q.**    You didn't believe that you would be safe there without

17   her?

18   **A.**    No.

19   **Q.**    Even for the months and months that you had been in

20   hiding, or weeks and weeks that you had been in hiding?

21   **A.**    No, I didn't believe it.  I just wanted her to leave, to

22   come to safety.

23   **Q.**    But ultimately, you left in the car, and she smuggled you

24   into the United States?

25   **A.**    Yes.

1    Q.    And that was pursuant to a plan and agreement you had

2    reached.   Would that be a fair statement?

3    A.    Yes.

4              MR. LONG:   Pass the witness, Your Honor.

5                      REDIRECT EXAMINATION

6    BY MR. SLOAN:

7    Q.    Okay.   The plan that Mr. Long mentioned about obtaining a

8    residence in the United States, what was the plan on how you

9    were going to come back when that residence was obtained?

10   Legally or illegally?

11   A.    We tried legally.

12   Q.    All right.   So was the plan that you were going to secure

13   a residence, process whatever petitions had to be done, and

14   then come back?

15   A.    Yes.

16   Q.    All right.   But did the plan change when the level of

17   danger changed?

18   A.    Yes, sir.

19   Q.    When you were meeting with the Tom Green Sheriff's

20   Department at your house, were they always decent with you?

21   A.    Yes, sir.

22   Q.    Did you ever feel like these cops might be dirty cops or

23   anything like that?

24   A.    No, sir.

25   Q.    Were those--up until the last one when you got arrested,

1    were those incidents generally resolved with them telling you

2    to behave yourselves and quit misbehaving kind of stuff, or go

3    sleep the night somewhere else or whatever?  Was that generally

4    how those things resolved?

5    **A.**    Yes.

6    **Q.**    Generally resolved informally?

7    **A.**    Yes.

8    **Q.**    All right.  Do you think that reporting cartel harassment

9    to the Mexican officials would have been a good idea?

10   **A.**    No, sir.

11   **Q.**    Why not?

12   **A.**    Because they're on the payroll.

13   **Q.**    Okay.  Once you had crossed the border and you were in

14   the United States, like going through a checkpoint, did you

15   feel like, if you came out to the checkpoint people and said,

16   "Hey, these cartel people are after me," do you think you would

17   have been arrested for being in this country illegally?

18   **A.**    Yes.

19   **Q.**    Do you think that the jails are free from any influence

20   of these people, the cartel people?

21        Do you think you would have been safe in an

22   American jail?

23   **A.**    No.

24        MR. SLOAN:  No further questions.

25        THE COURT:  All right.  You may step down.

```
 1                    Call your next witness.

 2                    MR. SLOAN:  Call Oscar Barrientos

 3                    THE COURT:  Raise your right hand, please.

 4          (THE OATH IS ADMINISTERED BY THE COURT)

 5                    THE COURT:  Please be seated.

 6                              OSCAR BARRIENTOS,

 7     DEFENSE WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

 8                         DIRECT EXAMINATION

 9     BY MR. SLOAN:

10     Q.    Could you state your name for the jury?

11     A.    Oscar J. Barrientos.

12     Q.    And, Oscar, how are you employed?

13     A.    I'm an investigator with the Federal Public Defender's

14     Office out of Del Rio, Texas.

15     Q.    And is Del Rio, Texas, across the border from Acuna,

16     Mexico?

17     A.    Yes, it is.

18     Q.    How long have you been an investigator for the Federal

19     Public Defender's Office?

20     A.    In Del Rio, for 19 years.

21     Q.    Prior to that, do you have other law enforcement

22     experience?

23     A.    I was a Border Patrol agent in San Diego, California, and

24     prior law enforcement, Texas peace officer.

25     Q.    So you were a Texas peace officer?  Do you have any
```

1    formal education?

2    **A.**    Yes.  I have a bachelor's in criminal justice with an

3    emphasis in law enforcement.

4    **Q.**    Have you worked for the Eagle Pass Police Department?

5    **A.**    Yes, I have.

6    **Q.**    And when did you work for them?

7    **A.**    Started back in 1989 all the way to January 1993.

8    **Q.**    When you were working for them--  Is that a border town?

9    **A.**    Yes, it is.

10   **Q.**    Did you also work at the Hays County Sheriff's Office?

11   **A.**    Yes.  I worked in San Marcos, Texas, when I finished up

12   my bachelor's.

13   **Q.**    And then Border Patrol was after that?

14   **A.**    Yes.

15   **Q.**    And then since about 1997, you have worked in Del Rio as

16   an investigator for the Defender's Office?

17   **A.**    That is correct.

18   **Q.**    Apart from Hays County, has all of your employment been

19   along the border?

20   **A.**    Yes.

21   **Q.**    How long have you lived along the border?

22   **A.**    All my life.

23   **Q.**    Have you had an occasion to conduct an investigation that

24   involved cross-border investigations?

25   **A.**    Yes.

1    **Q.**    Have you investigated serious crimes?

2    **A.**    Yes, I have.

3    **Q.**    Have you investigated homicides?

4    **A.**    Yes.

5    **Q.**    Have you investigated immigration crimes?

6    **A.**    Yes.

7    **Q.**    Have you investigated drug crimes?

8    **A.**    Yes.

9    **Q.**    Have you investigated crimes in those categories that

10   involved the cartels in Mexico?

11   **A.**    Yes, I have.

12   **Q.**    Are you familiar with the cartels in Mexico?

13   **A.**    Very familiar.

14   **Q.**    How long have you been involved in cases that involve the

15   Mexican cartels?

16   **A.**    When I first started law enforcement as a patrol officer,

17   and I also worked as a detective, and that's when I got

18   involved with a bit of narcotics and when I got involved

19   on--you know, on the cartels.

