1        UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF TEXAS
2          SAN ANGELO DIVISION

3   UNITED STATES OF AMERICA        )
                                    )
4   VS.                             )   CAUSE NO. 6:15-CR-030-C
                                    )
5   RAFAEL ANTONIO MARIN-PINA       )

6

7   ------------------------------------------------------

8         **TRANSCRIPT OF TRIAL - VOLUME 2 OF 2**
          **BEFORE THE HONORABLE SAM R. CUMMINGS,**
9   **SENIOR UNITED STATES DISTRICT JUDGE, AND A JURY.**

10        **TUESDAY, FEBRUARY 2, 2016**
              **LUBBOCK, TEXAS**

11  ------------------------------------------------------

12

13            **A P P E A R A N C E S**

14  **FOR THE GOVERNMENT**:
    UNITED STATES ATTORNEY'S OFFICE
15  1205 TEXAS AVENUE, SUITE 700
    LUBBOCK, TEXAS 79401
16  BY:  SEAN LONG
         JEFFREY R. HAAG

17

18  **FOR THE DEFENSE**:
    FEDERAL PUBLIC DEFENDER'S OFFICE
19  1205 TEXAS AVENUE, SUITE 506
    LUBBOCK, TEXAS 79401
20  BY:  DAVID SLOAN
         HELEN M. LIGGETT

21

22

23  FEDERAL OFFICIAL COURT REPORTER: MECHELLE DANIEL, 1205 TEXAS
    AVENUE, LUBBOCK, TEXAS 79401, (806) 744-7667.
24

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
25  PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

1               **I N D E X**
        **FEBRUARY 2, 2016; VOLUME 2**
2

3   COURT'S CHARGE TO THE JURY                    265
    CLOSING ARGUMENT BY THE GOVERNMENT            276
4   CLOSING ARGUMENT BY THE DEFENSE               282
    RESPONSE BY THE GOVERNMENT                    294
5   VERDICT                                       300

6

7

8

9

10                    * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Be seated, please.

 3            Members of the jury, you have now heard all of the

 4   evidence in the case and soon will hear the final arguments of

 5   the lawyers for the parties.

 6            It becomes my duty, therefore, to instruct you on

 7   the rules of law that you must follow and apply in arriving at

 8   your decision in the case.

 9            In any jury trial, there are, in effect, two

10   judges.  I am one of the judges; the other is the jury.  It is

11   my duty to preside over the trial and to decide what evidence

12   is proper for your consideration.  It is also my duty at the

13   end of the trial to explain to you the rules of law that you

14   must follow and apply in arriving at your verdict.

15            First, I will give you some general instructions

16   which apply in every case, for example, instructions about

17   burden of proof and how to judge the believability of

18   witnesses.  Then I will give you some specific rules of law

19   about this particular case, and finally I will explain to you

20   the procedures you should follow in your deliberations.

21            You, as jurors, are the judges of the facts, but in

22   determining what actually happened, that is, in reaching your

23   decision as to the facts, it is your sworn duty to follow all

24   of the rules of law as I explain them to you.