20   **Q.**    Okay.  Have you come to know the various cartels and

21   where they operate and things like that?

22   **A.**    Yes.

23   **Q.**    Have you been present in the courtroom during the

24   testimony in this case?

25   **A.**    Yes, I have.

1    Q.    Have you also been made familiar with the case from

2    previous discussions with me?

3    A.    Yes, I have.

4    Q.    I'm going to ask you a few things that are specific to

5    this case.

6              The presence of black SUVs, does that tell you

7    something?

8    A.    In the northern part of--

9    Q.    In Acuna.

10   A.    In Acuna?  Yes.  It normally pertains to Los Zetas, which

11   is a cartel, started back in--well, it started back in 1999,

12   but it deflected from the Gulf cartel back in 2010, and--

13   Q.    What are the Zetas?  What's their origin?

14   A.    Their origin, they work for--they were paramilitary

15   personnel, and they were working as the right hand for the Gulf

16   cartel until they deflected from them in 2010.  And they were

17   mostly started in Tamaulipas, which pertains to (speaking

18   Spanish) across from Laredo, Texas.  And they worked their way

19   up to the northern part of the Eagle Pass area, Piedras Negras

20   sister city, Coahuila and Ciudad Acuna.

21   Q.    Are these people--you said they're paramilitary.  Where

22   do they get their training?

23   A.    Most of them had done their training, you know, from the

24   military government.  And I want to say they started clashing

25   with the Gulf cartel basically in 2010.  And in Acuna, I think

1    the heaviest was January of 2013.  But then that's when another

2    group started, which was Los GATES, which is (speaking

3    Spanish), and they were--

4    **Q.**    And I'm going to stop you there.

5    **A.**    Okay.

6    **Q.**    You said GATES.

7    **A.**    Uh-huh.

8    **Q.**    And you heard the testimony of Mr. Marin.  Is that GATES?

9    Is that the same thing he's referring to?

10   **A.**    Yes.

11   **Q.**    Okay.  GATES is the Spanish pronunciation?

12   **A.**    Yes, which is--stands for (speaking Spanish), which would

13   be Elite Arms Group.

14   **Q.**    Okay.  Elite Arms Group, was that originally part of the

15   Mexican government?

16   **A.**    Yes, it was.

17   **Q.**    Are they now sort of independent of the government?

18   **A.**    They're independent.  Unfortunately they're--they were

19   brought in at--supposedly in the State of Coahuila to root out

20   the Zetas, the Zeta cartel.  Supposedly they were funded by the

21   Chapo Guzman organization.

22   **Q.**    Okay.  Did they then turn to illegal activities

23   themselves?

24   **A.**    Yes, they did.

25   **Q.**    Have you had a number of cases over the years involving

1    direct involvement with the Mexican cartel?

2    **A.**    Yes.

3    **Q.**    Many times or a few times or what?

4    **A.**    Many times.

5    **Q.**    Do you try to keep up with the changing landscape, the--

6    sort of the cartel politics?

7    **A.**    We--we have to, actually.  We do.

8    **Q.**    Okay.  Why do you have to?

9    **A.**    Well, because most of our clients--we have clients that

10   also work with the government to bring them intelligence

11   reports, so we keep up to date, you know, on this process.

12   **Q.**    In the State of Texas, where is Ciudad Acuna?

13   **A.**    Ciudad Acuna would be southwest of San Antonio three

14   hours.

15   **Q.**    And I'm sorry.  I said in the State of Texas.  Ciudad

16   Acuna is not in the State of Texas.

17   **A.**    I'm sorry.  Yeah.

18   **Q.**    Del Rio is in Texas.  Right?

19   **A.**    Del Rio, Texas.  And Ciudad Acuna is a border city to

20   Del Rio, Texas.  My apologies.

21   **Q.**    About how many people live there?

22   **A.**    Right now, about 145,000 is the population.

23   **Q.**    Have you become familiar with the operations of criminal

24   cartels in the City of Acuna, Mexico?

25   **A.**    Yes.

1    Q.    In 2013 and 2014-- Well, okay.  Let me ask you--let me

2    preface this question.  Is there something called a plaza?

3    A.    Yes.  Each northern Mexican city has a territory.  The

4    city, they refer to the plaza, means--it's standing for a

5    certain cartel that runs the whole drug business out of that

6    area.  And that allows--it's like a funnel from Mexico, coming

7    up.  Basically whichever cartel runs that, they have to, you

8    know, pay quotas and stuff like that.

9    Q.    Okay.  So if a cartel has the plaza, as they say, in a

10   Mexican city, what does that mean for the inhabitants of that

11   city?

12   A.    It depends.  You know, if it's a hostile cartel, means

13   that there's going to be a lot of corruption, unfortunately, a

14   lot of chaos.  It depends which cartel is running which city

15   and which plaza.

16   Q.    In 2013 and the early part of 2014, which criminal cartel

17   had the plaza in the City of Acuna, Mexico?

18   A.    Los Zetas.

19   Q.    Okay.  And the Zetas, you indicated, are a paramilitary

20   organization sort of?

21   A.    Yes.

22   Q.    Do they have actual military training from the

23   government?

24   A.    The original and--the originals did have.  Unfortunately,

25   they started hiring--they started organizing different

1    leaderships, and when it got--in, I want to say, 2011, 2012,

2    there were losing a lot of bodies, so they ended up, you know,

3    picking up, you know, juveniles, people underage that did not

4    have any training.  Originally, yes, they were trained, but as,

5    you know, they lost more bodies, they ended up getting more

6    individuals that were not trained.

7    Q.    Okay.  You say they lost bodies.  Were they involved in

8    disputes with other cartels?