25            You have no right to disregard or give special
```

1    attention to any one instruction, or to question the wisdom or

2    correctness of any rule I may state to you.  You must not

3    substitute or follow your own notion or opinion as to what the

4    law is or ought to be.  It is your duty to apply the law as I

5    explain it to you, regardless of the consequences.

6            It is also your duty to base your verdict solely

7    upon the evidence, without prejudice or sympathy.  That was the

8    promise you made and the oath you took before being accepted by

9    the parties as jurors, and they have the right to expect

10   nothing less.

11           The indictment or formal charge against a defendant

12   is not evidence of guilt.  Indeed, the defendant is presumed by

13   the law to be innocent.  The defendant begins with a clean

14   slate.  The law does not require a defendant to prove his

15   innocence or produce any evidence at all.

16           The government has the burden of proving the

17   defendant guilty beyond a reasonable doubt, and if it fails to

18   do so, you must acquit the defendant.  While the government's

19   burden of proof is a strict or heavy burden, it is not

20   necessary that the defendant's guilt be proved beyond all

21   possible doubt.  It is only required that the government's

22   proof exclude any reasonable doubt concerning the defendant's

23   guilt.

24           A reasonable doubt is a doubt based upon reason and

25   common sense after careful and impartial consideration of all

1    the evidence in the case.  Proof beyond a reasonable doubt,

2    therefore, is proof of such a convincing character that you

3    would be willing to rely and act upon it without hesitation in

4    the most important decisions of your own affairs.

5            As I told you earlier, it is your duty to determine

6    the facts.  To do so, you must consider only the evidence

7    presented during the trial.  Evidence is the sworn testimony of

8    the witnesses, including stipulations, and the exhibits.  The

9    questions, statements, objections, and arguments made by the

10   lawyers are not evidence.

11           The function of the lawyers is to point out those

12   things that are most significant or most helpful to their side

13   of the case, and in so doing to call your attention to certain

14   facts or inferences that might otherwise escape your notice.

15   In the final analysis, however, it is your own recollection and

16   interpretation of the evidence that controls in the case.  What

17   the lawyers say is not binding upon you.

18           Also, do not assume from anything I may have done

19   or said during the trial that I have any opinion concerning any

20   of the issues in this case.  Except for the instructions to you

21   on the law, you should disregard anything I may have said

22   during the trial in arriving at your own verdict.

23           In considering the evidence, you are permitted to

24   draw such reasonable inferences from the testimony and exhibits

25   as you feel are justified in the light of common experience.

1    In other words, you may make deductions and reach conclusions

2    that reason and common sense lead you to draw from the facts

3    which have been established by the evidence.

4            Do not be concerned about whether evidence is

5    direct evidence or circumstantial evidence.  You should

6    consider and weigh all of the evidence that was presented to

7    you.

8            The law makes no distinction between the weight to

9    be given either direct or circumstantial evidence.  But the law

10   requires that you, after weighing all of the evidence, whether

11   direct or circumstantial, be convinced of the guilt of the

12   defendant beyond a reasonable doubt before you can find the

13   defendant guilty.

14           I remind you that it is your job to decide whether

15   the government has proved the guilt of the defendant beyond a

16   reasonable doubt.  In do so, you must consider all of the

17   evidence.  This does not mean, however, that you must accept

18   all of the evidence as true or accurate.

19           You are the sole judges of the credibility or

20   believability of each witness and the weight to be given to the

21   witness's testimony.  An important part of your job will be

22   making judgments about the testimony of the witnesses,

23   including the defendant who testified in this case.  You should

24   decide whether you believe all, some part, or none of what each

25   person had to say, and how important that testimony was.  In

1    making that decision, I suggest that you ask yourself a few

2    questions:  Did the witness impress you as honest?  Did the

3    witness have any particular reason not to tell the truth?  Did

4    the witness have a personal interest in the outcome of the

5    case?  Did the witness have any relationship with either the

6    government or the defense?  Did the witness seem to have a good

7    memory?  Did the witness clearly see or hear the things about

8    which he testified?  Did the witness have the opportunity and

9    ability to understand the questions clearly and answer them

10   directly?  Did the witness's testimony differ from the

11   testimony of other witnesses?  These are a few of the

12   considerations that will help you determine the accuracy of

13   what each witness said.

14           The testimony of the defendant should be weighed

15   and his credibility evaluated in the same way as that of any

16   other witness.

17           Your job is to think about the testimony of each

18   witness you have heard and decide how much you believe of what

19   each witness had to say.  In making up your mind and reaching a

20   verdict, do not make any decisions simply because there were

21   more witnesses on one side than on the other.  Do not reach a

22   conclusion on a particular point just because there were more

23   witnesses testifying for one side on that point.  You will

24   always bear in mind that the law never imposes upon a defendant

25   in a criminal case the burden or duty of calling any witnesses

1    or producing any evidence.

2              If scientific, technical, or other specialized

3    knowledge might assist the jury in understanding the evidence

4    or in determining a fact in issue, a witness qualified by

5    knowledge, skill, experience, training, or education may

6    testify and state an opinion concerning such matters.

7              Merely because such a witness has expressed an

8    opinion does not mean, however, that you must accept this

9    opinion.  You should judge such testimony like any other

10   testimony.  You may accept it or reject it or give it as much

11   weight as you think it deserves, considering the witness's

12   education and experience, the soundness of the reasons given

13   for the opinion, and all other evidence in the case.

14             You have been told that the defendant was found

15   guilty in 1997 of aggravated domestic battery.  This conviction

16   has been brought to your attention only because you may wish to

17   consider it when you decide, as with any witness, how much of

18   the defendant's testimony you will believe in this trial.  The

19   fact that the defendant was previously found guilty of that

20   crime does not mean that the defendant committed the crime for

21   which the defendant is on trial, and you must not use this

22   prior conviction as proof of the crime charged in this case.

23             The defendant is charged in the single-count

24   indictment with violating Title 8, United States Code,

25   Section 1326(a), which makes it a crime for an alien to enter,

1  to be found in, or attempt to enter the United States without

2  consent of the Secretary of the Department of Homeland Security

3  or the Attorney General of the United States to apply for

4  readmission after being deported, removed, excluded or denied

5  admission.

6        For you to find the defendant guilty of this crime,

7  you must be convinced that the government has proved each of

8  the following beyond a reasonable doubt:

9        First, that the defendant was an alien at the time

10 alleged in the indictment;

11       Second, that the defendant had previously been