9    A.    They were in a dispute with the Gulf cartel.  And, you

10   know, when I refer to bodies, means, you know, they had a lot

11   of death in between the killings between both cartels.

12   Q.    So the members of the cartels kill each other with some

13   frequency?

14   A.    Yes.

15   Q.    Who has the plaza in Acuna now?

16   A.    I am not sure it is right now.  I know about six

17   months ago, they were saying it was a family Michoacan.  Then

18   there were--there's another group, (speaking Spanish), are the

19   ones that were managing it recently.  You know, the Zetas are

20   not--they're no longer--or they don't have control over the

21   plaza no more.

22   Q.    Okay.  Do cartels work in cooperation with the Mexican

23   government?

24   A.    Yes.

25   Q.    Okay.  At what levels?

1    **A.**    At the highest level to the lowest levels.

2    **Q.**    Is a--are Mexican government officials on the payroll of

3    cartels sometimes?

4    **A.**    In my opinion, over 90 percent of the time.

5    **Q.**    Okay.  So if a person is involved in a dispute with a

6    cartel, is going to the police a good idea?

7    **A.**    No, it's not a good idea.

8    **Q.**    Why?

9    **A.**    Because normally, if you go to the police, the police are

10   going to just basically, when you leave, call, you know, the

11   drug cartel and advise them, you know, the situation.

12   **Q.**    Okay.  So in other words, the police would call and alert

13   the cartel that somebody just came in and--

14   **A.**    That's correct.

15   **Q.**    --reported on them?

16   **A.**    Yes.

17   **Q.**    What would probably happen to that person?

18   **A.**    To the person reporting, or--

19   **Q.**    Yeah, the person reporting.

20   **A.**    Well, maybe he will get extra, you know, income for that

21   week, or--

22   **Q.**    No, I mean the person who came into the police and

23   reported.

24   **A.**    Oh.  More than likely, he would probably be followed and

25   more likely, you know, if the cartels need him, he'll be picked

1    up.

2    Q.    Okay.  And if someone is picked up by the cartel, do they

3    usually ever come back?

4    A.    Normally they don't.

5    Q.    What are the sources of income of a criminal cartel?

6    A.    Kidnappings, extortion, alien smuggling.  Just about--

7    gambling, horse racing, gamecock fighting in Mexico.

8    Q.    Drugs?

9    A.    Drugs.

10   Q.    Is the primary reason these cartels come into existence

11   moving drugs into the United States?

12   A.    Yes.

13   Q.    Have mass graves been found near Acuna?

14   A.    Yes.  Recently, about an hour down around Santa Rosa

15   (speaking Spanish) area, there's been a lot of graves, you

16   know, found.  And also, there's a jail between (speaking

17   Spanish) and Ciudad Acuna.  It's a state jail.  It's called

18   (speaking Spanish).  Apparently during 2011, 2012, it is said--

19   and now the media is barely, you know, acknowledging all this--

20   that they used to take the people that were picked up, put them

21   in diesel barrels and burn their bodies and then throw them,

22   you know, outside of the (speaking Spanish) prison.

23   Q.    Okay.  And have there been a large number of bodies

24   recovered from that location?

25   A.    Not bodies, but bones and--yes.

1    **Q.**    Parts of bodies?

2    **A.**    Yes.

3    **Q.**    Human remains?

4    **A.**    Yes.

5    **Q.**    And has that been identified as cartel activity taking

6    place within--or--close proximity to an actual government

7    facility?

8    **A.**    Yes.

9    **Q.**    All right.  And that's the federal prison there?

10   **A.**    The state prison.

11   **Q.**    I'm sorry, state prison.

12   **A.**    Yes.

13   **Q.**    Okay.  Would that indicate that there's close cooperation

14   between the state authorities and the cartel people?

15   **A.**    That would indicate so.

16   **Q.**    Are cartels vulnerable to infiltration?

17   **A.**    Yes.

18   **Q.**    Does the United States Drug Enforcement Agency have

19   agents in Mexico that try to infiltrate cartels?

20   **A.**    Both, yeah, U.S. Customs and Border Protection and also

21   Drug Enforcement Agency have agents in Mexico.

22   **Q.**    Okay.  So they--we have our agents in another country.

23   That's with the governments' agreement.  Right?

24   **A.**    Yes.

25   **Q.**    Okay.  And under these sort of joint agreements, have

1    United States agents operated in Mexico?

2    **A.**    Yes.

3    **Q.**    Have DEA drug enforcement agents been captured by the

4    cartel?

5    **A.**    I mean, going--I mean, I can go back a few years.  I

6    think there was a U.S. Customs and Border Protection officer by

7    the name of Jaime Zapata who was working in--I believe he was

8    stationed out of Monterrey, but he was traveling from Laredo to

9    San Luis Potosi.  And I believe they got--as they were

10   traveling, they got stopped and they got killed, and I believe

11   the Zetas were--were the ones who did that hit.

12   **Q.**    Okay.  So the Zetas killed a United States peace officer

13   or--

14   **A.**    Federal agent.

15   **Q.**    --federal agent--

16   **A.**    Yes.

17   **Q.**    --in Mexico?

18           Kiki Camarena, was he also killed in connection

19   with the drug trade?

20   **A.**    Yes, he was.  And I believe that was the Guadalajara

21   cartel, and I believe that was in the eighties.  I'm not sure.

22   **Q.**    Okay.  So one of the southern cartels?

23   **A.**    Yes.

24   **Q.**    And was he actually tortured and murdered?

25   **A.**    Yes, he was.

1    Q.    If someone were to be identified as a Drug Enforcement

2    agent operating undercover in Mexico, what happens to that

3    person?