12 deported, denied admission, excluded, or removed from the

13 United States;

14       Third, that thereafter the defendant knowingly

15 entered, or was found in, or attempted to enter the

16 United States; and

17       Fourth, that the defendant had not received the

18 consent of the Secretary of the Department of Homeland Security

19 or the Attorney General of the United States to apply for

20 readmission to the United States since the time of the

21 defendant's previous deportation.

22       An alien is any person who is not a natural-born or

23 naturalized citizen of the United States.

24       The word "knowingly," as that term has been used

25 from time to time in these instructions, means that the act was

1    done voluntarily and intentionally, not because of mistake or

2    accident.

3         The defendant claims that if he committed the acts

4    charged in the indictment, he did so only because he was forced

5    to commit the crime.  If you conclude that the government has

6    proved beyond a reasonable doubt that the defendant committed

7    the crime as charged, you must then consider whether the

8    defendant should nevertheless be found not guilty because his

9    actions were justified by duress or coercion.

10        The defendant's actions were justified, and

11   therefore he is not guilty, only if the defendant has shown by

12   a preponderance of the evidence that each of the following four

13   elements is true.  To prove a fact by a preponderance of the

14   evidence means to prove that the fact is more likely so than

15   not so.  This is a lesser burden of proof than to prove a fact

16   beyond a reasonable doubt.

17        The four elements which the defendant must prove by

18   a preponderance of the evidence are as follows:

19        First, that the defendant was under an unlawful

20   present, imminent, and impending threat of such a nature as to

21   induce a well-grounded fear of death or serious bodily injury

22   to himself;

23        Second, that the defendant had not recklessly or

24   negligently placed himself in a situation in which it was

25   probable that he would be forced to choose the criminal

1    conduct;

2              Third, that the defendant had no reasonable legal

3    alternative to violating the law, that is, he had no reasonable

4    opportunity to avoid the threatened harm; and

5              Fourth, that a reasonable person would believe that

6    by committing the criminal action, he would directly avoid the

7    threatened harm.

8              You will note that the indictment charges that the

9    offense was committed on or about a specified date.  The

10   government does not have to prove that the crime was committed

11   on that exact date, so long as the government proves beyond a

12   reasonable doubt that the defendant committed the crime on a

13   date reasonably near September 13, 2015, the date stated in the

14   indictment.

15             You are here to decide whether the government has

16   proved beyond a reasonable doubt that the defendant is guilty

17   of the crime charged.  The defendant is not on trial for any

18   act, conduct, or offense not alleged in the indictment.

19   Neither are you called upon to return a verdict as to the guilt

20   of any other person or persons not on trial as a defendant in

21   this case, except as you are otherwise instructed.

22             If the defendant is found guilty, it will be my

23   duty to decide what the punishment will be.  You should not be

24   concerned with punishment in any way.  It should not enter your

25   consideration or discussion.

1          Our system of law does not permit jurors to be

2    governed by sympathy, prejudice, or public opinion.  Both the

3    parties and the public expect that you will carefully and

4    impartially consider all the evidence in the case, follow the

5    law as stated by the Court, and reach a just verdict,

6    regardless of the consequences.

7          All persons stand equal before the law and are to

8    be dealt with as equals in a court of justice.  Keep constantly

9    in mind that it would be a violation of your sworn duty to base

10   your verdict upon anything other than the evidence in the case.

11         To reach a verdict, whether it is guilty or not

12   guilty, all of you must agree.  Your verdict must be unanimous

13   on the indictment.  Your deliberations will be secret.  You

14   will never have to explain your verdict to anyone.

15         It is your duty to consult with one another and to

16   deliberate in an effort to reach agreement if you can do so.

17   Each of you must decide the case for yourself, but only after

18   an impartial consideration of the evidence with your fellow

19   jurors.  During your deliberations, do not hesitate to

20   re-examine your own opinions and change your mind if convinced

21   that you were wrong.  But do not give up your honest beliefs as

22   to the weight or effect of the evidence solely because of the

23   opinion of your fellow jurors, or for the mere purpose of

24   returning a verdict.

25         Remember at all times, you are judges, judges of

1    the facts.  Your duty is to decide whether the government has

2    proved the defendant guilty beyond a reasonable doubt.

3           When you go to the jury room, the first thing that

4    you should do is select one of your number as your foreperson,

5    who will help to guide your deliberations and will speak for

6    you here in the courtroom.

7           A verdict form has been prepared for your

8    convenience.

9           The foreperson will write the unanimous answer of

10   the jury in the space provided, either guilty or not guilty.

11   At the conclusion of your deliberations, the foreperson should

12   date and sign the verdict.

13          If you need to communicate with me during your

14   deliberations, the foreperson should write the message and give

15   it to the Court Security Officer.  I will either reply in

16   writing or bring you back into court to answer your message.

17           Bear in mind that you are never to reveal to any

18   person, not even to the Court, how the jury stands, numerically

19   or otherwise, until after you have reached a unanimous verdict.

20          The verdict of the jury reads as follows:  "We, the

21   jury, find the defendant, Rafael Antonio Marin-Pina, (answer

22   guilty or not guilty in the space provided)," and then "as

23   charged in the indictment in the above-styled and numbered

24   cause."

25          The foreperson needs to sign this verdict form and

1    date the verdict form.

2              Mr. Haag?

3              MR. HAAG:  Thank you, Your Honor.  May it please

4    the Court, Counsel.

5              Good morning, Ladies and Gentlemen of the Jury.

6    This is the closing argument.  I'm going to begin by talking to

7    you a little bit about the elements of illegal re-entry after

8    deportation.  I'm going to go through these kind of quickly,

9    because I don't think there's really any doubt that the

10   defendant is guilty of the crime charged.  I think that the

11   arguments this morning are going to center on whether the

12   defendant has proved the duress defense by a preponderance of

13   the evidence.

14             The first element is that the defendant is an

15   alien; in other words, a citizen and national of a country

16   other than the United States.  Looking at the evidence that we

17   have brought before you here today, we have the defendant's

18   admission, and that admission is corroborated by all of the

19   documentary evidence recovered from the defendant's alien

20   registration file, including, most notably, his birth

21   certificate.

22             The second element is that the defendant had

23   previously been deported from the United States of America.  We

24   brought before you at the trial the warrant of removal, the

25   I-205, and that is the document showing that the defendant was

1    ordered deported from the United States, and it showed that an

2    immigration officer physically removed him from the

3    United States on August the 7th of 2008.  Garland Timms

4    testified that he compared the fingerprints taken directly from