4    A.    My opinion is, if they know that, you know, he is working

5    undercover, I mean, he's going to get picked up and, you know,

6    be discarded, basically, or killed.

7    Q.    Okay.  If somebody was identified by, for example, the

8    Zetas as being an undercover federal agent, United States

9    federal agent, would a different cartel concern themselves with

10   it?

11   A.    Yes, because it poses a problem to different--whoever the

12   cartel is there.  You know, they are very uneasy, you know,

13   in--especially in the northern cities when there's somebody who

14   they don't know or who he works for.  They're very uneasy on

15   that.

16   Q.    You have heard both Mr. Pina and--or Mr. Marin and his

17   wife talk about the play that was made to try to get them to

18   run drugs across the border.  Would that be something you would

19   expect from a cartel?

20   A.    I would, you know, to see, you know--you know, if that

21   person really is or doesn't work for the government.  Being

22   honest, I mean, it's--usually when you get picked up, I mean,

23   you don't get released, so--

24   Q.    Okay.  So when--for example, when Mr. Pina was taken into

25   that house and searched, the usual result of that is, he's not

1   coming out of the house?

2   **A.**    Usually you get, you know, paddled, per se.   What I mean

3   paddled, is, you get beaten severely and then maybe released,

4   if you get released.

5   **Q.**    Okay.  Let's talk a little bit about the cartels'

6   sophistication.  Do you consider the cartels to be

7   sophisticated organizations?

8   **A.**    Yes, I do.

9   **Q.**    Do they have technological advances?

10   **A.**    Yes.

11   **Q.**    What are some examples of that?

12   **A.**    Examples would be, I know just about a year ago, in

13   Ciudad Victoria, which is about an hour and a half down from

14   (speaking Spanish), they had put cameras, you know, in the

15   city.  They mobilized themselves using technology, Facebook,

16   you know, social media networks.  I mean, they're pretty

17   sophisticated.

18   **Q.**    If Mr. Marin had been identified in Acuna as being a

19   federal agent, would it be beyond the capabilities of the

20   cartels to communicate that across Mexico?

21   **A.**    It would be very easy, you know, in just making phone

22   calls, advising, you know, different cartels, you know, who

23   that person is.

24   **Q.**    All right.  They have the Internet too.  Right?

25   **A.**    Yeah, they have the Internet, you know.  Sometimes, you

1  know, they'll take photos and they'll disseminate the

2  information to other places or other cartels.

3  **Q.**    The searching of a house, does that signify anything to

4  you?

5  **A.**    That's something that's done, common.  And the reason I

6  say "common" is because I deal with these cases on a daily and

7  weekly base where--you know, especially if they want to know

8  something about a person, they'll go in--they'll go through

9  personal photos.  It may be two or three weeks later where

10  they'll pick you up and they say, you know what?  You know, I

11  have--I know who your wife is, your child, you know, but I need

12  for you to basically, you know, do this or travel into the U.S.

13  and take drugs.

14  **Q.**    Okay.  Do they sometimes coerce people into running drugs

15  for them by making threats to their family?

16  **A.**    Yes.

17  **Q.**    Are those threats carried out?

18  **A.**    Yes, I've seen it carried out.

19  **Q.**    You say you've seen it carried out.  And what I'm talking

20  about is a threat not just to an individual, but to--

21  **A.**    To family members.

22  **Q.**    Does the violence go beyond immediate family?

23  **A.**    Yes.

24  **Q.**    Like--give me an example.

25  **A.**    Well, give you an example, I live in--I work in Del Rio

1    but I live in Eagle Pass, and Eagle Pass is a border town with

2    Piedras Negras.  I think in 2011, we had some families out of

3    Eagle Pass that were in Nienda (phonetically), Coahuila, where

4    there was--they were looking for a certain family.  And they

5    ended up finding the family and they ended up killing not only

6    the family, which means from the grandmother to 2- and

7    3-year-old children, but also all the people that were in the

8    house at, you know, just the wrong time.

9    **Q.**   Okay.  And where did that happen?

10   **A.**   That happened in Nienda (phonetically), Coahuila, about

11   2011.

12   **Q.**   Okay.  Was there an incident involving a school bus full

13   of protestors?

14   **A.**   I heard that there was.  I'm not sure; I think it was

15   down in Central Mexico where they disappeared, like,

16   44 students or something like that.

17   **Q.**   Okay.  When you say "they disappeared 44 students," what

18   does it mean to disappear in Mexico?

19   **A.**   Basically just eradicate them, basically kill them.

20   **Q.**   Are the police down there very vigilant in solving these

21   crimes?

22   **A.**   No.

23   **Q.**   What about corruption within Acuna itself?  Do you have

24   an opinion as to whether the local authorities would be a

25   reliable place to go to for protection?

1    **A.**    Living--I cross a lot to Mexico, and, you know, the way

2    the police works, I mean, normally they--I'll give you an

3    example.   They see organized crime or cartel picking up

4    somebody, and if the police are there, the police are not going

5    to do anything, basically.

6    **Q.**    All right.   So if somebody is at an intersection and

7    somebody tries to kidnap them out of their car, would it

8    surprise you that a police officer looked on and did nothing?

9    **A.**    It wouldn't surprise me.   I have a friend who just

10   retired with U.S. Customs and Border Protection.   I want to say

11   in April, his wife got picked up, and her son, and they ended

12   up leaving--or breaking one of the windows from the vehicle,

13   and they got--she got shot in her chest, her son got shot in

14   the back of the neck.   And there was a police officer about a

15   block away.

16   **Q.**    Did he do anything?

17   **A.**    No.

18   **Q.**    Are the cartels capable of reaching across the border

19   into the United States?