5    the defendant by Agent Felps with the fingerprint from the

6    I-205, and it is, to a certainty, the same person.

7                Third element, after the defendant's deportation,

8    he was found in the United States of America.  You had the

9    testimony of Lonnie Felps that on September the 13th of 2015,

10   he identified the defendant as being in the country illegally,

11   and he took custody of the defendant on October the 16th of

12   2015.

13               And finally the last element, which is very

14   verbose, but in short, he did not have permission to re-enter

15   the United States.  You had the defendant's admission that he

16   did not have permission to re-enter the United States, and that

17   admission was corroborated by Agent Felps' search of all the

18   immigration databases showing that, in fact, he did not have

19   permission.

20               Let's turn now to the duress or coercion defense,

21   and there are four elements that I've put up here on the

22   screen.  You will have a copy of those with the Court's

23   instructions, and so I'll let you read them in greater detail

24   when you go back to the jury room.

25               But there are two things I want to talk about, and

1    let's first talk about the credibility of the witnesses.  Your

2    first step in analyzing the duress defense is, what's the

3    credibility of the testimony that the defendant brought before

4    you yesterday?

5            The first thing I want to point out is a pattern

6    that we're going to loop back to.  The defendant's perception

7    when facing consequences.  You will recall yesterday when he

8    testified, he testified that--when we were talking about why he

9    was initially picked up by immigration authorities, he said,

10   well, it was really because the California Department of

11   Corrections kept me six months longer, and that's why they had

12   to get immigration authorities involved.

13           And then we went to the immigration proceedings and

14   he said, well, really, they just told me to sign this

15   paperwork; I signed the paperwork, and all of a sudden I was

16   deported.

17           And what we're going to see is, there's a pattern,

18   is that when the defendant is forced to face the consequences

19   of his choices, his perceptions about why he is now facing

20   those consequences is not in accordance with reality.

21           I want you to ask yourself, in evaluating the

22   testimony of the defendant and his wife and the expert that the

23   defense brought to you, are their actions consistent with

24   someone in impending, imminent fear or danger?  The defendant

25   and his wife testified that they were absolutely terrified.

1    The cartel was after them, their lives were in danger, they

2    were on the run.  And yet, according to his wife, her and the

3    kids are going back to this place where they're hunted by the

4    cartel every single weekend.  Does that make sense?  In your

5    common experience and common sense, if there is a place of

6    danger, would you go back there every weekend?  More

7    importantly, would you allow your wife and kids to go back

8    there every weekend?

9            The defendant testified that weeks or months passed

10   between the time when cartel members allegedly shot at him and

11   when he fled Acuna.  Does that make sense?  If you were shot

12   at, would you waste any time at all in fleeing?  Would you

13   wait?

14           And this ties in to the next point.  The defense

15   talks about how the cartel is this pervasive, dominant,

16   all-influencing entity in Acuna.  They run everything.  They

17   run the government, they run the police.  If they want you,

18   they will get you.

19           But you contrast this with their seemed

20   incompetence or inability to track down the defendant.  And he

21   testified that he fled to his church friend's residence.  And

22   what does he do?  He gets a voter identification card with the

23   address he's staying at.  So he goes to the government entities

24   that are controlled by the cartel and says, "This is where I

25   live."  And despite telling the cartel, in effect, where he

1     lived, they couldn't find him?  Does that make sense?

2           And then looping back to my original point, the

3     defendant had numerous encounters with law enforcement.  You've

4     heard about all the times that the Tom Green County Sheriff's

5     Office was called out to the residence.  You heard about the

6     fact that when he crossed the border, he had encounters with

7     immigration authorities.  All those contacts with law

8     enforcement and not once does he ever tell them, "I am in fear

9     of my life, the cartel is hot on my heels," not once.  It's

10    only until he is called to court to face criminal immigration

11    consequences that, all of a sudden, the story begins.

12          And again, looping back to my first point, that's

13    the pattern you see, isn't it?  When the defendant is called to

14    account for his conduct, when he's called to account for his

15    felony conviction by being removed from the United States, he

16    creates a story to justify it.  When he's called here today to

17    account for his conduct in illegally entering and remaining in

18    the United States of America, all of a sudden, he's in fear for

19    his life from the cartel.

20          Let's talk about a couple of the elements.

21    Unlawful present, imminent, and impending threat.  You're going

22    to read that that's one of the elements of the duress defense.

23    Before I talk about it, we need to sort of have a common

24    definition of what that means.  So I would like everyone here

25    to think in your mind of the person that you hold most dear.

1    It can be wife, husband, kids, mom, dad, brother, sister,

2    whoever.  Get that person in your mind.  If I told you that

3    person is under present, imminent, and impending threat of

4    death, would any of you stay and listen to the rest of my

5    closing argument?  You would vault this rail and be gone.

6    That's what present, imminent means.  Right here, right now.

7         The evidence that the defendant brought before you

8    is that he illegally entered the United States sometime in

9    early 2014.  He was apprehended, or at least identified,

10   September the 13th of 2015.  And so it points out the absurdity

11   of his argument.  Imminent: right here, right now.  His claim,

12   imminent: a year and a half or more?  Would anybody define

13   "imminent" as a year and a half?  Of course not.  On this point

14   alone--  The defendant has to establish all four elements,

15   every single one.  He fails right here.  There's no possible

16   way he can establish this element.

17        Let's talk about another element: no reasonable

18   legal alternative.  No reasonable legal alternative means just

19   that.  There is not one alternative.  My only choice, my only

20   choice was to violate the law.  If there's any other choice,

21   the defense fails.

22        Here, the defendant had numerous legal alternatives

23   he could have taken besides illegally entering the

24   United States.  Number one, relocated to another area of

25   Mexico.  The defendant and his wife proved this to you with

1   their own testimony.  They testified that in Yucatan, they had

2   no problems.  No threats, no cartel members after them, no

3   danger.  There's their first alternative.  Move back to

4   Yucatan.  Move away from the violence.

5           Second, they could have approached the

6   United States Embassy, Consulate, Diplomatic Mission, filed the

7   paperwork for refugee status.  The defendant's wife testified

8   that's what she was in the process of doing.

9           Or, lastly, even if they thought, for whatever

10  reason, they couldn't get asylum, the United States is not the

11  only country in North America, or Central America or South

12  America.  Canada, any of the countries in Central America, any

13  of the countries in South America.  Apply for refugee status,

14  asylum status in any one of those countries.

15          As long as you find one reasonable alternative, the

16  defense fails.  Here, you have several.  Because we have proven