20   **A.**    They're networked all--almost all the major cities in the

21   U.S.

22   **Q.**    Okay.   According to the Drug Enforcement Agency, do the

23   cartels have a presence in every state in the union?

24   **A.**    Yes.

25   **Q.**    And by--I mean, the Drug Enforcement--the United States

1    Drug Enforcement Agency, do they issue reports on this sort of

2    thing?

3    **A.**    Yeah, they do, like, a yearly report.  And you can go to

4    their website and they usually have a map and they'll

5    distribute the cartels, you know, from Baja, California, all

6    the way down to Florida, even the northern U.S. cities.

7    **Q.**    Okay.  And as far as the southern part of Texas, towns in

8    the southern part of Texas, do the Zetas have a presence in

9    American towns?

10   **A.**    Yes, they do.

11   **Q.**    Are they capable of killing somebody in the United States

12   of America?

13   **A.**    Yes.

14   **Q.**    Has that happened before?

15   **A.**    I don't know on factual, but I know that they have hired,

16   in conjunction, street-level gangs, like Mexican Mafia, Texas

17   Syndicate, Latin Kings, to, you know, sometimes work in

18   conjunction with them.

19   **Q.**    Okay.  So a person might not be killed by an actual

20   cartel member, but they would contract it out to an American

21   street gang?

22   **A.**    Subcontract, yes.

23   **Q.**    Subcontract.  Okay.

24            Are you familiar with United States prison gangs

25   and street gangs?

1    **A.**    Most of the ones in Texas.

2    **Q.**    Okay.  Are there--  What's the difference between a

3  prison gang and a street gang?

4    **A.**    Prison gangs are sometimes run--they will give you--like

5  the Mexican Mafia.  They're active in the prison, and they're

6  also active on the street.  Sometimes you may have one of the

7  higher lieutenants or somebody who is a resident and is serving

8  time.  Well, sometimes they will communicate to their lower

9  street, you know, gangs to do certain things or certain illicit

10  work, you know, for the--

11    **Q.**    Have prison gangs committed murder in prisons?

12    **A.**    Yes.

13    **Q.**    Are the cartels able to reach into United States prisons?

14    **A.**    Unfortunately, yes.

15    **Q.**    What about in other states?  Like if somebody was to get

16  transferred to Chicago or New York or something like that,

17  would that be beyond the reach of these people?

18    **A.**    No.

19    **Q.**    Are they--  You say they subcontract with American gangs?

20    **A.**    Uh-huh.

21    **Q.**    Are they also capable of putting a bounty on somebody?

22    **A.**    Yes.

23    **Q.**    Have you seen that before?

24    **A.**    I have not seen it personally.  I have read about it, but

25  I have not--I have--I don't have personal experience on that.

1    Q.    Okay.  How-- Are you familiar with a term called

2    falcones (phonetically)?

3    A.    Halcones (phonetically).

4    Q.    Okay.  What is that?

5    A.    Halcones are basically--they live in a border town.  They

6    get paid from the cartels.  They usually get paid about

7    5,000 pesos per every two weeks.  Just to give you an average,

8    what it is, a normal factory worker makes between 1,200 to

9    1,500 pesos a week.  Okay?

10            So halcones basically are spotters that--some of

11   them cross to the U.S. and some of them stay at the port of

12   entry or near the port of entry, and they usually look at

13   shipments coming from, you know, Mexico to the U.S.  Usually if

14   they run cocaine, heroin, or meth, they will have a spotter,

15   you know, watching the vehicle to make sure that vehicle passes

16   the port of entry area.  And then, you know, they call the--you

17   know, the Mexican, you know, halcones or the Mexican person via

18   cell phone or walk back and advise that the car has made it

19   into the U.S.

20   Q.    Do these halcones also watch, like, for the immigration

21   bus?

22   A.    Yes.  The deportation buses usually go to half of the

23   international bridge and they will release, you know, people

24   that have been incarcerated in the U.S., and they will keep a

25   watch on them walking back to Mexico.

1    Q.    Okay.  So the halcone--the halcones--the spotters will

2    watch the deportees as they come into Mexico?

3    A.    Yes.

4    Q.    Do they then interact with those deportees?

5    A.    They will probably have somebody else interact with them.

6    Q.    What will usually happen?

7    A.    Usually they will have--basically they'll--once they pass

8    the Mexican port of entry, usually they'll--depending on who

9    that person is, a lot of times you have people that are

10   released that have a lot of tattoos, and that's normally

11   something that the cartel is interested in.  Why?  Because

12   they're interested in picking that person up to have them work

13   for them.  And sometimes they will get picked up and they end

14   up working for the drug cartels.

15   Q.    Okay.  If a person from a--let's say the Gulf cartel was

16   deported into Ciudad Acuna during the time when the Zetas had

17   the plaza, would they pick him up?

18   A.    Oh, definitely.

19   Q.    And identify him by his tattoos?

20   A.    Yes, or by, you know, who he is.  Usually they harass,

21   you know, all the people that are going back.

22   Q.    Okay.  And then would he likely be killed?

23   A.    Depending on, well, what allegiance or alliance he has to

24   what specific cartel.

25   Q.    Okay.  So a rival cartel--he might kill someone from a

1    rival cartel--

2    **A.**    Yes.

3    **Q.**    --or let them go or--

4    **A.**    Right.

5    **Q.**    What does the Mexican Border Patrol do about that?

6    **A.**    You have (speaking Spanish)--actually I've never seen

7    them do anything basically.  I have never dealt with them,

8    except on maybe sending a minor back to Mexico.  Other than

9    that--

10   **Q.**    What about the Mexican police or the federales?  Do they

11   protect the people?