17  the defendant's guilt beyond any doubt and because his defense

18  fails, I ask you to return the only possible verdict based on

19  the evidence, and that is guilty.  Thank you.

20          MR. SLOAN:  Thank you, Your Honor.  May it please

21  the Court.

22          About ten and a half years ago, I had renal cell

23  carcinoma.  It's a cancerous tumor in one of my kidneys.  Went

24  to the doctor; gave me some choices.  He said, because of where

25  it was, I could take out your kidney; operation might kill you.

1   Or leave it in; cancer will kill you.  I didn't get to choose

2   not to have cancer.  Sometimes life puts you in a situation

3   where you have no good choices.

4           And the government has proven the elements of their

5   case, I mean, as far as the illegal re-entry.  I mean, he was

6   deported; he came back.  Didn't have paperwork.  But--and we

7   talked about that in voir dire.  We talked about respecting the

8   immigration laws of our country.  But if we're going to--  We

9   don't get to be choosy about what laws we respect.  If you

10  respect the laws of immigration, you also have to respect all

11  of the law, and that includes the law of justification.  Has a

12  longer history than the law of immigration.  It's been a part

13  of our law for a very long time.  And justification based on

14  duress is just as much a part of the law that you have to

15  follow as the immigration laws are.

16          So let's talk about duress.  And the Judge has

17  given you some elements of what constitutes duress.  Was the

18  defendant under an unlawful present, imminent, and impending

19  threat of such a nature as to induce a well-grounded fear of

20  death or serious bodily injury to himself?  Well, they tried to

21  actually kill him.  So, you know--  And it's not imminent,

22  like, every day I'm walking around and someone has got a gun to

23  my head.  This is not that kind of world south of the border.

24  You know, this isn't Lubbock, Texas.  This is Mexico, and

25  things are different down there.  And it's imminent in the

1    sense is that it could happen any minute because he was

2    specifically targeted.

3              It's not a general threat.  It's not like, you

4    know, Mr. Haag talked about yesterday, well, couldn't every

5    Mexican in Acuna claim duress?  No, because none of them had

6    been specifically pointed out.  None of them had a specific hit

7    on them.  Because they thought he was DEA.  And he looks like a

8    DEA guy.  That's not his fault.  He didn't recklessly make

9    himself look like a DEA agent.  He didn't--  You know, he got

10   himself a German Shepherd.  And, you know, I thought about

11   this.  There's really nothing he did.  He didn't engage in any

12   kind of criminal activity, didn't join any conspiracy with

13   them.  He just looked the way he looked.  And that's not

14   placing himself in that situation.

15             Did he have a reasonable legal alternative to

16   violating the law?  And, you know, Mr. Haag put up a bunch--

17   asylum and going to Canada--which I don't know how you get to

18   Canada without going through the U.S.--or going south to South

19   American countries where the drugs come from.  I don't think

20   these are reasonable legal alternatives, because--  When I was

21   a kid, I used to do these carpentry deals with my dad, and he

22   said, when you measure wood, you have to think in inches, not

23   yards.  I was, like, okay.  Never understood what that meant

24   because I was a kid.

25             But, you know, the government is thinking in yards

1    here, because these--  The Judge's instruction to you is that

2    the alternatives have to be reasonable, not fantasy, not things

3    that take months when the threat is not in months.  You know,

4    applying to asylum--  Well, okay.  First of all, immigrating to

5    Canada, again, geographically, not easy to do.  But suppose you

6    could get there, so then he's breaking Canada's law by getting

7    into that country, unless he goes through the lawful

8    immigration process, which takes months, and he's a guy who is

9    hiding out at a friend's house from church, afraid to open the

10   front door.  So how does he go down to the Visa office?  How

11   does he go down the street?  How does he--  You know, these are

12   not reasonable--these are not reasonable alternatives, because

13   they're physically not reasonable for him to do.  They sound

14   great.  Seek asylum.  Go to the American Consulate and seek

15   asylum.

16          They don't have asylum houses down there.  They

17   don't have safe houses where people seeking asylum get to stay.

18   You go down to the asylum office, you fill out a paperwork and

19   say, "I want asylum," they say, "Okay, go back home, we'll let

20   you know."  That can take weeks, months, years before they let

21   you know.  In the meantime, that threat hasn't gone away.

22   You're still living right where you were living.  If there were

23   asylum houses--  You know, talk about expert witnesses.  I

24   brought in Mr. Barrientos, who's a former Border Patrol expert,

25   spent a lot of time on the border, and he told you what it's

1    like down there.

2           And if the government wanted to say it's not like

3    that down there, they have their own expert witness, Mr. Felps,

4    who's sitting right here, sat here through the whole trial, and

5    he could have got up and said, "You know what, I've been on the

6    border for 20 years, and Mr. Barrientos isn't saying how it

7    is."  But he didn't.  They have their own immigration expert

8    right here.  If they wanted to say, "Oh, well, you know, he

9    could have really got asylum," they could have brought him up

10   and said, "You know what, here's how he would have done it,"

11   but they didn't, because he can't.

12          And again, that's yards.  That's long thinking when

13   the time is short.  That's the problem with every one of these

14   alternatives they bring up.  They have already tried to shoot

15   him in the street.  They tried to kill him.  And that changes

16   things.  And so when we're talking about, well, he got to move

17   around in Yucatan all he wanted to, that was way before.  That

18   was before they picked him out.  That was before they had

19   targeted him.  Of course he could move around Yucatan all he

20   wanted, because this is the difference between a general threat

21   and a specific threat.

22          A general threat, that's the threat everybody in

23   Mexico lives under.  And you know what, I bet you there's

24   places in Mexico where the people live boring and safe lives.

25   I bet you there are places in Mexico, you know, the gated

1   communities and the expat communities, the tourist communities

2   where everything is fine.  But underneath that, there's this

3   corruption, this abyss.  And it's not until you get drawn into

4   that that the threat becomes specific to you.

5         I can't imagine the just plain evil that would be

6   involved in a busload of kids--  I had a good friend of mine

7   who was a Jewish lawyer, and he once said to me--he was an

8   Orthodox Jew.  He's got the beard and the hat.  And he once

9   said to me, "You know, there has to be a limit on how bad

10   people can be to each other."  And, you know, one of the things

11   I saw in this case is that there's not.

12         And so when we talk about the imminence of the

13   threat--  This is not something without parallel in the

14   American experience, you know.  In the 1940's, 1950's, the big

15   thing was the Mafia in New York.  If you ratted on the Mafia,

16   they would come to find you wherever you were and they would

17   kill you.  And that was an imminent, present threat.  Even

18   though there wasn't a Mafia car in front of your house every

19   day, that's an imminent, present threat, and you have to act to

20   avoid that.

21         And, you know, when he talked about the people that

22   live the normal lives in Mexico and that don't encounter the--

23   that's what Mr. Marin was the first time that he ran into these

24   guys.  And, you know, they took him in a house and they made

25   him strip off his clothes.  Can you imagine?  I would have run