12   **A.**    No.

13   **Q.**    Let's talk about the offer that was made to Mr. Marin to

14   run a load to prove he's not a DEA agent.  Would that be an

15   alternative--an acceptable alternative for somebody to do?  I

16   mean, apart from its illegality, just from a practical point of

17   view, would that work out for these folks?

18   **A.**    No.

19   **Q.**    Why not?

20   **A.**    Because once you go in, I mean, basically you're either

21   going to be moving a lot of drugs--  Let's say he does make it

22   in.  He's basically going to be working for them.  And when he

23   decides not to, more than likely, he's going to be, you know,

24   killed.

25   **Q.**    Okay.  So they would use him up and then kill him?

1   **A.**    Yes.

2   **Q.**    Do the halcones keep track of who crosses the border on a

3   regular basis?

4   **A.**    Yes.

5   **Q.**    Like, for example, when Ms. Marin is taking the kids to

6   school, would they know that from having watched her vehicle?

7   **A.**    I'll be honest with you, and this is because I have

8   personal knowledge, because I have friends that reside in

9   Mexico.  And--and I'll answer your question, but, you know, a

10  lot of these residents that live--they're U.S. citizens that

11  live in Mexico that come across every day.  I mean, the drug

12  cartels know, you know, what they're driving and who they are,

13  you know.  And a lot of times, depending on where they live or

14  what society they belong to, you know, they may, you know,

15  harass them into, you know, bringing in something illegal.  I

16  have friends that reside in Mexico and they prefer to walk and

17  work in the U.S. and walk back because--

18  **Q.**    They don't want to be seen driving a car?

19  **A.**    Well, because they have been harassed already.

20  **Q.**    What about seeking asylum, going into the American

21  Embassy and seeking asylum if you're under a threat from a

22  cartel?  Is that a viable option?

23  **A.**    It's a viable option.  You can go in, but, I guess, after

24  you're done asking for political asylum, you're basically not

25  going to be protected or you're not going to stay there.

1   Q.   Okay.  So does the United States Consulate or

2   United States Embassy--do they have a safe house for asylum

3   seekers?

4   A.   I don't have personal knowledge of them having safe

5   houses, I mean, so I cannot, you know, testify to that.  I

6   mean--

7   Q.   Okay.  But have you seen asylum seekers in the past who

8   have attempted to seek asylum involved in your cases?

9   A.   Yes, I have.

10  Q.   And what's the usual process?

11  A.   Sit and wait in Mexico basically.

12  Q.   So they would go down to this office, pick up a form,

13  fill it out, and they go back home and--

14  A.   Yes.

15  Q.   --wait for it to be decided?

16  A.   Yes.

17  Q.   How long do those processes take?

18  A.   It can be a year, two years, three years.

19  Q.   Okay.  So whatever danger they're in, they're going to

20  remain in that danger while they're waiting for asylum?

21       What about crossing the bridge into the

22  United States, seeking asylum with the border guys?

23  A.   Unfortunately, if you have a--if you are a deported

24  alien, you're probably going to be charged with a 1326, which

25  is re-entry after deportation, just merely for going to the

1    port of entry.

2    **Q.**    Okay.  Because the port of entry is on the American side

3    of the border?

4    **A.**    The U.S. side.

5    **Q.**    So you have to cross the border to get there.  Right?

6    **A.**    That's correct.

7    **Q.**    So in order for a deportee to go and seek asylum in that

8    place, he has to actually commit another crime.  Right?

9    **A.**    He will be basically--aliens are inspected, so basically

10   when he goes to the port of entry, they will run his name, his

11   alien number, and if he is deported, he's going to be

12   incarcerated.

13   **Q.**    Can a person with an aggravated felony conviction in

14   their history even get asylum in the United States?

15   **A.**    No.

16   **Q.**    All right.  Is there a--there's a specific statute that

17   prohibits that?

18   **A.**    Yes.

19   **Q.**    Do you know about a United States Marine having been

20   murdered at Falcon Lake in Texas?

21   **A.**    I know the story.  I fish in Falcon Lake.  The guy was a

22   jet skier.  Him and his wife crossed into the Mexican side of

23   Falcon Lake, and I think he got--well, I mean, we know he got

24   shot and killed.  I don't know if the body was ever recovered.

25   **Q.**    Is it common for people to--I mean--for people to

1  disappear in Mexico and never be heard from again?

2  **A.**    Yes.

3  **Q.**    Is there any legitimate recourse to go to the authorities

4  for protection, in your opinion?

5  **A.**    Not in Mexico.

6            MR. SLOAN:  I'll pass the witness.

7                    CROSS-EXAMINATION

8  BY MR. HAAG:

9  **Q.**    Good afternoon, Mr. Barrientos.

10  **A.**    Good afternoon, Counselor.

11  **Q.**    You are employed by the Office of the Federal Public

12  Defender; is that correct?

13  **A.**    Yes, sir.

14  **Q.**    And the Office of Public Defender represents the

15  defendant in this case?

16  **A.**    I work for the Western District of Texas, and this is the

17  Northern District.

18  **Q.**    Okay.  But you still represent--you're representing the

19  defendant's interests here?  You're not representing just--

20  you're not here out of the goodness of your heart; you're

21  representing the defendant's interests?

22  **A.**    That is correct.

23  **Q.**    And let's be clear.  You don't have any personal

24  knowledge at all about his case?

25  **A.**    No.

1    **Q.**    This is all just stories that you've heard, things that

2    you've come across, stories you've read, generalized

3    information about things in Mexico?