```
1    right there.  That's when I would run.  It's just surreal the

2    way things are down there, the things that happen.  It's like

3    an alternate reality.  And that is the way it is.  It's

4    uncontroverted from Mr. Barrientos that that's how it is.

5              And Mr. Haag wanted to argue about, well, they

6    could have gone to the cops.

7              And Mr. Barrientos says, 90 percent of them are

8    corrupt.

9              Well, are you sure it's 90 percent?  Well, what if

10   it's only 50 percent?

11             I mean, if you put a gun to your head, does it

12   matter if there's only three bullets or five?  You're still

13   putting a gun to your head.  Going to the police in Mexico is

14   not an option.  It's not even--it's not at all reasonable.

15             I thought about, you know, the reason he got picked

16   out.  And from the Mexican Mafia guy's point of view, it makes

17   a lot of sense, really.  I mean, he looks military.  Every

18   morning, he's out walking a police dog around the neighborhood

19   where their criminal activities are going on.  I mean, he

20   doesn't have a steady job.  He doesn't speak good Spanish.  His

21   Spanish is like he's from America.  He has a military bearing

22   in the way he walks.  He looks like a federal agent.  To the

23   Mexican criminals running these neighborhoods, he fits a

24   profile, kind of a reverse profile.  Right?  I mean, we talk

25   about police profiling people.  They profiled him, except it's
```

1   not a case where it's like due process and you get to prove

2   you're not a federal agent.  It's like you--  And I don't know

3   who started the rumor at the first place he lived at.  But once

4   that rumor got attached to him, then his days in Mexico were

5   numbered.  I mean, that's the reality.  There was some--  You

6   know, from the Mexican gang point of view, it's, like, okay, we

7   think he's a federal agent; we'll make him run some dope.  You

8   know, we know his wife crosses the border; maybe we'll make a

9   little money that way.  He can prove he's not a federal agent.

10          And then suddenly some stuff starts happening in

11  Acuna.  Government raids.  And interesting, minutes after they

12  do this deal where they try to chase her and block her in at

13  the house, a gunfight breaks out in the street between

14  government officials and these cartel guys.  What are they

15  supposed to think?  She called it in.  Who is he and how come

16  the GATE, a paramilitary organization from the government,

17  shows up months after he arrives and start hitting specific

18  targets in Acuna?  Because he's tipping them off.  Right?

19          But he's not.  But that's why he fits the profile,

20  and that's why the duress changes.  It's no longer this sort

21  of, like, we'll see what we can get out of him.  It's, like, we

22  know who he is, and that's when they say he has to die and they

23  try to kill him in the street.

24          And he goes from there--he doesn't--I mean, he goes

25  home--I don't know--he goes home, gets some stuff, and he goes

1    and stays at his friend's house from church, hiding out, afraid

2    to go out the front door.  That's not--  And, you know, these

3    weekend visits--she didn't say she went down every weekend

4    and--she says maybe every weekend and--  You remember the

5    testimony the way you remember it.  But from the time after

6    that shooting happened until the time she went and got him,

7    there weren't visits happening then.

8              And as far as that address on the identification

9    card, they applied for that address, you know, months before

10   this stuff started happening.  So, you know, that's not like,

11   oh, well, then maybe they weren't really scared.  They were

12   really scared, and they had every reason to be scared.

13             Even the government's DEA guy--I mean, the

14   government's immigration guy, he knows about the DEA guy, Kiki

15   Camarena.  He knows what happened.  He was tortured and killed,

16   like other DEA agents in Mexico have been killed, like

17   immigration officers have been killed, like hundreds of Mexican

18   nationals have been killed.  There are mass graves in Mexico.

19   It's not the reality that we experience here.

20             So Mr. Haag talked about credibility of the

21   witnesses.  And, okay, so how do we--  I'll tell you this.  As

22   far as the elements of duress, if Rafael and Bibiana are

23   telling the truth about what happened in Mexico, they were

24   absolutely under duress.  That's--I mean, that's the truth.  So

25   how do we tell if they're telling the truth?  Well, sometimes

1    it's easy.  I know Bibiana is telling the truth, and you know

2    it too, for two reasons.  Number one, she admitted to smuggling

3    him across the border.  That's a crime.  And if the two of them

4    had cooked up some kind of story, she wouldn't have come in

5    here and told you that.  She got on the stand under oath and

6    admitted to committing a federal felony because she was telling

7    you the truth.  That's litmus test number one.

8             Number two, they stopped at a park.  And the

9    government is going to say, well, that shows they weren't

10   really scared or weren't really--  But, I mean, think about it.

11   You escape a place where you're worried about death.  You get

12   across the border; you get through the checkpoint.  Imagine the

13   relief.  Stopping at a park makes perfect sense.

14            And the fact that--I mean, if they had cooked up a

15   story, there wouldn't have been any stopping at a park.  And, I

16   mean, you saw her on the testimony.  She screwed up her dates,

17   and there were inconsistencies between what they perceived.

18   The first house was, like, she heard that the rumors--there

19   were people asking her questions about him being a federal

20   agent.  He didn't hear that.  If they had cooked this thing up

21   together, their stories would be lockstep together.

22            But I thought about it.  It makes perfect sense

23   that she would have heard about it and he wouldn't have.  They

24   wouldn't be asking him.  They would be asking her.  So the

25   inconsistencies make sense, but if they had cooked it up, they