4    **A.**    I wouldn't say generalized, because I have friends that,

5    you know, have been picked up, you know, by the drug cartels or

6    have been traveling from Laredo in a bus to Piedras Negras,

7    they get pulled over and basically they take all their monies

8    and-- General, maybe on some things, like we have friends that

9    work for the media, for (speaking Spanish), in Piedras Negras,

10    and so I get a lot of information, you know, from them.

11    **Q.**    Okay.  But they're not things that have happened to you?

12    **A.**    That's correct.

13    **Q.**    And really, I mean, based upon what you've told this jury

14    here today, all 145,000 citizens in Acuna, Mexico, should be

15    allowed to cross into the United States because they're all

16    under duress; isn't that correct?

17    **A.**    I never specifically said that.

18    **Q.**    Well, I mean, the situation you described is, everyone in

19    Acuna lives at the whim of drug cartels.  The police are all

20    corrupt, there's no recourse, and the only thing to do is to

21    enter the United States.  Is that correct?

22    **A.**    I can't speak for Mexican citizens.  I'm a U.S. citizen

23    and I live in the U.S.  So they have to live with what, you

24    know, their area--I mean, unfortunately, if you live in the

25    northern city versus living in, you know, another city in

1    Mexico, of course, the northern Mexican cities are always going

2    to be clashing because that is where all the drugs--it's a

3    billion-dollar industry.  All the drugs from Mexico, from

4    Colombia, they all come in through Mexico.

5    **Q.**    And you raise a very good point.  There's a severe

6    distinction between the situation in Acuna, Mexico, and

7    Yucatan, Mexico.  Correct?

8    **A.**    Yes.

9    **Q.**    And let's go ahead and take a look at a few things.  How

10   many American citizens are estimated to live in Mexico?

11   **A.**    Don't know the estimate.  I travel a lot to Mexico, and I

12   would say thousands of U.S. Americans, you know, live in Mexico

13   at least, you know, four or six months out of the year.

14   **Q.**    Would it surprise you to learn that approximately one

15   million American citizens live in Mexico?

16   **A.**    It wouldn't surprise me.

17   **Q.**    And the places that they live, mainly along the Yucatan

18   Peninsula, those are safe places, are they not?

19   **A.**    Yes, fairly safe.

20   **Q.**    And you heard the defendant testify in trial, and his

21   wife testify in trial, that when they were in Yucatan, there

22   were no problems; is that correct?

23   **A.**    That's correct.

24   **Q.**    And as you noted, millions of Americans travel to Mexico

25   every year as tourists; is that correct?

1   **A.**    That is correct.

2   **Q.**    And they travel to very safe locations in Mexico?

3   **A.**    Yes.

4   **Q.**    Let's talk a little bit--you talked about the corruption

5   in Mexico, and I believe, according to your estimates, that

6   90 percent of the police force or government officials in Acuna

7   were corrupt?

8   **A.**    Yes.

9   **Q.**    What do you base that on?

10   **A.**    I base that on what I've seen.  I have, you know, lived

11   in the border towns all my life.  I cross into Mexico.  There's

12   a certain thing that we learned when I was young, you know,

13   (speaking Spanish), you know, basically, you know, paying off

14   you know, Mexican officials, you know, certain things--little

15   things.  You know, I made it a habit always to have 200 pesos.

16   I used to get stopped when I was younger because I had a fast

17   car, driving into Mexico, and basically, you know, take out the

18   200 pesos and you'd be on your way.

19   **Q.**    So based upon your experience in giving bribes,

20   essentially, to Mexican law enforcement, you believe that,

21   based on that, in your estimation, about 90 percent of them are

22   corrupt?

23   **A.**    Yes.

24   **Q.**    What about the state Mexican law enforcement?

25   **A.**    Also.

1    Q.    And the federal Mexican law enforcement?

2    A.    Also.

3    Q.    Let's talk a little bit about asylum.  What is your

4    familiarity with the process for obtaining--well, it's actually

5    not asylum, is it, if they're outside the United States.

6    Right?

7    A.    Correct.

8    Q.    If they're outside the United States, what is that

9    process called?

10    A.    Well, it depends.  If you come into the U.S.--

11    Immigration is very complex, and I'm got not going to testify

12    as an expert, and the Judge will probably kick me out on this

13    also, so--  So Border Patrol, when I was a Border Patrol agent,

14    usually we'd deal with--they used to take out a book, and about

15    that much (indicating) was deportations.  Okay?  Anybody coming

16    into the U.S., you know, you can be excluded, and it deals with

17    another type of immigration, which are exclusion--exclusionary

18    law under the Immigration and Naturalization Act.

19          To answer your question, I mean, political asylum

20    is--if you're in the U.S, you know, if you want to ask for

21    political asylum, you have to do it through the proper

22    channels, through immigration court, which is an administrative

23    proceeding versus a criminal proceeding, as to what we're doing

24    here.

25    Q.    Okay.  And let's--and I just want to make sure that the

1    jury understands.  In all candor, you can't express an opinion

2    that if the defendant were to apply for either refugee status

3    from outside the country or asylum status in the country, that

4    he would definitely be denied, can you?

5    A.     I know for a fact if you have an aggravated felony, you

6    cannot get political asylum.  And I think--and I know I've read

7    that in the immigration--

8    Q.     Okay.  But what--I mean, have you ever been--served as an

9    asylum officer?

10   A.     No, I have not.

11   Q.     Have you served with the Bureau of Immigration and

12   Citizenship Services?

13   A.     No, sir.

14   Q.     Would it surprise you to learn that there, in fact, is

15   eligibility for relief from being an aggravated felon?

16   A.     It would surprise me.

17   Q.     Would it surprise you to learn that you can apply

18   through--if you're--depending on your asylum results, you can

19   apply to the Board of Immigration Appeals.  Have you heard of

20   that entity before?