```
 1   wouldn't make sense.
 2          As for Rafael, you know, they had a big argument
 3   about what happened in 1996-97.  Yeah, he blames the California
 4   Department of Corrections, blames the immigration people,
 5   thought it was unfair, whatever.  Who cares?  Has nothing to do
 6   with this case.  But it matters to him, so he made a big deal
 7   out of it.  Was he honorably discharged?  Did he have a general
 8   discharge?  Matters to him, so he wanted to argue about that,
 9   and--because it was important to him.  That shows you his
10   earnestness.  He's putting himself out--  He said, I relapsed
11   into alcohol.  You know, he's putting himself out there.  This
12   is the way it is.
13          There's things about what happened in Mexico that--
14   You know, first of all, what he describes dovetails with what
15   Mr. Barrientos described as the culture down there.  He said,
16   yeah, the conduct, the trying to get her to run stuff across
17   the border, the searching of the house, all these things match
18   the way that Mr. Barrientos says things happen down there.  And
19   if the government wants to say that's not how they happen,
20   here's the guy.  He can come in and say it didn't happen that
21   way; that's not really the way it is.  But it is that way.
22   They know that because they have lost people.
23          The fact that the guys say "Dea" instead of D-E-A,
24   which if you just write the word "D-E-A" and then you pronounce
25   it in Spanish, Dea.  But they--that's how they say it.  They
```

1    say Dea.  I mean, that's a detail that you wouldn't know if you

2    hadn't brushed into that.

3         The fact that they say "plomo or plata," which I

4    didn't know what that meant before this case.  You know, plomo

5    is the lead; plata is the silver.  You know, you get the bribe

6    or you get the bullet.  I thought it was interesting they

7    talked about plomo or plata, because when you're talking about

8    bribes, who do you bribe?  You bribe officials.  You bribe

9    police.  The fact that they offered him plomo or plata tells

10   you they thought he was police of some kind.

11        The strangeness, the way he described the first

12   encounter.  You know, "At first, I thought these guys were just

13   construction workers; then I thought they were kind of bullies

14   intending to rob me, and I told them I didn't have a job."  You

15   know, that's--there's nothing dramatic about it.  It's just

16   kind of weird.  And I think, you know, the weirdness of it

17   tells you that it's truthful.  Not that--  You know, because if

18   he was making it up, there would be drama, there would be, oh,

19   you know, machine guns and, you know, scary scuff, and it was

20   really just this weird scary encounter that he had.

21        And knowing what I know now about Mexico, it's a

22   miracle he got out of there.  But to a mind like a tourist,

23   which is what he had when he went down there, like an American

24   tourist in Mexico, it was just this weird thing that was

25   happening.  "DEA, and then they said FBI, and then I realized

1  what they were asking me."

2            THE COURT:  You've got one minute.

3            MR. SLOAN:  If they told the truth about what

4  happened in Mexico--and I think they did--then they were under

5  duress, and I can't get worked up about someone doing exactly

6  what any one of us would do in their shoes, and I don't think

7  you should either.  They told the truth.  He's not guilty,

8  because the law of justification is just as much the law as the

9  immigration laws, and the judge has instructed you to follow

10  that law, and I would ask you to do that.  Thank you.

11            MR. LONG:  May it please the Court.

12            THE COURT:  Yes, sir.

13            MR. LONG:  Counsel.

14            Mr. Sloan would never ask you to judge someone for

15  doing the very thing that he would do, but he just told you--

16  and I hope you caught it.  This is important.  He just told you

17  that being strip-searched and having a gun pointed at you,

18  flashed at you, who knows, being strip-searched by the cartel--

19  you know it's the cartel--this is all coming to you so quickly,

20  it's so terrifying.  Mr. Sloan, a reasonable man, he would have

21  been gone.

22            So what does it say that if a reasonable man would

23  see that situation, experience that, and be gone immediately,

24  what does that sound like?  That sounds like an impending,

25  immediate threat where you're not able to think about it,

 1    you're not able to come up with a plan.  You have to react.

 2    And that's what duress is for, for reasonable people put in

 3    those situations.

 4            So what does it say when this defendant doesn't do

 5    that?  Either you have to disbelieve that that ever happened,

 6    or you have to believe that, if it did happen, he didn't

 7    perceive it as such a threat that he would go home, gather his

 8    family, send them across the border where they go every day,

 9    and then follow them as soon as he could.

10            We now know how he crossed the border.  They could

11    have done it that way, the same way they did it, by having him

12    smuggled across in their family vehicle, if that's what really

13    happened.  I submit to you that's suspect.  That is suspect,

14    how an adult male would be able to sit in the back of the

15    vehicle and cross the border undetected after it going through

16    two checkpoints.  Maybe that's how it happened.

17            I want to pose to you a scenario.  You're at your

18    office, you're at the grocery store, and some nefarious

19    character comes up to you; you think they're a gang member.

20    And they say, "I know where you work, know where your kids go

21    to school, and you're going to rob this bank.  If you don't do

22    it, bad things are going to happen."

23            Now, as Mr. Sloan has just stated, as I have just

24    explained to you, a reasonable person, when they're allowed to

25    get out of that situation, gets as far away from that situation

 1    as they can.  Right?  Reports it, does something.

 2            Let's say you don't do that.  Let's say you go home

 3    and you tell your wife or your husband or whoever it is, "These

 4    people approached me at the supermarket and they said they know

 5    where we live, they know where our family is.  They're going to

 6    harm us if we don't rob this bank."

 7            So y'all talk about it and say, well, that seems

 8    kind of suspicious.  No real, I guess, grave concern because

 9    you don't leave immediately and you don't report it to the

10    authorities.  So you talk about it a little bit more.  We've

11    got to find a way out of this situation.  Maybe it's not for

12    real, who knows.

13            Eventually you find a place for your wife and

14    children to go.  They are out of harm's way.  They have left

15    the country.  They should be out of the reach of these bad men.

16    But you're under such an impending threat and danger that you

17    had your wife leave, that you're okay with her coming and

18    visiting you every weekend, every weekend to be in the same

19    environment, the same situation where they have just been

20    threatened.  So either you don't perceive the threat as really

21    being that serious, or it didn't happen.

22            Ultimately the gang members approach you again, and

23    let's say you think they try to shoot at you.  Shootings happen

24    a lot, let's say, in your neighborhood, but you think they try

25    to shoot at you, and somehow you get away from this very

1    effective gang that builds mass graves.  You talk to your wife

2    over the phone where she's at in this other country and you