21   A.     Yes, I have.

22   Q.     And then you can apply from Board of Immigration Appeals

23   up to--directly to the Courts of Appeal across the

24   United States?

25   A.     Yes.

1  Q.    Okay.  So can you tell this jury to a 100-percent degree

2  of certainty, if this defendant applied for either asylum or

3  refugee status, there's no way in the world he could ever get

4  it?

5  A.    Not with 100-percent percentage.

6  Q.    Even outside the asylum status, you were here and heard

7  the defendant testify about the possibilities for obtaining

8  citizenship.  Correct?

9  A.    Correct.

10  Q.    And he certainly had a path to citizenship at one point

11  in time, didn't he?

12  A.    Yes.

13  Q.    He, in fact, really had two paths to citizenship?

14  A.    Yes.

15  Q.    He could have gone the military route or he could have

16  gone the regular application route?

17  A.    Correct.

18  Q.    We've talked a little bit about--well, really in vague

19  terms, about asylum procedures here in the United States.  Are

20  there other countries that have asylum?

21  A.    Yes.

22  Q.    Does Canada have asylum?

23  A.    Yes.

24  Q.    Are there countries in Central America that offer asylum?

25  A.    Yes.

1    **Q.**    Are there countries in South America that offer asylum?

2    **A.**    Yes.

3                   MR. HAAG:  Pass the witness, Your Honor.

4                        REDIRECT EXAMINATION

5    BY MR. SLOAN:

6    **Q.**    Mr. Haag talked about the people of Mexico, the citizens

7    and the tourists.  In your opinion, is there a difference

8    between a specific threat versus a general threat?

9    **A.**    Rephrase that.

10   **Q.**    All right.  The people who live in Mexico, the

11   U.S. citizens who live in Mexico that haven't been identified

12   as agents of the federal government, are they living under the

13   same kind of threat as somebody who has been identified that

14   way?

15   **A.**    No.

16   **Q.**    All right.  And once somebody has been specifically

17   identified as being a DEA agent, is there any place in Mexico

18   that they can call safe?

19   **A.**    No.  They're a target basically.

20   **Q.**    What about the Yucatan?  Isn't that a place that's

21   perfectly safe, or have people been murdered there?

22   **A.**    Yes, but if you're targeted as an individual, you know,

23   by any drug cartel, you're going to be found, whether it be any

24   state in Mexico.

25   **Q.**    In terms of this refugee status, seeking that, the laws

1   on aggravated felons--is it more likely than not that he would

2   be denied that status based on his record?

3   **A.**    My opinion would be more likely than not.

4   **Q.**    All right.

5              MR. SLOAN:  Pass the witness.

6              THE COURT:  All right.  You may step down.

7              Call your next witness.

8              MR. SLOAN:  Defense--  Oh, I'm sorry.  Go ahead.

9              MS. LIGGETT:  Your Honor, at this time, the defense

10   would ask the Court to take judicial notice of the law found in

11   8 U.S.C. Section 1158.  The Fifth Circuit has recognized the

12   power of a federal court to take judicial notice of legislative

13   facts.  It is the section of the law governing asylum and

14   noting that aliens convicted of aggravated felonies are not

15   eligible for the asylum relief provided thereunder.

16              THE COURT:  I'll take that under advisement.

17              MS. LIGGETT:  We do have--it's marked as

18   Defendant's Exhibit 1.  Should the Court decide to admit it, we

19   are prepared to have it admitted into evidence.

20              THE COURT:  All right.

21              MR. SLOAN:  With that, Your Honor, the defense

22   rests.

23              THE COURT:  All right.

24              MR. LONG:  The United States closes, Your Honor.

25              MR. SLOAN:  Rest and close, Your Honor.

1          THE COURT:  All right, members of the jury.  You

2     have heard all the evidence to be produced in the case.  The

3     next stage of the proceedings will be for me to present to you

4     my charge or instructions on the law.  I will do that at 9:00

5     in the morning.

6          So for your purposes, you will be in recess for the

7     rest of the day.  Please keep all my instructions in mind.

8     Please be back in the jury room in the morning at 9:00.  We

9     will take up at that time.

10         All rise for the jury.

11     (THE JURORS EXIT THE COURTROOM)

12         THE COURT:  All right.  Be seated.

13         All right.  I've pulled some pages from my charge.

14     I'm going to leave it here in the courtroom.  The attorneys

15     will need to conform your copies with what I've got here.  I'll

16     be back in the courtroom in 20 minutes.

17     (RECESS TAKEN)

18     (OUTSIDE THE PRESENCE OF THE JURY)

19         THE COURT:  All right.  We're in court outside the

20     presence of the jury.

21         I've handed to the attorneys a copy of the proposed

22     charge.  The Court will now entertain any objections or

23     requests from the attorneys.  From the government?

24         MR. LONG:  No objections to the charge from the

25     government, Your Honor.

```
 1                    THE COURT:  All right, sir.  Defense?

 2                    MR. SLOAN:  No objections to the charge, Your

 3     Honor.  Thank you.

 4                    THE COURT:  All right.  At 9:00 a.m. in the

 5     morning, I'll read the charge to the jury; then I'll give the

 6     attorneys an opportunity to make their summations.  How much

 7     time is requested by the government?

 8                    MR. LONG:  Twenty minutes, Your Honor.

 9                    THE COURT:  Twenty?

10                    Is that enough--

11                    MR. SLOAN:  We can do 20, Judge.

12                    THE COURT:  I'll give each side up to 20 minutes

13     then for your summations.

14                    All right.  Court will stand adjourned until 9:00

15     in the morning.

16          (END OF DAY)

17

18

19

20

21

22

23

24

25
```