3    say, hey, this bad thing is happening, but it's okay, please

4    still come visit me, everything is okay.  Please bring the

5    kids, in fact.  Keep doing what you're doing, come visit.

6    We're going to have to come up with a plan to get me out of

7    here or a plan to rob the bank.

8            Let's say ultimately you decide, we better rob this

9    bank; we're being forced to do it.  So you go and rob the bank.

10   You get away with the bank robbery and you take the spoils back

11   to your home, and months and months and months pass.  And as

12   officers come to your home for various reasons, you sit on the

13   spoils of the bank robbery, at no point ever mentioning it.

14           You're guilty of bank robbery.  You've robbed a

15   bank.  But you've got a valid duress claim.  Right?  They

16   forced you to do it.  But you never at all mention it to the

17   authorities.  It's only when they find out you're the bank

18   robber that you say, okay, you got me, but here's why I did it.

19           That may sound a little foolish to you.  That may

20   sound like that doesn't really sound like a duress claim, and

21   you would be right.  Because you can't get caught for

22   committing a crime and say "so-and-so made me do it" and then

23   just get to walk away.  That's not how it works.  Duress is

24   a high standard, and it applies to the defense.  And the

25   defense has to prove each of these four elements.  If they fail

1   on any of these, it is not duress.

2              So when you look at the first one, unlawful

3   present, imminent, impending threat of such a nature as to

4   induce a well-grounded fear of death or serious bodily injury

5   to himself, when you look at that, even if you assume all the

6   things that happened to Mr. Marin-Pina happened, how impending

7   is it when he tells you, I was able to run away from the--I was

8   able to run away from them when they strip-searched me.  I went

9   back to the home where they know I lived, talked about it with

10  my wife, we kept on business as usual.  Months and months

11  later, I get shot at.  We talk about it on the phone, but

12  again, I don't think the threat is so impending that I think

13  you shouldn't come visit me and bring the kids.

14             It's only until, by his own statement, a month and

15  a half, several weeks later that they come up with the plan to

16  have him ride in the vehicle.  Again, the same vehicle where

17  the cartel is supposedly watching these border crossings, the

18  same vehicle they watched her take the kids to school in.  If

19  they're so hot to get this guy, would it not have been easy for

20  the cartel to follow his family to the residence where he was

21  staying.

22             How imminent is that threat when he has escaped and

23  is sitting there and has time to come up with a plan on how

24  he's going to break the law?  The truth is, this element goes

25  to the idea if you have time to come up with a plan on how

1    you're going to best break the law, it can't be duress.  I am

2    going to disagree with Mr. Sloan.  If everything Mr. Marin

3    tells you is the truth, that is not duress because of this

4    first element.  Even if it's true, no duress.

5         The second states that he had not recklessly or

6    negligently placed himself in a situation.  You can argue they

7    moved to Acuna, put themselves in that situation.  You can

8    argue he stayed there when he had the opportunity to leave.

9    You don't even have to reach that.  But he was in the situation

10   because of choices he had made.  There's no doubt about it.

11        Third, the defendant had no reasonable legal

12   alternative.  We kind of had these ethereal ideas of asylum,

13   refugee status, could he go to other parts in the country,

14   would he be able to make it to Yucatan, a place he's familiar

15   with and has connections.

16        Here's what we know.  He was threatened.  How did

17   he respond to that threat?  He went to a neighbor's house and

18   laid low--not a neighbor's house.  He went to a friend's house

19   and laid low.  There's your reasonable legal alternative.

20        THE COURT:  You have got one minute.

21        MR. LONG:  Thank you, Your Honor.

22        He went to a friend's house and laid low.  And I

23   asked him specifically, what threats did you receive from the

24   cartel while at the neighbor's house?  None.  You know he had a

25   reasonable legal alternative.  He was able to go to the

1    friend's house.  You don't think the friend could take him

2    anywhere he needs to go, the friend who would let him use his

3    address, buy him a bus ticket, send him anywhere he can

4    lawfully go, which is everywhere but the United States,

5    everywhere but the United States.  He fails on that ground as

6    well.

7            The fourth ground, a reasonable person would

8    believe, by committing the action, he would directly avoid the

9    harm.  He told you he still feels threatened today because the

10   cartel is here.  By his own statement, coming here didn't even

11   cure him of his problems.  So he could have gone anywhere else,

12   because the cartel is everywhere.

13           Ladies and gentlemen, he's been proven guilty of

14   illegally re-entering the country.  The duress claim fails.  We

15   ask you to find him guilty.

16           THE COURT:  Members of the jury, if you would,

17   please, retire to the jury room.  I'll send back to you the

18   charge, along with the exhibits.

19           All rise for the jury.

20      (DELIBERATIONS COMMENCE AT 9:50 A.M.)

21   -------------------------------------------------

22      (VERDICT RETURNED AT 10:10 A.M.)

23           THE COURT:  Be seated, please.

24           All right.  Has the jury reached a verdict in the

25   case?

1           JURY FOREPERSON:  We have, Your Honor.

2           THE COURT:  Is that verdict unanimous?

3           JURY FOREPERSON:  It is.

4           THE COURT:  All right.  If you would hand it to the

5      marshal.

6           All right, Counsel.  Follow along as I read the

7      verdict.

8           "We, the jury, find the defendant, Rafael Antonio

9      Marin-Pina, guilty as charged in the indictment."

10          The verdict form is signed by Kerry Siders,

11     foreperson.

12          Does either side wish the Court to canvass the

13     jury?

14          MR. LONG:  No, Your Honor.

15          MR. SLOAN:  No, Your Honor.

16          THE COURT:  All right.  The Court then will accept

17     the verdict of the jury.

18          Members of the jury, thank you very much for

19     serving in this case.  You are now excused from any further

20     service.

21          All rise for the jury.

22       (THE JURORS EXIT THE COURTROOM)

23          THE COURT:  All right.  Be seated, please.

24          I'm going to order a presentence investigation.

25     Mr. Marin, you have the right to have your attorney present at

1   the time that you're interviewed by the probation officer.

2          Court will stand adjourned.

3       (END OF TRIAL)

4                          * * * * *

5

6       I, Mechelle Daniel, Federal Official Court Reporter in and
    for the United States District Court for the Northern District
7   of Texas, do hereby certify pursuant to Section 753,
    Title 28, United States Code, that the foregoing is a true and
8   correct transcript of the stenographically reported proceedings
    held in the above-entitled matter and that the transcript page
9   format is in conformance with the regulations of the Judicial
    Conference of the United States.

10

11   *s/ Mechelle Daniel*          **DATE** JUNE 13, 2016

12   MECHELLE DANIEL, CSR #3549
    FEDERAL OFFICIAL COURT REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25